## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| AMERICAN MULTI-CINEMA, INC., | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 8:25-cv-292 |
| | ) | |
| WOODSONIA HWY 281, LLC, | ) | |
| | ) | |
| GREGORY C. SCAGLIONE, | ) | |
| | ) | |
| CITY OF GRAND ISLAND, NEBRASKA, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| COMMUNITY REDEVELOPMENT | ) | |
| AUTHORITY OF THE CITY OF GRAND | ) | |
| ISLAND, NEBRASKA, | ) | |
|     Defendants. | ) | |

## COMPLAINT
JURY TRIAL DEMAND

American Multi-Cinema, Inc. ("AMC"), by and through counsel, states as follows for

its causes of action against Defendants Woodsonia Hwy 281, LLC, Gregory C. Scaglione,

City of Grand Island, Nebraska; and Community Redevelopment Authority of the City of

Grand Island, Nebraska.

## NATURE OF THE CASE

1.      This is an action for damages arising from Defendants' wrongful conduct in

improperly terminating AMC's lease to occupy and operate a movie theater at the

Conestoga Mall in Grand Island, Nebraska; wrongfully evicting AMC from its leased

premises; and violating AMC's constitutional rights under the Fifth and Fourteenth

1

Amendments to the United States Constitution by taking AMC's leasehold interest without just compensation.

2.     AMC seeks damages including but not limited to the lost value of its leasehold interest; lost profits, relocation and rebuilding expenses, and other direct and consequential damages flowing from Defendants' misconduct; punitive damages; and attorneys' fees and costs.

## PARTIES, JURISDICTION, AND VENUE

3.      Plaintiff AMC is a Missouri corporation with its principal place of business at 11500 Ash Street, Leawood, Kansas 66211.

4.     Defendant Woodsonia Hwy 281, LLC ("Woodsonia") is a Nebraska limited liability company with its principal place of business at 20010 Manderson Street, Suite 101, Elkhorn, Nebraska 68022. On information and belief, all members of Woodsonia are Nebraska citizens.

5.     Defendant Gregory C. Scaglione ("Scaglione") is an attorney licensed to practice law in the State of Nebraska. On information and belief, Scaglione is a Nebraska citizen.

6.     Defendant City of Grand Island, Nebraska (the "City") is a Nebraska municipal corporation located in Hall County, Nebraska.

7.     Defendant Community Redevelopment Authority of the City of Grand Island, Nebraska (the "CRA") is a political subdivision of the City formed for the purpose

2

of exercising the powers and functions authorized under Nebraska's Community

Development Law, Neb. Rev. Stat. §§ 18-2101 *et seq.* (the "Act").

8.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)

because Plaintiff AMC is a citizen of Missouri and Kansas and all Defendants are citizens

of different states, and the amount in controversy exceeds $75,000, exclusive of interest

and costs.

9.    This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 and

28 U.S.C. § 1343 because AMC's cause of action arises under 42 U.S.C. §1983 and the

Fifth and Fourteenth Amendments to the United States Constitution.

10.    Venue in this district is proper under 28 U.S.C. § 1391(b).

**LEASE FOR OPERATION OF A MOVIE THEATER AT THE SHOPPING CENTER**

11.    This dispute arises from the redevelopment of the Conestoga Mall in Grand

Island, Nebraska (the "Shopping Center") by Woodsonia, the City, and the CRA, acting

together with and through their shared attorney, Scaglione.

12.    In July 2003, AMC's predecessor-in-interest, Dickinson Theatres, Inc., and

Woodsonia's predecessor-in-interest, Conestoga Mall 2002, LLC, entered into a lease

agreement ("Lease") for the operation of a movie theater at the Shopping Center. *See*

*generally* Lease, attached as **Exhibit 1**.

13.    The Lease defines the "Demised Premises" as the physical portion of the

Shopping Center to be occupied by the tenant under the Lease, specifically "[s]tore number

3

B-24, B-25, B-26, B-28 and ST-30 of the Shopping Center ... containing approximately 17,000, square feet." *See* Lease, Ex. 1, § 1.1 (emphasis omitted) and Exhibit A to Ex. 1.

