## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| AMERICAN MULTI-CINEMA, INC., | Case No. 8:25-cv-292 |
| Plaintiff, | |
| v. | |
| WOODSONIA HWY 281, LLC, GREGORY C. SCAGLIONE, CITY OF GRAND ISLAND, NEBRASKA, and COMMUNITY REDEVELOPMENT AUTHORITY OF THE CITY OF GRAND ISLAND, NEBRASKA, | **DEFENDANT GREGORY C. SCAGLIONE'S BRIEF IN SUPPORT OF HIS MOTION TO DISMISS** |
| Defendants. | |

Pursuant to NECivR 7.1, Defendant Gregory C. Scaglione ("Scaglione"), by and through counsel, respectfully submits this brief in support of his Motion to Dismiss Plaintiff American Multi-Cinema, Inc.'s ("AMC") Complaint (Filing No. 1), as it pertains to Scaglione in accordance with Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). AMC lacks standing, and thus this Court lacks subject matter jurisdiction, and AMC's Complaint fails to state a claim upon which relief can be granted against Scaglione. Moreover, no amendment to the Complaint could cure such pleading deficiencies relating to Scaglione.

## INTRODUCTION

In this case, AMC is seeking to bring a section 1983 action against a private attorney acting in connection with AMC's eviction from a shopping mall. There is no legal or factual basis for such a claim, and it should be dismissed.

The complaint attaches hundreds of pages of documents, all of which may be considered on this motion, and which paint a picture of AMC simply having sour grapes over its eviction. The Community Redevelopment Authority of the City of Grand Island (the "CRA") is charged

with, among other things, taking action in specified areas of the Grand Island community to remove, prevent or inhibit physical deterioration (such as blighted and substandard conditions) that will result in lower property values and create disincentives to private investment. (Filing No. 1-10). Nebraska state law expressly authorizes such action by the CRA under the Community Development Law, Neb. Rev. Stat. § 18-2101, et seq. (the "Act"). The City of Grand Island (the "City") and the CRA determined that the redevelopment of the Conestoga Mall is for the betterment of the City and surrounding communities and serves various public needs. (Filing Nos. 1-10 – 1-13). The City duly adopted a Resolution, approving an Extremely Blighted Determination Study and declaring certain property, including the leased Premises "substandard, blighted and extremely blighted and in need of redevelopment pursuant to the Act." (Filing 1-13). With the CRA's recommendation, the City approved a Redevelopment Plan and authorized the execution of a redevelopment contract (the "Redevelopment Contract") with Woodsonia Hwy 281, LLC ("Woodsonia") for the implementation of the Redevelopment Plan. (*Id*.) The Redevelopment Plan would abate the blighted and substandard conditions of the Conestoga Mall, and the City and the CRA engaged Woodsonia as the developer to assist these government agencies in that regard. (*Id*., Filing 1-14 at 41-44.)

Woodsonia reached workout agreements with all of the tenants of the Mall to terminate existing leasehold interests so as to allow for the demolish of the Mall, except AMC. From September 2022 through March 2023, Woodsonia made numerous attempts to negotiate an amenable workout with AMC to terminate AMC's Lease, without success. (Filing 1 ¶ 26.) On March 31, 2023, under threat of condemnation by the CRA, the CRA made an offer to AMC supported by a certified appraisal, which AMC never accepted. (Filing No. 1-17).

Under Section 15.1 of the Lease, if a "substantial part" of the Demised Premises—i.e., AMC's leasehold interest—is "conveyed under threat of condemnation proceedings, then this Lease shall forthwith terminate." (Filing No. 1-1 at 20-21). Under Section 15.5 of the Lease, the landlord, Woodsonia, "may, without any obligation or liability to [AMC], agree to sell and/or convey to the condemnor the Demised Premises, the Shopping Center or any portion thereof, sought by the condemnor, free from this Lease and the rights of Tenant hereunder." (*Id*. at 21). Section 15.5. continues, "In such event, this Lease shall be deemed terminated effective on the date of such transfer." (*Id*.). The CRA and Woodsonia signed a "TRANSFER AND TERMINATION OF AMC LEASE DATED EFFECTIVE MARCH 31, 2023" reflecting the operation of the Lease in this regard. (Filing No. 1-18).

Thus, under the terms of the Lease, AMC granted to Woodsonia the contractual authority (not an estate in real estate) to transfer the leasehold interest to the condemning authority. Woodsonia exercised that contractual authority and made the transfer after the condemning authority had threatened condemnation proceedings, namely, notice of the CRA's intent "to exercise eminent domain power to take AMC's entire leasehold interest." (Filing No. 1 at 20-21). Under the terms of the Lease, the Lease automatically terminated, yet AMC refused to vacate and continued to wrongfully possess the Premises. (Id.; (Exhibit A to the accompanying declaration of Greg Scaglione ("Scaglione Decl."), the Order on Forcible Entry and Detainer and Motion to Dismiss entered on May 8, 2023 in Hall County Court, Case No. CI 23-1015).

On April 4, 2023, Woodsonia served on AMC the "THREE (3) DAY NOTICE TO QUIT TO AMERICAN MULTI-CINEMA, INC. ("AMC") AND NOTICE OF TERMINATION OF AMC LEASE" pursuant to Neb. Rev. Stat. §§ 25-21,219, et seq. (the "Notice to Quit"). (Filing No. 1-19). AMC wrongfully detained, occupied, and used the Premises in violation of

Woodsonia's right to possess the Premises. (Scaglione Decl. Ex. A.) After AMC ignored the Notice to Quit, on April 14, 2023, Woodsonia filed the forcible entry and detainer action, and on May 1, 2023, the County Court ruled from the bench, granting Woodsonia's request for forcible entry and detainer. (*Id*.). On May 8, 2023, the County Court entered an Order and Writ of Execution, denying AMC's Motion to Dismiss and granting the forcible entry and detainer action. (*Id*.). Thereafter, AMC appealed to the District Court of Hall County, and on December 1, 2023, the District Court entered an Order affirming the decision of the County Court in its entirety finding that "the Lease is unambiguous, [and] allowed Woodsonia to transfer AMC's leasehold interest, and the transfer terminated the Lease. . ." (Scaglione Decl. Ex. B, Order entered on December 1, 2023 in Hall County District Court, Case No. CI 23-406 at 10.) The District Court also found that Woodsonia proved that events occurred triggering the Lease condemnation termination clause.  (*Id.* at 11.)