14.    The original term of the Lease ran through December 31, 2018, with an option for the tenant to extend for two additional five-year terms. *See* Lease, Ex. 1, §§ 1.3 and 1.3.1; Lease Amendment Agreement, attached as **Exhibit 2**.

15.    In 2015, through a series of mergers and acquisitions, AMC became the tenant under the Lease. *See* Letter dated December 17, 2015, attached as **Exhibit 3**.

16.    In June 2017, Conestoga Mall 2002, LLC, assigned all of its interests under the Lease to Conestoga Realty LLC and Conestoga Nassim LLC. *See* General Assignment and Assumption dated June 9, 2017, attached as **Exhibit 4**.

17.    In November 2017, AMC gave notice that it was exercising its first option to extend the Lease through December 31, 2023. *See* Letter dated November 16, 2017, attached as **Exhibit 5**.

18.    In April 2023, AMC gave notice that it was exercising its second option to extend the Lease through December 31, 2028. *See* Letter dated April 3, 2023, attached as **Exhibit 6**.

19.    Until the events described below, and even in the face of the tremendous challenges brought on by the global COVID-19 pandemic, AMC successfully operated a movie theater at the Shopping Center without major incident under the Lease.

## WOODSONIA SEEKS GOVERNMENTAL POWER
## TO REDEVELOP THE SHOPPING CENTER

20.     In early 2022, Woodsonia began the process of purchasing the Shopping Center and acquiring the prior landlord's rights and obligations under all associated leases, including the Lease. These transactions were consummated in early March 2023. *See* Assignment and Assumption Agreement dated March 1, 2023, attached as **Exhibit 7**; Special Warranty Deed, attached as **Exhibit 8**.

21.     As part of its plans to redevelop the Shopping Center, Woodsonia commissioned two blight studies to be performed on the Shopping Center for purposes of redevelopment under the Act. The City approved and adopted the blight studies on November 8, 2022.

22.     On Woodsonia's application, the CRA prepared a redevelopment plan ("Redevelopment Plan") for the Shopping Center project. *See* Redevelopment Plan, attached as **Exhibit 9**.

23.     On November 16, 2022, the CRA recommended that the City approve and adopt the Redevelopment Plan. As part of the CRA's recommendation and in accordance with § 18-2114 of the Act, the CRA found and determined that the land interests to be acquired in accordance with the Redevelopment Plan "will not be acquired by the [CRA] … [and] the method of acquisition of real estate shall be by private contract by [Woodsonia] and not by condemnation …." *See* CRA Resolution 416, attached as **Exhibit 10**.

24.     On November 22, 2022, the City approved and adopted the Redevelopment Plan and authorized the execution of a redevelopment contract by and between the City, the CRA, and Woodsonia for the purpose of implementing the Redevelopment Plan. *See* City Resolution 2022-341, attached as **Exhibit 11**; City Resolution 2022-374, attached as **Exhibit 12**; City Resolution 2022-352, attached as **Exhibit 13** (attachment to exhibit omitted).

25.     The final redevelopment contract ("Redevelopment Contract") by and between the City, the CRA, and Woodsonia was executed on February 28, 2023. *See* Redevelopment Contract, attached as **Exhibit 14**.

**WOODSONIA MAKES AN OFFER TO BUY OUT AMC'S LEASEHOLD INTEREST**

26.     While Woodsonia has claimed that between September 2022 and March 2023, it made a number of attempts to negotiate an amenable buyout of the Lease with AMC, it would be more accurate to state that during that time period, Woodsonia made several attempts to convince AMC to take the one low offer that it made to buy out AMC's leasehold interest.

27.     On March 8, 2023, Woodsonia (through its attorney Scaglione) sent AMC a letter stating that the redevelopment of the Shopping Center "will require AMC to quickly vacate the [Demised] Premises [and] AMC's Lease will need to be terminated with AMC permanently relocating to a different location." *See* Letter dated March 8, 2023, attached as **Exhibit 15**, at p. 2.

28.    Woodsonia further stated that if the parties "are not able to quickly reach an amicable and reasonable settlement regarding the mutual termination of AMC's Lease, Woodsonia believes the governmental authorities will be disappointed and will then have to pursue a total taking of AMC's leasehold interest" by eminent domain. *See* Letter dated March 8, 2023, Ex. 15, at p. 5.