Both the Hall County Court and the Hall County District Court are the only courts to rule on the unambiguous language of §15 of the Lease, and both found that Woodsonia indeed had the private contractual right to transfer AMC's leasehold interest to the CRA and that by virtue of §15.5, the Lease then terminated effective on the date of the transfer. (*Id*.). Finding a jurisdictional question of first impression, the Nebraska Supreme Court held the application of §15 of the Lease presented a title issue, not a contract issue, so the Hall County Court had no jurisdiction. (Scaglione Decl. Ex. C, the Opinion entered on March 14, 2025 in Nebraska Supreme Court, Case No. S-24-0004 at 13, 21). Without jurisdiction, the Supreme Court reversed the eviction judgment, but not on the merits of Woodsonia's contract rights. (*Id*.). Before Woodsonia could institute a proceeding in the Hall County District Court (which had already upheld the Hall County Court's opinion that the Nebraska Supreme Court vacated

because the county court lacked jurisdiction), AMC filed this action, presumably to avoid litigating the issue again in Hall County and to avoid the mandatory arbitration provision in the Lease.

## APPLICABLE MOTION TO DISMISS STANDARDS

### Standard for the Rule 12(b)(1) Motion Based Upon Lack of Subject Matter Jurisdiction

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'" *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 408 (2013). An essential element of justiciability under Article III is that a party must have standing to sue. *Id.* All courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). And "[t]he objection that a federal court lacks subject-matter jurisdiction, see Fed. Rule Civ. Proc. 12(b)(1), may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Id.* at 506. Standing is a threshold question that must be addressed before the merits of a case because, without it, judicial power ceases beyond recognition of its absence and dismissal of the case. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998); *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007) ("We have stated numerous times that "standing is a 'threshold inquiry' that 'eschews evaluation on the merits.'").

A plaintiff in federal court must meet Article III standing requirements irrespective of whether the underlying claims are based in federal or state law. *See In re Guidant Corp. Implantable Defibrillators Products Liability Litigation*, 484 F.Supp.2d 973, 982 (D. Minn. 2007). "To satisfy the requirements of standing, a plaintiff must (1) allege to have suffered an injury in fact, (2) establish a causal relationship between the defendant's conduct and the alleged injury, and (3) show that the injury would be redressed by a favorable decision." *Subramanian v. Tata*

*Consultancy Servs. Ltd.*, 352 F.Supp.3d 908, 915 (D. Minn. 2018) (citing *Lujan v. Defendants of Wildlife*, 504 U.S. 555, 560-61 (1992)). This inquiry is determined based on the facts that existed at the time the complaint was filed. *Id.*

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). That is not present here. "Article III standing cannot be waived by the parties, nor can litigants consent to have the Court issue a non-binding advisory opinion." *Stewart v. City of Red Wing*, 554 F.Supp. 2d 924, 930 (D. Minn. 2008) (citing *Sierra Club v. Robertson*, 28 F.3d 753, 757 n. 4 (8th Cir. 1994)).

"The real party in interest requirement, […], focuses on ensuring that the proper plaintiff is prosecuting the claim, i.e., that the plaintiff is the person who possesses the right to be enforced." *Hamilton v. Credit Bureau Servs.,* No. 8:20CV141, 2020 WL 5593885 (D. Neb. Sep. 18, 2020) (citing *Mitchell Food Prods., Inc. v. United States*, 43 F.App'x 369, 369-70 (Fed. Cir. 2002)). "The function of [FRCP 17(a)] 'is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata.' " *Id*. (quoting *Curtis Lumber Co. v. Louisiana Pac. Corp.,* 618 F.3d 762, 771 (8th Cir. 2010) (some internal quotation marks omitted). The rule "requires that the plaintiff 'actually possess, under the substantive law, the right sought to be enforced.'" Id. (quoting *United HealthCare Corp. v. Am. Trade Ins. Co*., 88 F.3d 563, 569 (8th Cir. 1996)).

<u>Standard for Rule 12(b)(6) Motion for Failure to State a Claim</u>

Rule 8(a)(2) requires a complaint to include a short and plain statement of the claim against a defendant showing that the plaintiff is entitled to the relief sought. Rule 10(c) reads, "[a] statement in a pleading may be adopted by reference elsewhere in the same pleading or in

any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Federal Rule of Civil Procedure 10(c). Rule 9(g) requires the complaint to specifically state special damages. Federal Rule of Civil Procedure 9(g).

The Court should consider the nonconclusory allegations of the complaint as true for the purposes of ruling on this Motion. *See Bauer v. AGA Serv. Co.,* 25 F.4th 587, 589 (8th Cir. 2022) (quoting *Pietoso, Inc. v. Republic Servs., Inc.,* 4 F.4th 620, 622 (8th Cir. 2021)). "A claim survives a Rule 12(b)(6) motion to dismiss only if the complaint's nonconclusory allegations, accepted as true, make it not just 'conceivable' but 'plausible' that the defendant is liable." *Mitchell v. Kirchmeier*, 28 F.4th 888, 895 (8th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 680–83 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

While the Court must accept factual allegations as true, it is not required to accept any "legal conclusion couched as a factual allegation." *Brown v. Green Tree Servicing LLC*, 820 F.3d 371, 373 (8th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678). Where the facts alleged in the complaint are 'merely consistent with' a defendant's liability, and fail to rise above a speculative level, the complaint "stops short of the line between possibility and plausibility of entitlement to relief." *See Twombly*, 550 U.S. at 557; *see also Dunbar v. Wells Fargo Bank, N.A.*, 853 F. Supp. 2d 839, 845–46 (D. Minn. 2012), as amended (Apr. 12, 2012), aff'd, 709 F.3d 1254 (8th Cir.

2013). Thus, if from the face of the complaint, the claim to relief is not plausible and conceivable, Rule 12(b)(6) also permits dismissal of such claim. *Twombly*, 550 U.S. at 570. *See, e.g., Couzens v. Donohue*, 854 F.3d 508, 517 (8th Cir. 2017) (concluding that dismissal was appropriate where Missouri did not recognize a claim for false light invasion of privacy); *Freeney v. Galvin,* No. 8:19CV557, 2020 WL 229996, at *2 (D. Neb. Jan. 15, 2020) (concluding that the plaintiff failed to state a § 1983 claim against the manager of his private place of employment because such a claim is not cognizable where a private person is not a state actor or engaged in joint action with the state or its agents).