29.    In its letter, Woodsonia claimed that it had the right under the Lease as landlord to convey to the condemnor AMC's leasehold interest as tenant—without any requirement that Woodsonia also convey to the condemnor its own fee interest as owner of the Demised Premises. *See* Letter dated March 8, 2023, Ex. 15, at pp. 3–4.

30.    In support of its supposed power to give away AMC's leasehold interest while retaining its own fee interest in the Demised Premises, Woodsonia cited to Article XV of the Lease, entitled "Eminent Domain," which includes the following provisions:

15.1    <u>Taking</u>. If the Demised Premises, or a substantial part thereof, shall be taken in eminent domain, or conveyed under threat of condemnation proceedings, then this Lease shall forthwith terminate and end upon the taking thereof as if the original term provided in said Lease expired at the time of such taking .... If only such part or portion of the Demised Premises is taken which, in Landlord's ***reasonable*** opinion, would not substantially and materially interfere with or adversely affect the business of the Tenant conducted at the Demised Premises, then Landlord, at Landlord's option ... may repair, rebuild, or restore the Demised Premises and this Lease shall continue in full force and effect. If, however, because of such taking of the Demised Premises, in Landlord's ***reasonable*** opinion, should be rendered untenantable or partially untenantable, then the Base Rent, or a portion thereof, shall abate in proportion to the portion of the Demised Premises rendered untenantable until the Demised Premises shall have been restored.

....

7

> 15.5 <u>Transfer of Landlord's Interest to Condemnor</u>. Landlord may, without any obligation or liability to Tenant, agree to sell and/or convey to the condemnor the Demised Premises, the Shopping Center or any portion thereof, sought by the condemnor, free from this Lease and the rights of Tenant hereunder, without first requiring that any action or proceeding be instituted or, if instituted, pursued to a judgment. In such event, this Lease shall be deemed terminated effective the date of such transfer.

*See* Letter dated March 8, 2023, Ex. 13, at pp. 3–4; *see also* Lease, Ex. 1, **§§** 15.1 to 15.5 (emphasis in original).

31.     By a separate letter also dated March 8, 2023, Woodsonia made a settlement and compromise offer to pay AMC a certain amount in exchange for a mutual termination of the Lease and release of all related claims. Woodsonia stated that the offer would remain open until March 17, 2023.

**WOODSONIA AND THE CRA PURPORT TO TERMINATE AMC'S LEASE**

32.     Meanwhile, on or about March 15, 2023, Woodsonia sought to increase pressure on AMC by, among other things, agreeing to pay the CRA's attorneys fees, expert fees, costs, and the amounts of any condemnation awards given, in the event that condemnation proceedings were needed to acquire the requisite property interests (including AMC's leasehold interest) to implement the Redevelopment Plan. *See* CRA Resolution No. 430, attached as **Exhibit 16**.

33.     The CRA retained Scaglione—the same attorney representing Woodsonia in the matter—to likewise represent the CRA "in pre-suit negotiations and during the condemnation process and proceedings and any related appeals" involving the Lease. *See* CRA Resolution No. 430, Ex. 16.

8

34.     On March 30, 2023, AMC responded to Woodsonia's March 8 letter and expressed a desire to work with Woodsonia to continue operating a movie theater at the Shopping Center during and after the redevelopment, or alternatively a willingness to reengage in settlement discussions in the event that AMC's continued operation was not viable under the Redevelopment Plan.

35.     On March 31, 2023, the CRA sent a letter to AMC—through Scaglione now acting as the CRA's attorney—advising AMC of its intent "to exercise its eminent domain powers to take AMC's entire leasehold interest," and stating that "[b]efore instituting a condemnation proceeding, the CRA is hereby pursuing good faith negotiations … and making reasonable attempts to induce settlement with AMC." The CRA offered to pay AMC a certain amount to terminate the Lease and fully surrender the Demised Premises, with the offer to remain open until April 7, 2023. *See* Letter dated March 31, 2023, attached as **Exhibit 17**.