On a Rule 12(b)(6) motion, this court is not strictly limited to consideration of the nonconclusory allegations in the complaint. Instead, "[c]ourts may [also] consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Roberson v. Dakota Boys & Girls Ranch*, 42 F.4th 924, 928 (8th Cir. 2022) (internal quotation marks and citations omitted). As such, following Eighth Circuit precedent, the Court should also consider "materials 'necessarily embraced by the pleadings.'" *LeMay v. Mays,* 18 F.4th 283, 289 (8th Cir. 2021) (quoting *Buckley v. Hennepin Cnty.*, 9 F.4th 757, 760 (8th Cir. 2021), in turn quoting *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015)). Thus, the 20 exhibits attached to AMC's Complaint should be treated as a part of the complaint itself, including for purposes of this motion to dismiss. *See Ballinger v. Gustafson*, No. 8:22CV213, 2022 WL 16758558, at *3 (D. Neb. Oct. 19, 2022) (citing *Meehan v. United Consumers Club Franchising Corp.*, 312 F.3d 909, 913 (8th Cir. 2002) and finding that "the Eighth Circuit Court of Appeals, treat Rule 10(c) more broadly, and generally consider 'materials attached to the complaint as exhibits' when construing the

sufficiency of a complaint on a motion to dismiss."); *Bradford v. Huckabee*, 394 F.3d 1012, 1015 (8th Cir. 2005) ("The exhibits Bradford attached to his complaint are part of the complaint for this purpose" of reviewing a denial of a motion to dismiss."); *W. Point Auto & Truck Ctr., Inc. v. Klitz*, 492 F. Supp. 3d 936, 940 (D. Neb. 2020) ("In evaluating a facial attack, the Court can consider 'materials that are necessarily embraced by the pleadings and exhibits attached to the complaint.'").

Where a document attached to the complaint contradicts an allegation of the complaint, the attached document controls. *Thompson v. Illinois Dept. of Prof. Reg.*, 300 F.3d 750, 754 (7th Cir. 2002) (noting the "well-settled rule that when a written instrument contradicts allegations in a complaint to which it is attached, the exhibit trumps the allegations") (internal quotation marks and omitted, emphasis in the original); *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 note 8 (3rd Cir. 1994) (same); *Feldmann Imports Inc. v. Mercedes-Benz USA, LLC*, 506 F. Supp. 3d 687, 694 (D. Minn. 2020) (same); *Elkharwily v. Mayo Holding Co.,* 955 F. Supp. 2d 988, 996 (D. Minn. 2013), aff'd, 823 F.3d 462 (8th Cir. 2016) (same).

However, the Court cannot consider factual allegations that are not included in the Complaint or in materials embraced by the pleadings. *See Glick v. W. Power Sports, Inc.,* 944 F.3d 714, 717 (8th Cir. 2019) ("While [the plaintiff] presented additional facts in his oppositions to the motion to dismiss[,] . . . those factual allegations were not included in his amended complaint and, thus, cannot be considered on a motion to dismiss.").

Applying these pleading standards to AMC's nonconclusory allegations, AMC has not (and cannot by amendment) state a plausible and conceivable claim for relief against Scaglione. "[D]ismissal under Rule 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises and designed to fail, thereby sparing litigants the burden of unnecessary pretrial

and trial activity." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001).

## THE CHALLENGED CLAIM AND AMC'S ALLEGATIONS

The Complaint consists of only 84 paragraphs of conclusory and nonconclusory allegations and incorporates 20 exhibits consisting of over 400 pages replete with factual information. AMC's only claim attempted to be stated against Scaglione is Count III based on 42 U.S.C. § 1983. (Filing No. 1 at ¶¶ 78-84). AMC alleges that Scaglione is a citizen of and an attorney licensed to practice in Nebraska (*Id*. at ¶ 5), and as the attorney for Woodsonia, sent a letter to AMC on behalf of Woodsonia. (*Id.* at ¶ 27). AMC further alleges that the CRA retained Scaglione as its attorney who sent correspondence to AMC on behalf of the CRA and provided advice to the CRA (*Id*. at ¶¶ 33, 35, 51). In conclusory language, AMC opines that it "is entitled to bring the following affirmative causes of action and claims for relief against Woodsonia, Scaglione, the City, and the CRA for their individual and joint malfeasance in wrongfully terminating the Lease, evicting AMC, and depriving AMC of its leasehold interest without just compensation." (*Id*. at ¶ 65).

In Count III, AMC conclusorily asserts "Woodsonia and Scaglione were willful participants in a joint action with the City and the CRA in which they conspired to deprive AMC of its Fifth and Fourteenth Amendment rights, and therefore were acting under color of law and are subject to suit under 42 U.S.C. § 1983." (*Id*. at ¶ 81). In paragraph 82(a) – (h), AMC asserts it will "specifically" allege facts to purported support a Section 1983 claim against Scaglione. (*Id*. at ¶ 82). These facts are analyzed below, and, it will be shown, as a matter law cannot support a section 1983 claim against Scaglione.

- **Paragraph 82(a): "Scaglione represented both Woodsonia and the CRA (a political subdivision of the City) in their efforts to terminate the Lease and evict AMC."**

10

AMC concedes that (i) Scaglione was a disclosed agent and attorney for the disclosed principals of Woodsonia and the CRA, (ii) Scaglione was not an attorney for AMC and AMC had its own legal counsel, Thomas Larson, who is also counsel for AMC in this action, (Filing No. 1-17 at 1; Filing No. 1-19 at 1); (iii) Scaglione was not a party to or referenced in the Lease, the Redevelopment Agreement, the Transfer and Termination Agreement, or the Notice to Quit (Filing Nos. 1-1, 1-9-16, 1-18-20), and was not a party to the eviction proceeding in Hall County or the resulting appeals (*see generally* Scaglione Decl. Exs. A, B & C).; and (iv) within each document, resolution and pleading that Scaglione is referenced in or that he signed, there is an express notation that Scaglione was acting and writing as an agent and attorney on behalf of disclosed principals Woodsonia and the CRA. (Filing Nos. 1-15 – 1-17, 1-20.). There is no allegation (nor can there be in good faith) that Scaglione acted in his individual capacity or for his personal benefit, gain or undertaking. The documents Scaglione signed and transmitted to AMC showed he did so as an employee and disclosed agent of the law firm Koley Jessen, which firm was retained by Woodsonia (under a full engagement) and the CRA (under a limited scope engagement, *see* Filing No. 1-16 at 1-2) and who received payment of attorney fees. (*See generally* Filings Nos. 1-15 through 1-17).