36.     The CRA's March 31 letter addressed potential condemnation proceedings only as against AMC's leasehold interest in the Demised Premises, and did not indicate any intent to initiate condemnation proceedings against Woodsonia's fee interest in the Demised Premises.

37.     Also on March 31, 2023—the very same day the CRA notified AMC of its intent to acquire AMC's leasehold interest by eminent domain and claimed to be pursuing "good faith negotiations" prior to doing so—Woodsonia and the CRA (both represented by Scaglione) entered into an agreement purporting to transfer AMC's leasehold interest to

the CRA and terminate the Lease ("Transfer and Termination Agreement"). *See* Transfer and Termination Agreement, attached as **Exhibit 18**.

38.    In the Transfer and Termination Agreement, Woodsonia and the CRA purported to agree as follows:

> In light of the CRA's threat of condemnation proceedings [by letter to AMC dated March 31, 2023], Woodsonia hereby transfers, assigns and conveys to the CRA AMC's entire leasehold interest in the [Demised] Premises under the AMC Lease, and the CRA (as the new lessee) and Woodsonia (as the lessor) hereby mutually terminate the AMC Lease dated effective March 31, 2023.

> Further, in accordance with Section 15.2 [*sic*] of the AMC Lease, Woodsonia, without any obligation or liability to AMC, hereby transfers, assigns and conveys (free from the rights of AMC under the AMC Lease, without first requiring that any condemnation action or proceeding be instituted) to the CRA AMC's entire leasehold interest in the [Demised] Premises under the AMC Lease, and the CRA (as the new lessee) and Woodsonia (as the lessor) hereby mutually terminate the AMC Lease effective March 31, 2023.

*See* Transfer and Termination Agreement, Ex. 18.

39.    The "Demised Premises, or a substantial part thereof" as used in § 15.1 of the Lease refers to the physical portion of the Shopping Center occupied by AMC under the Lease—*i.e.*, the land and buildings held in fee by Woodsonia.

40.    The provisions in §§ 15.1 to 15.5 of the Lease operate to terminate AMC's leasehold interest in the Demised Premises if, and only if, Woodsonia's own fee interest in the Demised Premises—*i.e.*, a physical portion of the Shopping Center—is taken in condemnation proceedings or conveyed under threat of condemnation proceedings.

41.     Neither the City, the CRA, nor any other governmental entity or person purporting to act on behalf of any governmental entity ever initiated or threatened to initiate condemnation proceedings against Woodsonia's fee interest in the Demised Premises.

42.     Woodsonia's fee interest in the Demised Premises was not taken in condemnation proceedings.

43.     Woodsonia did not convey its fee interest in the Demised Premises under threat of condemnation proceedings.

44.     Woodsonia retained its fee interest in the Demised Premises.

45.     Because Woodsonia's fee interest in the Demised Premises was never taken in condemnation proceedings nor conveyed under threat of condemnation proceedings, the purported termination of AMC's leasehold interest in the Demised Premises by Woodsonia and the CRA was not authorized by §§ 15.1 to 15.5 of the Lease and was, therefore, a nullity.

46.     There are no other provisions in the Lease or any legal authority that would permit Woodsonia to simply give its tenant's contract rights (in this instance, AMC's ownership of its leasehold interest) to another party.

## WOODSONIA WRONGFULLY EVICTS AMC

47.     On April 4, 2023, Woodsonia served AMC with a three-day notice to quit, alleging AMC wrongfully remained in possession of the Demised Premises because (as described above) Woodsonia had conveyed AMC's leasehold interest to the CRA and then

11

Woodsonia and the CRA had mutually agreed to terminate the Lease. Woodsonia sought to evict AMC pursuant to the Nebraska forcible detainer statutes, Neb. Rev. Stat. § 25-21,219 *et seq. See* Three Day Notice to Quit, attached as **Exhibit 19**.

48.    AMC opposed the eviction proceedings on the grounds that County Court of Hall County, Nebraska, had no jurisdiction to resolve a title issue (*i.e.*, the dispute over AMC's title to the leasehold estate in the Demised Premises) in a forcible detainer action.

49.    AMC also opposed the eviction proceedings on the grounds that Woodsonia's and the CRA's actions purporting to convey AMC's leasehold interest and terminate the Lease were not authorized under the Lease and were ineffective, and therefore that the Lease remained in effect and AMC was entitled to continue occupying, using, and possessing the Demised Premises.