Also, contrary to the undisputed facts in the documents attached to the Complaint, AMC alleges that Woodsonia and the CRA made efforts to evict AMC. The CRA did not issue the Notice to Quit (Filing No. 1-19), file and prosecute the eviction action (*see generally* Scaglione Decl. Ex. A), file a writ to have CRA evicted (*see generally* Scaglione Decl. Ex. B), or take any action to evict AMC (*id.*), as the CRA was neither the Landlord nor a party to the Lease (Filing No. 1-1). Based on the unambiguous language of the Lease and Nebraska law that allowed Woodsonia to transfer and terminate the Lease, the Hall County Court and the Hall County

District Court recognized Woodsonia's unambiguous contractual rights and Woodsonia's legal right to evict AMC. (*See generally* Scaglione Decl. Exs. A & B.) The rulings of the Hall County Court and District Court finding that the unambiguous language of section 15 the Lease and Nebraska law allowed Woodsonia to transfer AMC's leasehold interest to the CRA because a threat of condemnation occurred were never reversed on the merits. (Scaglione Decl. Ex. C at 21.) Instead, those rulings were only reversed because the action should have been brought in the Hall County District Court, not the County Court, which was a jurisdiction issue of first impression in Nebraska. (*Id*. at 13, 21). All efforts to transfer and terminate the Lease were solely taken by Woodsonia as the Landlord who exercised private rights under section 15 of the Lease, *not the CRA*. (Filing No. 1-1, 1-15, 1-18, 1-19). The CRA, who had received AMC's leasehold interest from Woodsonia, mutually terminated the Lease with Woodsonia as §15.5 mandated, so that the CRA could have the blight abated and the mall redeveloped. (Filing No. 1-18). AMC makes no allegations (nor can it) that Scaglione or any of the parties violated Neb. Rev. Stat. § 25-824 in the Nebraska state court proceedings or appeals or that AMC sought such sanctions. (Scaglione Decl. Exs. A, B & C).

- **Paragraph 82(b) "Woodsonia agreed to pay the CRA's attorneys' fees, expert fees, costs, and the amounts of any condemnation awards given, in the event that condemnation proceedings were needed to acquire AMC's leasehold interest in order to implement the Redevelopment Plan."**

This allegation does not relate to Scaglione, as the CRA and Woodsonia engaged the law firm of Koley Jessen P.C., and agreed to pay attorney fees to that firm, not Greg Scaglione individually. (Filing No. 1-16 at 1-4). Scaglione is not a party to or referenced in the Redevelopment Agreement or the Redevelopment Plan. (Filing Nos. 1-13 & 1-14.) Per the

Redevelopment Plan and Agreement, leasehold interests had to be extinguished (either by agreement or condemnation) to demolish and redevelop the mall so that blight could be abated and the mall redeveloped. (Filing No. 1-14 at 34-35). As such, there are no facts alleged or references to a legal basis to indicate that the understanding between Woodsonia and CRA that Woodsonia would reimburse the CRA such amounts was improper. And, in any event, none this is an allegation against Mr. Scaglione personally.

- **Paragraph 82(c) "On March 31, 2023, the CRA (through Scaglione) sent AMC a letter purportedly threatening to condemn AMC's leasehold interest, and claiming that the CRA was 'pursuing good faith negotiations' to induce AMC to voluntarily terminate the Lease, with an offer to remain open until April 7, 2023."**

In this allegation, AMC again acknowledges that Scaglione sent the letter as a disclosed agent and attorney of the CRA and was based on properly adopted CRA resolutions following a public meeting and vote. (Filing Nos. 1-9, 1-16, 1-20). There is nothing in that letter that indicates Scaglione was acting in his individual capacity or that he stood to benefit individually from any of the contemplated actions. (Filing No. 1-17). That letter expressly states that the CRA "has authorized **Koley Jessen** to negotiate the acquisition of all of AMC's leasehold interests in the Premises under the AMC Lease." (*Id*. at 1) (Emphasis added.). So, the incorporated letter expressly shows Scaglione was an agent of Koley Jessen who was the agent for the CRA.

- **Paragraph 82(d) "In fact, the CRA had no good-faith intention of either voluntarily settling with AMC or of following through with condemnation proceedings against AMC's leasehold interest."**

Again, none of these allegations relate to Scaglione. Second, these are conclusory allegations regarding the CRA, with not a single fact alleged, and which is inconsistent with the

letters, judicial filings and resolutions incorporated into AMC's complaint. The incorporated documents set forth the following incontrovertible facts which trump the false and conclusory allegations in the Complaint: the mall in which the leasehold interest was located was properly declared blighted (Filing No. 1-13); a Redevelopment Plan and Redevelopment Agreement were adopted to abate that blight and remove the substandard conditions (*Id.*); in §§ 15.2 - 15.5 of the Lease, AMC assigned to Woodsonia "the entire award in any condemnation proceeding or other proceeding for taking the Demised Premises, Building or Shopping Center for public or quasi-public use, including, without limitation, any award made for the value of the leasehold estate created by this Lease" with no apportionment right or other claims retained by AMC (Filing No. 1-1 at 21); the CRA made settlement offers to AMC that exceed a certified appraised value (Filing No. 1-15); the CRA's actions and authorization to proceed with an eminent domain proceeding were made pursuant to properly adopted resolutions after a public meeting and vote (Filing Nos. 1-16 and 1-17); AMC's promised and committed that it is not entitled to nor shall AMC "seek any damages for lost profits, consequential or punitive damages" (Filing Nos. 1-1 at 32 §29.7) or under applicable law[1]; the only courts to have considered and applied section 15 of the Lease found that Woodsonia had an unambiguous contractual right to and properly