50.    On April 27, 2023, the County Court commenced a hearing on Woodsonia's forcible detainer action. The hearing did not conclude that date, but was continued to May 1, 2023.

51.    On May 1, 2023, at 1:00 p.m., the CRA held a special meeting during which it voted to go into executive (closed) session to receive an update from its attorneys regarding the status of Woodsonia's negotiations regarding certain leasehold interests (including AMC's leasehold interest) at the Shopping Center. Scaglione advised the CRA during the closed session. The CRA considered authorizing condemnation actions regarding the leasehold interests, but voted to take no action at that time. The special

meeting adjourned at 2:25 p.m. *See* Special Meeting Packet for May 1, 2023, attached as **Exhibit 20**.

52.    On May 1, 2023, at 3:00 p.m., the County Court concluded the forcible detainer hearing and ruled that it would enter an order evicting AMC.

53.    On May 4, 2023, Woodsonia blocked AMC's access to the Demised Premises. From that date forward, AMC was excluded from the Demised Premises.

54.    On information and belief, Woodsonia began demolition of the Demised Premises in May 2023, shortly after AMC was evicted, and the Demised Premises has since been entirely demolished.

55.    AMC appealed the County Court's ruling in the forcible detainer action to the District Court of Hall County, Nebraska, which affirmed the County Court.

56.    AMC appealed the District Court's ruling in the forcible detainer action to the Nebraska Court of Appeals, and the Nebraska Supreme Court on its own motion transferred the case to its docket.

57.    On March 14, 2025, the Nebraska Supreme Court issued its opinion in this matter. *See Woodsonia Hwy 281, LLC v. American Multi-Cinema, Inc.*, 318 Neb. 592, 17 N.W.3d 780 (2025).

58.    The Supreme Court held that—as AMC had argued—the question of whether AMC's leasehold interest had been validly terminated under the terms of the Lease presented a title dispute that could not be tried in a forcible entry and detainer action, and

therefore that the County Court lacked subject matter jurisdiction and was required to dismiss the action. 318 Neb. at 610–12.

59.     The Supreme Court explained that forcible entry and detainer is a limited statutory proceeding designed to speedily and summarily restore possession of real property to an owner from one who is in wrongful possession. *Id.* at 605–07. Because of the limited nature of these proceedings, when a party presents evidence of a title dispute (as AMC had), the court is divested of jurisdiction and "resort must be had not only to another tribunal but also to a different form of action." *Id.* at 608–09, 611.

60.     The Supreme Court had "no difficulty" in concluding that the dispute about whether AMC's leasehold interest had been validly terminated under the terms of the Lease presented a title question, because it would require the court to decide whether certain termination provisions in the Lease had been both triggered and satisfied. *Id.* at 610.

61.     The Supreme Court specifically rejected the lower courts' apparent conclusions regarding the Lease and/or the evidence, stating that "it is immaterial whether a court thinks the evidence is sufficient to resolve a title dispute in a forcible detainer action, because it plainly lacks jurisdiction to do so." *Id.*

62.     Because the County Court lacked subject matter jurisdiction, the District Court and the Supreme Court likewise lacked subject matter jurisdiction. *Id.* at 612. The Supreme Court vacated the judgment of the District Court and remanded the cause with

directions to vacate the judgment of the County Court and remand the cause with directions to dismiss the action. *Id.*

63.    On April 1, 2025, the District Court issued its order executing the mandate of the Supreme Court.

64.    On April 10, 2025, the County Court issued its order vacating its previous order and dismissing the action.

65.    AMC is entitled to bring the following affirmative causes of action and claims for relief against Woodsonia, Scaglione, the City, and the CRA for their individual and joint malfeasance in wrongfully terminating the Lease, evicting AMC, and depriving AMC of its leasehold interest without just compensation.

## COUNT I — BREACH OF CONTRACT
### (AGAINST WOODSONIA)

66.    AMC incorporates and realleges all previous paragraphs of this Complaint as if fully restated here.

67.    The Lease constitutes a binding and enforceable contract between Woodsonia, as lessor and holder of the fee interest in the Demised Premises, and AMC, as lessee and holder of the leasehold interest in the Demised Premises.