---

[1] When a tenant (who pays rent for the use of the property) asserts an inverse condemnation, the law prohibits (i) the consideration of anticipated lost profits from the continued carrying on of a business in an established location in estimating the damages, and (ii) the showing of lost profits of a business for the purpose of proving the value of the taken property. *Lantis v. City of Omaha,* 237 Neb. 670, 674, 467 N.W.2d 649, 652 (Neb. 1991). As stated in the Annotation, 7 A.L.R. 163, and in 27 Am.Jur.2d, Eminent Domain, § 285, p. 83, and § 431, p. 338, American jurisdictions have held with remarkable unanimity that evidence of profits derived from a business conducted on property is too speculative, uncertain, and remote to be considered as a basis for ascertaining the market value of property taken in eminent domain proceedings. In the case of business income, much depends on such factors as management, available capital, advertising, business connections, the times, etc. In 5 Nichols on Eminent Domain (3d Ed.), § 19.-3(1), it is stated in regard to commercial property: "If the owner of property uses it himself for commercial purposes, the amount of his profits from the business conducted upon the property depends so much upon the capital employed and the fortune, skill and good management with which the business is conducted, that it furnishes no test of the value of the property." A capitalization of income or profit approach has met with disfavor. *Y Motel, Inc. v. State Dept. of Roads,* 193 Neb. 526, 533, 227 N.W.2d 869, 874 (Neb. 1975) ("There is no such thing as typical income or expenses for the operation of a restaurant, motel, or lounge. To permit a person, even a qualified one, to appraise a tract of land on the basis of capitalization of income by an estimate of the operation of a typical business would be guesswork at every stage."); *see Verzani v. State,* 188 Neb. 162, 195 N.W.2d 762 (1972).

transferred and terminated AMC's leasehold interest, and then ordered AMC be evicted (Scaglione Decl. Exs. A & B); and the CRA's settlement offer remained open despite the transfer and termination of AMC's leasehold interest, which AMC failed to accept before its expiration (Filing No. 1-17). So, with those facts documented in the documents that AMC incorporated into its Complaint, AMC has alleged facts *supporting* the CRA's good faith intentions and actions, and AMC's conclusory and false statements to the contrary do not control.

- **Paragraph 82(e) "Instead, on March 31, 2023—the very same day the CRA sent its letter purportedly threatening to condemn AMC's leasehold interest, with a voluntary settlement offer to supposedly remain open until April 7, 2023 — the CRA and Woodsonia (again, both represented by Scaglione), entered into the purported "Transfer and Termination Agreement," in which they claimed that the CRA's threatened condemnation had operated to terminate the Lease in accordance with §§ 15.1 to 15.5 of the Lease, notwithstanding that Woodsonia's own fee interest in the Demised Premises was never condemned or conveyed under threat of condemnation."**

Again, in these allegations, AMC again acknowledges that Scaglione sent the letter as a disclosed agent and attorney of the CRA and Woodsonia, and that the letter was based on properly adopted CRA resolutions following a public meeting and vote. (Filing No. 1-16, 1-17). There is nothing in that letter that indicates Scaglione was acting in his individual capacity or that he stood to benefit individually from any of the contemplated actions. The letter instead shows he functioned as an agent of Koley Jessen as an agent for the CRA. (Filing 1-17 at 1). The Transfer and Termination Agreement was neither signed by nor does it even mention Scaglione (Filing No. 1-18). The only courts to have consider and applied section 15 of the Lease found

that Woodsonia had the unambiguous contractual right to and properly transferred and terminated AMC's leasehold interest, and then ordered AMC evicted. (Scaglione Decl. Exs. A & B). It is irrelevant that Woodsonia's fee simple interest was not condemned or conveyed under threat of condemnation. It was essential that Woodsonia maintain fee simple ownership to fulfill its redevelopment obligations to the City and the CRA to abate the blight and remove the substandard condition.

- **Paragraph 82(f) "Also within the purported "Transfer and Termination Agreement," Woodsonia (who did not own AMC's leasehold interest in the Demised Premises) purported to transfer AMC's leasehold interest to the CRA. Woodsonia and the CRA then purported to mutually terminate the Lease."**

First, none of these allegations relate to Scaglione. Second, indeed Woodsonia, a private party (not a state actor) is the only party that transferred AMC's leasehold interest away from AMC and to the CRA pursuant to rights AMC granted to Woodsonia in a private commercial contract, not under color of law. (Filing Nos. 1-1 at 21, 1-18). Once Woodsonia transferred AMC's leasehold interest, § 15.5 of the Lease deemed the Lease terminated as of the date of such transfer, thus the mutual termination simply documented what occurred automatically by operation of the Lease. (*Id.*). This transfer/termination of lease provision is a common provision in a commercial lease where the condemnation award is assigned to the landlord, so as to avoid the expense, delay and futility of a condemnation proceeding involving the tenant.

- **Paragraph 82(g) "As explained above, Woodsonia's and the CRA's purported termination of the Lease was a nullity."**

First, none of these allegations related to Scaglione. Second, this in a conclusory statement of law or a legal opinion, not an allegation of fact. Moreover, such conclusory

statement is directly inconsistent with the operation and application of the Lease, as described above.

- **Paragraph 82(h) "Notwithstanding the ineffective termination of the Lease, AMC was wrongfully evicted and has been unable to occupy, use, or possess the Demised Premises—as it was entitled to do under the Lease—since approximately May 4, 2023."**

First, none of these allegations related to Scaglione. Second, this in a conclusory statement of law or a legal opinion, not an allegation of fact. Moreover, such conclusory statement is directly inconsistent with Orders which show that only the Hall County Court ordered and then the Hall County Sheriff evicted AMC, not any of the Defendants. (Scaglione Decl. Exs. A & B). Again, the eviction was requested only by Woodsonia as a private party exercising a private contract right, not a state actor exercise government power.

In paragraphs 83 and 84, AMC alleges in conclusory form that it suffered damages and it entitled to recover attorney fees, costs and to be awarded punitive damages, and fails to specifically state special damages in violation of Federal Rule of Civil Procedure 9(g). No facts are alleged to identify such damages or to support a basis for an award of punitive damages other than quoting statutory grounds for such an award.

## ARGUMENTS AND SUPPORTING AUTHORITIES

### I. Because AMC Assigned Its Section 1983 Claim to Woodsonia, AMC Lacks Standing and this Court Is Without Subject Matter Jurisdiction.

In the Lease, AMC assigned any award relating to Count III in this Action to Woodsonia, except possibly for a claim for out-of-pocket relocation costs, and neither the Lease nor any allegation in the Complaint authorizes AMC to pursue such claims on behalf of Woodsonia. AMC therefore lacks standing to bring its sole claim against Scaglione.