68.    Under the Lease, Woodsonia expressly covenanted to AMC the right to quiet enjoyment of the Demised Premises, including the right to "hold and enjoy possession of the Demised Premises and all rights granted [AMC] in this Lease during the term hereof." *See* Lease, Ex. 1, Art. XX.

15

69.    Under the Lease, Woodsonia impliedly covenanted to AMC that it would act in good faith and with fair dealing, meaning that it would refrain from doing anything which would injure AMC's right to receive any benefit of the Lease.

70.    As described above, the purported termination of AMC's leasehold interest in the Demised Premises is a nullity. Therefore, Woodsonia remains liable to AMC for its breaches of the Lease.

71.    Woodsonia breached its covenant of quiet enjoyment by, among other things, wrongfully evicting and barring AMC from the Demised Premises notwithstanding that the Lease remained valid and enforceable.

72.    Woodsonia breached its covenant of good faith and fair dealing by, among other things, conspiring with the City, the CRA, and/or Scaglione to purportedly terminate the Lease and wrongfully evict and bar AMC from the Demised Premises.

73.    As a direct and proximate result of Woodsonia's breaches, AMC has suffered and continues to suffer damages, including but not limited to the lost value of its leasehold interest; lost profits, relocation and rebuilding expenses, and other direct and consequential damages flowing from Woodsonia's breaches; and attorneys' fees and costs.

WHEREFORE, AMC respectfully requests that the Court find that Woodsonia has breached its Lease with AMC; that the Court enter judgment in AMC's favor in an amount in excess of $75,000 that will fully compensate AMC for the losses it has sustained as a result of Woodsonia's breaches; that the Court further award AMC its costs and attorneys' fees; and for any additional relief as the Court deems just and proper.

## COUNT II – WRONGFUL EVICTION
## (AGAINST WOODSONIA)

74.     AMC incorporates and realleges all previous paragraphs of this Complaint as if fully restated here.

75.     As described above, the purported termination of AMC's leasehold interest in the Demised Premises under §§ 15.1 to 15.5 of the Lease is a nullity because Woodsonia's fee interest in the Demised Premises was never taken in condemnation proceedings nor conveyed under threat of condemnation proceedings, and the Lease does not permit Woodsonia to simply give AMC's contract rights under the lease to another party.

76.     Woodsonia's eviction of AMC from the Demised Premises was wrongful because, among other reasons, at the time Woodsonia brought its forcible detainer action, the Lease was in full force and effect and AMC was entitled to continue occupying, using, and possessing the Demised Premises through the expiration of its Lease term on December 31, 2028.

77.     As a direct and proximate result of Woodsonia's wrongful eviction of AMC, AMC has suffered and continues to suffer damages, including but not limited to the lost value of its leasehold interest; lost profits, relocation and rebuilding expenses, and other direct and consequential damages flowing from Woodsonia's wrongful eviction; and attorneys' fees and costs.

WHEREFORE, AMC respectfully requests that the Court find that Woodsonia wrongfully evicted AMC; that the Court enter judgment in AMC's favor in an amount in excess of $75,000 that will fully compensate AMC for the losses it has sustained as a result of Woodsonia's wrongful eviction; that the Court further award AMC its costs and attorneys' fees; and for any additional relief as the Court deems just and proper.

## COUNT III – CLAIM FOR RELIEF UNDER 42 U.S.C. § 1983
### (AGAINST ALL DEFENDANTS)

78.    AMC incorporates and realleges all previous paragraphs of this Complaint as if fully restated here.

79.    AMC is a corporation and person entitled to sue under 42 U.S.C. § 1983 to vindicate its rights protected under the Fifth and Fourteenth Amendments to the United States Constitution, which prohibit the government from taking private property for public use without just compensation.

80.    The City and the CRA are municipal corporations and government actors subject to suit under 42 U.S.C. § 1983 for their official policies, practices, customs, and/or decisions that resulted in the deprivation of AMC's Fifth and Fourteenth Amendment rights.