17

15.2 Award. Landlord shall be entitled to the entire award in any condemnation proceeding or other proceeding for taking the Demised Premises, Building or Shopping Center for public or quasi-public use, including, without limitation, any award made for the value of the leasehold estate created by this Lease. No award for any partial or total taking shall be apportioned, and Tenant hereby assigns to Landlord any award that may be made in such condemnation or other taking, together with any and all rights of Tenant now or hereafter arising in or to the same or any part thereof. Although all damages in the event of any condemnation are to belong to Landlord whether such damages are awarded as compensation for diminution in value of the leasehold or to the fee of the Demised Premises, Tenant shall have the right to claim and recover from the condemnor, but not from Landlord, such compensation as may be separately awarded or recoverable by Tenant in Tenant's own right on account of the interruption of or damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss to which Tenant might incur in removing Tenant's merchandise, furniture and other personal property, fixtures, and equipment from the Demised Premises.

15.3 No Claim Against Landlord. It is understood that in the event of the termination of this Lease as provided under this Article, Tenant shall have no claim against Landlord for the value of any unexpired term of this Lease and has no right or claim to any part of the award made on account thereof, except as specifically provided in this Article.

"When the terms of a contract are clear, . . . [they] are accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them, and in such a case, a court shall seek to ascertain the intention of the parties from the plain language of the contract." *Stackhouse v. Gaver*, 801 N.W.2d 260, 270 (Neb. 2011). This is particularly true where, as here, the parties are sophisticated business entities. The language could not be clearer – any award of damages "in any condemnation proceeding or other proceeding for taking the Demised Premises" belongs not to AMC, but to Woodsonia alone as the Landlord. AMC is entitled to no apportionment, and nothing in the Lease or alleged in AMC's Complaint suggests that AMC may pursue Woodsonia's claims. There are only two narrow exceptions noted in section 15.2. One exception is that AMC has the right to claim and recover from the condemnor, but not from Landlord, damages for interruption of or damage to Tenant's business by reason of the condemnation. However, as the legal authorities cited in footnote 1 above demonstrate, no such claim or right exists under the applicable law. AMC cannot legally recover lost profits or

business reduction damages. Under the law, AMC may only recover "just compensation" as defined by NJI2d Civ. 13.26, which is the amount of money equal to the decrease in the fair market value of AMC's leasehold interest under the following formula, *first* the fair market value of the remainder of the term of the Lease before the alleged taking, minus the amount of rent AMC was obligated to pay over the remainder of the term of the Lease; *second,* after the alleged taking, what was the fair market value of the remainder of the term of the Lease, minus the amount of rent AMC was obligated to pay over the remainder of the term of the Lease; *third*, subtract the second number from the first number to determine the amount of compensation to which the AMC is entitled). *However*, AMC assigned that claim and related damages to Woodsonia without apportionment. (Filing No. 1-1 at 21). Moreover, 15.4 of the Lease provides that AMC has no claim whatsoever for the unexpired portion of the Lease. (*Id*.).

The other exception is that AMC has the right to claim and recover from the condemnor, but not from Landlord, for relocation costs. There is no allegation that AMC informed anyone that it incurred relocation costs for which it was seeking reimbursement. To the contrary, the CRA (and Woodsonia) have consistently stated that they would reimburse AMC its relocation costs. None have been presented for reimbursement, and no allegations in the Complaint suggest otherwise.

## II.  Even If This Court Finds That AMC Has Standing, AMC Nonetheless Failed to State a Section 1983 Claim Against Scaglione.

There is no plausible theory for Scaglione to be liable to AMC.

As an agent/attorney of disclosed principals, Scaglione is not liable to AMC. First, regarding contractual liability, "[i]t is a fundamental rule that an agent who contracts on behalf of a disclosed principal, in the absence of some other agreement to the contrary or other circumstances showing that the agent has expressly or impliedly incurred or intended to incur

personal responsibility, is not liable to the other contracting party." *Koperski v. Husker Dodge, Inc.,* 208 Neb. 29, 48, 302 N.W.2d 655, 665 (1981); *Cargill Leasing Corp. v. Mueller*, 214 Neb. 569, 572, 335 N.W.2d 277, 279 (1983). "There is little question that the relationship between attorney and client is one of agency and that the general agency rules of law apply to the relation of attorney and client. Thus, a client may be liable for the acts of the client's attorney when such was within the attorney's scope of authority." *Thomas & Thomas Court Reporters, L.L.C. v. Switzer*, 283 Neb. 19, 24–25, 810 N.W.2d 677, 683 (2012). But, while general agency rules apply to the attorney-client relationship, there is much more involved than mere agency. The attorney, not the client, is responsible for performing the details of litigation. *Id*. "Thus, the Restatement (Third) of the Law Governing Lawyers provides that unless a lawyer or third person disclaims such liability at the time of contracting, a lawyer is subject to liability to third persons on contracts entered into on behalf of a client if 'the contract is between the lawyer and a third person who provides goods or services used by lawyers and who, as the lawyer knows or reasonably should know, relies on the lawyer's credit.'" *Switzer*, 283 Neb. 19, 25, 810 N.W.2d 677 at 684.

The Supreme Court of Nebraska held in *RSUI Indem. Co. v. Bacon* that general agency principles cannot be displaced unless an attorney's signature on a contract "can be construed to bind him and his firm personally." 282 Neb. 436, 441, 810 N.W.2d 666, 672 (2011). The *Kalberg* court stated its reasoning as follows: "[a]lthough it is generally true that an agent who discloses the name of his principal to the persons with whom he is dealing incurs no personal responsibility to such persons on account of the transaction, there is an exception where the contract or circumstances of the transaction discloses a mutual intention to impose a personal responsibility on the agent." *Kalberg*, 279 S.W.2d at 181.

As alleged by AMC, the contracts at issue (Lease, Redevelopment Agreement, Transfer and Terminate Agreement, etc.), are all pre-eviction suits, were not signed by Scaglione and do not reference Scaglione. There are no factual allegations that Scaglione was to be personally responsible and liable for the acts of the disclosed principals.

Second, regarding tort liability, in general, a lawyer is not liable for a client's tort unless the lawyer assisted the client through conduct itself tortious or gave substantial assistance to the client knowing the client's conduct to be tortious. See Restatement Second, Torts § 876 (liability of persons acting in concert). Proper advice to a client does not constitute assistance leading to liability. The Eighth Circuit has held (applying Minnesota law) that "an attorney who acts within the scope of the attorney-client relationship will not be liable to third persons for actions arising out of his professional relationship unless the attorney exceeds the scope of his employment or acts for personal gain." *Maness v. Star-Kist Foods, Inc.,* 7 F.3d 704, 709 (8th Cir. 1993).