81.    Woodsonia and Scaglione were willful participants in a joint action with the City and the CRA in which they conspired to deprive AMC of its Fifth and Fourteenth Amendment rights, and therefore were acting under color of law and are subject to suit under 42 U.S.C. § 1983.

18

82.     Specifically, Woodsonia and Scaglione conspired with the City and the CRA to wrongfully terminate the Lease and evict AMC—and in doing so deprived AMC of its leasehold interest without paying any just compensation, as prohibited by the Fifth and Fourteenth Amendments—as follows:

a. Scaglione represented both Woodsonia and the CRA (a political subdivision of the City) in their efforts to terminate the Lease and evict AMC.

b. Woodsonia agreed to pay the CRA's attorneys' fees, expert fees, costs, and the amounts of any condemnation awards given, in the event that condemnation proceedings were needed to acquire AMC's leasehold interest in order to implement the Redevelopment Plan.

c. On March 31, 2023, the CRA (through Scaglione) sent AMC a letter purportedly threatening to condemn AMC's leasehold interest, and claiming that the CRA was "pursuing good faith negotiations" to induce AMC to voluntarily terminate the Lease, with an offer to remain open until April 7, 2023.

d. In fact, the CRA had no good-faith intention of either voluntarily settling with AMC or of following through with condemnation proceedings against AMC's leasehold interest.

e. Instead, on March 31, 2023—the very same day the CRA sent its letter purportedly threatening to condemn AMC's leasehold interest, with a voluntary settlement offer to supposedly remain open until April 7, 2023—

19

the CRA and Woodsonia (again, both represented by Scaglione), entered into the purported "Transfer and Termination Agreement," in which they claimed that the CRA's threatened condemnation had operated to terminate the Lease in accordance with §§ 15.1 to 15.5 of the Lease, notwithstanding that Woodsonia's own fee interest in the Demised Premises was never condemned or conveyed under threat of condemnation.

f.  Also within the purported "Transfer and Termination Agreement," Woodsonia (who did not own AMC's leasehold interest in the Demised Premises) purported to transfer AMC's leasehold interest to the CRA. Woodsonia and the CRA then purported to mutually terminate the Lease.

g.  As explained above, Woodsonia's and the CRA's purported termination of the Lease was a nullity.

h.  Notwithstanding the ineffective termination of the Lease, AMC was wrongfully evicted and has been unable to occupy, use, or possess the Demised Premises—as it was entitled to do under the Lease—since approximately May 4, 2023.

83.    As a direct and proximate result of the City's, the CRA's, Woodsonia's, and Scaglione's conspiracy to wrongfully take AMC's leasehold interest without just compensation, AMC has suffered and continues to suffer damages, including but not limited to the lost value of its leasehold interest; lost profits, relocation and rebuilding

20

expenses, and other direct and consequential damages flowing from the conspiracy to deprive AMC of its constitutional rights; and attorneys' fees and costs.

84. AMC is also entitled to an award of punitive damages against Woodsonia and Scaglione for their roles in willfully or maliciously scheming to deprive AMC of its Fifth and Fourteenth Amendment rights, or doing so with reckless or callous indifference to AMC's constitutional rights.

WHEREFORE, AMC respectfully requests that the Court find that Woodsonia, Scaglione, the City, and the CRA violated AMC's Fifth and Fourteenth Amendment rights by conspiring to deprive AMC of its leasehold interest without just compensation; that the Court enter judgment in AMC's favor in an amount that will fully compensate AMC for the losses it has sustained as a result of their conspiracy; that the Court award AMC punitive damages against Woodsonia and Scaglione for their willful, malicious, reckless, and/or callous disregard of AMC's constitutional rights; that the Court further award AMC its costs and attorneys' fees; and for any additional relief as the Court deems just and proper.

**AMC DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

21

Respectfully submitted,

**LEWIS RICE LLC**

By: /s/ Thomas R. Larson
Thomas R. Larson, Mo. #26114
Ashlyn Buck Lewis, Mo. #65501
1010 Walnut, Suite 500
Kansas City, Missouri 64106
Tel:  (816) 421-2500
Fax:  (816) 472-2500
trlarson@lewisricekc.com
alewis@lewisricekc.com

*Attorneys for Plaintiff*