In addition to the deficiencies referenced above, AMC also failed to allege any facts to support that Scaglione assisted his clients through conduct itself tortious, gave substantial assistance to his clients knowing that such conduct to be tortious, or exceed the scope of his engagements. To be clear, the only Courts to consider the merits of Woodsonia's application of section 15 of the Lease, found such application to be proper based on what two separate judges held was unambiguous language in a commercial lease. Therefore, the disclosed principals did nothing wrong or unlawful.

Third, regarding Section 1983 liability, the Fifth Amendment to the U.S. Constitution states, "[N]or shall private property be taken for public use, without just compensation." To state a claim under 42 U.S.C. § 1983, AMC is required to plead and establish both the violation of a constitutional right, and that the violation was committed by a state actor. *West v. Atkins*, 487

U.S. 42, 48 (1988); *Mach v. Cnty. of Douglas*, 259 Neb. 787, 791, 612 N.W.2d 237, 241 (2000). In determining the question of "fair attribution," (a) the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by it or by a person for whom it is responsible, and (b) the party charged with the deprivation must be a person who may fairly be said to be a state actor, either because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State. *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 923, 102 S. Ct. 2744, 2746, 73 L. Ed. 2d 482 (1982).

Similarly, it is clear that in a § 1983 action brought against a state official, the statutory requirement of action "under color of state law" and the "state action" requirement of the Fourteenth Amendment are identical. The Court's conclusion in *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941), that "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law," was founded on the rule announced in *Ex parte Virginia*, 100 U.S. 339, 346–347, 25 L.Ed. 676 (1880), that the actions of a state officer who exceeds the limits of his authority constitute state action for purposes of the Fourteenth Amendment. *Lugar*, 457 U.S. 922, 929, 102 S. Ct. 2744, 2749–50, 73 L. Ed. 2d at 482.

To state a claim for violation of the Takings Clause, AMC "must show it has a property interest protected by the Takings Clause." *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 439 (8th Cir. 2007) (internal citations omitted). The express terms of a contract set forth the existence of any legally cognizable property interest. *See Hawkeye Commodity Promotions, Inc. v. Vilsack,* 486 F.3d 430, 440 (8th Cir. 2007) (finding there was no legally cognizable property interest where the contract provided for termination due to a change in law);

*The Lamar Co., LLC v. City of Fremont,* 278 Neb. 485, 493, 771 N.W.2d 894, 903 (2009) (finding any rights to a nonconforming use of land were extinguished when the leases at issue were terminated). As noted repeatedly herein, AMC's leasehold interest was created, governed, and then upon the occurrence of an agreed subsequent event, was transferred and terminated by a private party via the operation of a private contract. "Only state actors can be held liable under Section 1983…A private party who willfully participates in joint activity with the State or its agents is considered a state actor." *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001). Only Woodsonia had and exercised its contractual right to transfer the Lease to the CRA – so there was no joint action with the governmental entities and no performance of a public function.

Consider both of Koley Jessen's engagements for Woodsonia and for the CRA (which is one step removed from Scaglione). Woodsonia is a private party, not a governmental agency, and was exercising private contractual rights under the Lease to transfer and terminate the Lease, not exercising governmental power or right. As such, in that engagement, Scaglione (on behalf of Koley Jessen) was not representing a state agency and was not acting under color of law. As for the CRA, as noted above, AMC's alleged taking is the loss of its leasehold interest as created in the Lease; however, the CRA did not transfer the Lease, only Woodsonia did that via the power and right granted by AMC upon the threat of condemnation of the Lease. AMC cannot base a claim against Scaglione for performing tradition functions of an attorney representing a client. See *Pol Cty. v. Dodson*, 454 U.S. 312 (1981); *Trobaugh v. Sondag*, 2 F.Appx. 692 (8th Cir. 2001); *Aldrich v. Ruano*, 952 F.Supp.2d 295, 301 (D. Mass. 2013) ("**It is well-settled that a lawyer (even a court-appointed one) does not act under the color of state law in performing a lawyer's traditional function as counsel to a party**.") (Emphasis added.)).

Even if it is plausible that Scaglione was somehow acting under the color of law, AMC has failed to allege how Scaglione is not immune for liability. The Supreme Court unanimously held that the private attorney temporarily retained by the city to conduct the city's work was entitled to seek qualified immunity from suit under § 1983. See *Filarsky v. Delia*, 566 U.S. 377 (2012). The enactment of § 1983 did not abrogate common law immunities for government employees who often also worked in the private sector in order to ensure that the employees could perform their duties responsibly without the deterrent of the threat of lawsuits. AMC made no allegation (nor could it have a good faith basis to allege) that Scaglione waived such immunity. *See Foell v. Cnty. of Lincoln*, No. 4:17CV3044, 2019 WL 2996276, at *14 (D. Neb. July 9, 2019) (explaining that "a political subdivision . . . is shielded by immunity from tort recovery unless it has expressly waived this immunity").

Fourth, regarding liability for conspiracy, the Eighth Circuit discussed a doctrine labeled the "intercorporate conspiracy doctrine" and found "that a corporation and its agents are a single person in the eyes of the law, and a corporation cannot conspire with itself" to violate 42 U.S.C. § 1985. *Cross v. Gen. Motors Corp.*, 721 F.2d 1152, 1156 (8th Cir.1983). Under this intracorporate conspiracy doctrine, a local government entity cannot conspire with itself through its agents acting within the scope of their employment. *Id.; Richmond v. Bd. of Regents of Univ. of Minn.*, 957 F.2d 595, 598 (8th Cir. 1992); See also L.*L. Nelson Enterprises, Inc. v. Cnty. of St. Louis, Mo.*, 673 F.3d 799, 812 (8th Cir. 2012). A case from the Eastern District of Missouri found that this intercorporate conspiracy doctrine also applies to 1983 claims, and the Eighth Circuit declined to rehear this case. See *Baude v. City of St. Louis*, 476 F. Supp. 3d 900 (E.D. Mo. 2020), *aff'd sub nom. Baude v. Leyshock*, 23 F.4th 1065 (8th Cir. 2022). Therefore, Scaglione could not have been involved in any conspiracy to violate AMC's constitutional rights

under Section 1983.

Moreover, the Third Circuit, along with many district courts, has held that there is no conspiracy when attorneys act within scope of employment unless they act for their "sole personal benefit." *Heffernan v. Hunter*, 189 F.3d 405, 413 (3d Cir. 1999). The court stated their reasoning, stating that attorneys' conduct that is within the scope of representation is already regulated and enforced by disciplinary bodies established by the courts. *Id*. at 413. The right of a litigant to independent and zealous counsel is at the heart of our adversary system and, indeed, invokes constitutional concerns. *Id*. Abuses in litigation are punishable by sanctions administered by the courts in which the litigation occurs. *Id*. It is, of course, axiomatic that if the challenged conduct occurs outside the scope of representation, no reason for immunity exists and the attorney and the client, as individuals, could form a conspiracy. *Id*. The mere fact that attorneys have "mixed motives," such as "enhancing" their reputation by aggressive representation, does not remove their conduct from the scope of the agency. *Id*.; See also *Los Angeles Airways, Inc. v. Davis*, 687 F.2d 321, 328 (9th Cir. 1982). The challenged activity may violate the canons of ethics, but so long as it is within the scope of representation, it does not eliminate the exemption from a conspiracy charge under section 1985. "[S]imply because a lawyer's conduct may violate the rules of ethics does not mean that the conduct is actionable, in damages or for injunctive relief." *Id.*

Finally, regarding AMC's damages claims, AMC failed to specifically state [its alleged] special damages, in violation of Rule 9(g). Other than quoting the statutory basis for an award of punitive damages, AMC made no nonconclusory fact allegations supporting a basis for punitive damages. Indeed, AMC pled and incorporated the Lease in which AMC promised and committed that AMC is not entitled to nor shall AMC "seek any damages for lost profits, consequential or

punitive damages." (Filing Nos. 1-1 at 32, §29.7) AMC also failed to allege reduction of the fair

market value of the leasehold interest damages as provided in NJI2d Civ. 13.26. Further, AMC

failed to allege out of pocket relocation costs and a denied request for reimbursement of the

same. And, regarding punitive damages, other than quoting the statutory basis for an award of

punitive damages, AMC made no nonconclusory fact allegations supporting a basis for punitive

damages or how AMC could get around its waiver of punitive damages in the Lease. And the

U.S. Supreme Court held that punitive damages are only available under section 1983 when the

defendant's conduct involves a reckless or callous indifference to the plaintiffs federally

protected rights, as well as when the defendant's conduct involves an evil motive or intent. *Smith

v. Wade*, 103 S. Ct. 1625, 1640 (1983). AMC alleged no evil motive or intent, and certainly none

was recognized by the Hall County Court or the Hall County District Court in the position and

arguments Scaglione made on behalf of Woodsonia.

As for all of its vague damages assertions and prayer, AMC makes conclusory allegations

of damages that directly violate the Lease, with no amounts identified or how Scaglione caused

or should be personally liable to pay for such alleged damages.

### III.    AMC Should Not Be Given Leave to Amend

With regards to AMC's pleading deficiencies that require dismissal of the Complaint

pursuant to Fed. R. 12(b)(1) and 12(b)(6), AMC cannot amend its pleading in any way to cure

those deficiencies. As such, no amendment should be allowed. "A district court, in its discretion,

may dismiss a pleading for failure to state a claim with or without prejudice." *Paisley Park

Enters., Inc. v. Boxill*, 361 F. Supp. 3d 869, 880 n.7 (D. Minn. 2019) (citing *Orr v. Clements*, 688

F.3d 463, 465 (8th Cir. 2012)). "Dismissal with prejudice is appropriate if amending the

complaint would be futile." *Spagna v. Tift*, No. 8:19-CV-481, 2020 WL 7075523, at *3 (D. Neb.

Dec. 3, 2020) (citing *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 782 (8th Cir. 2009)). "[F]utility constitutes a valid reason for denial of a motion to amend." *Knapp v. Hanson*, 183 F.3d 786, 790 (8th Cir. 1999). The futility of any amendment by AMC is present under an analysis of the Complaint's failings as to Rule 12(b)(1) and Rule 12(b)(6).

As noted in the Pleadings Standards cited above, this Court should consider the nonconclusory allegations as true for the purposes of ruling on this Motion and should ignore any "legal conclusion couched as a factual allegation." Moreover, when considering documents incorporated by reference as well as the Orders and Opinion subject to judicial notice, the incorporated or noticed document control, and will not change any amendment.

The governing and unambiguous Lease provisions (AMC's assignment of claims and damages to Woodsonia, AMC's waiver of taking-type claims and damages, AMC's grant of authority for Woodsonia to transfer the Lease to the CRA and then terminate the Lease, and AMC's promise and commitment that AMC is not entitled nor shall AMC "seek any damages for lost profits, consequential or punitive damages") are not going to change by any conceivable amendment by AMC.

No factual nonconclusory amendment can change the undisputed reality that Scaglione (i) was an agent for the disclosed principals Koley Jessen, the CRA and Woodsonia, and had no personal action, benefit or undertaking related to the matters complained of by AMC; (ii) was not a state actor; (iii) did not act under color of law; (iv) is immune from liability, which immunity has not been waived; and (v) could not have conspired with the entities he represented under the intercorporate conspiracy doctrine.

Given all that is contained and incorporated into AMC's Complaint, there are no amendments AMC could, in good faith, make that would state a plausible claim for relief or

damages against Scaglione. Thus, AMC should not be given leave to amend its Complaint as it relates to Scaglione.

## CONCLUSION

Dismissal of AMC's Complaint is warranted for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted as it relates to Scaglione. For the reasons contained herein, and pursuant to the authorities cited herein, Scaglione respectfully requests that the Court enter an order dismissing with prejudice AMC's Complaint against Scaglione, without leave to amend.

DATED this 4th day of June 2025.

GREGORY C. SCAGLIONE, Defendant,

By: */s/ Adam R. Feeney*
Adam R. Feeney, #25897
LAMSON DUGAN & MURRAY LLP
10306 Regency Parkway Drive
Omaha, NE  68114-3743
(402) 397-7300
afeeney@ldmlaw.com

*Attorneys for said Defendant*

## CERTIFICATE OF COMPLIANCE

In accordance with NECivR 7.1(d)(3), I hereby certify that this Brief contains 9,432 words, which includes all text, including the caption, headings, footnotes, and quotations as determined by Microsoft Word for Office 365, and no generative artificial intelligence program was used in drafting this document.

*/s/ Adam R. Feeney*

## CERTIFICATE OF SERVICE

On this 4<u>th</u> day of June 2025, I electronically filed the above and foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to all CM/ECF participants.

*/s/ Adam R. Feeney*