**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| AMERICAN MULTI-CINEMA, INC., | Case No. 8:25-cv-292 |
| Plaintiff, | |
| v. | |
| WOODSONIA HWY 281, LLC; GREGORY C. SCAGLIONE; CITY OF GRAND ISLAND, NEBRASKA, and COMMUNITY REDEVELOPMENT AUTHORITY OF THE CITY OF GRAND ISLAND, NEBRASKA, | **DEFENDANT WOODSONIA HWY 281, LLC's BRIEF IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS, OR IN THE ALTERNATIVE, MOTION TO DISMISS** |
| Defendants. | |

Pursuant to NECivR 7.1, Defendant Woodsonia Hwy 281, LLC ("Woodsonia"), by and through counsel, respectfully submits this brief in support of its Motion to Compel Arbitration and Stay Proceedings brought by Plaintiff American Multi-Cinema, Inc.'s ("AMC") Complaint in accordance with the Federal Arbitration Act 9 U.S.C. §§ 2-4 and the express terms of the parties' agreement. In the alternative, Woodsonia respectfully submits this brief in support of its Motion to Dismiss AMC's Complaint. Filing No. 1, as it pertains to Woodsonia in accordance with Federal Rules of Civil Procedure 12(b)(1), as AMC lacks standing which deprives this Court of subject matter jurisdiction, and 12(b)(6), as AMC's Complaint fails to state a claim upon which relief can be granted against Woodsonia. The deficiencies in AMC's Complaint as to Woodsonia cannot be cured by any amendment.

## I.     <u>INTRODUCTION</u>

*First*, AMC's Complaint raises claims that are subject to the agreed upon arbitration provision. At the heart of AMC's Complaint, and attached and incorporated therein, is the Shopping Center Lease Agreement to which AMC and Woodsonia are parties (the "Lease"). Filing

No. 1, Filing No. 1-1. The Lease contains an express arbitration provision whereby "any disagreement, dispute or claim concerning this Lease or the obligations of Landlord and Tenant under this Lease," subject to limited carve-outs, shall be submitted to binding arbitration by either party (the "Arbitration Provision"). Filing No. 1-1 at 24, § 16.8. As evident from the face of the Complaint and its attachments, all of the allegations and claims for relief concern the Lease and/or the obligations under the Lease. As such, AMC should be compelled to arbitrate its claims and these proceedings stayed until the arbitration proceedings have concluded.

*Second*, in the alternative, AMC's claims should be dismissed as to Woodsonia because AMC lacks standing before this Court as it cannot plead allegations that it has suffered any injury in fact due to the express language contained in the written instruments attached and incorporated into the Complaint. In turn, pursuant to Rule 12(b)(1), the Complaint should be dismissed with prejudice as this Court lacks subject-matter jurisdiction.

*Third*, in the alternative, the Complaint fails to state a claim against Woodsonia upon which relief may be granted. The facts alleged on the face of the Complaint are nothing more than improper legal conclusions and allegations that fail to raise the presence of any liability above the speculative level. Moreover, the attachments to the Complaint are replete with indisputable facts that contradict the allegations in the Complaint. Accordingly, pursuant to Rule 12(b)(6), the Complaint against Woodsonia should be dismissed with prejudice for failure to state a claim.

## II.    BACKGROUND

The Community Redevelopment Authority of the City of Grand Island (the "CRA") is charged with, among other things, acting in specified areas of the Grand Island community to remove, prevent or inhibit physical deterioration (such as blighted and substandard conditions) that will result in lower property values and create disincentives to private investment. Filing No. 1-10. Nebraska state law expressly authorizes such action by the CRA under the Community

Development Law, Neb. Rev. Stat. § 18-2101, et seq. (the "Act"). The City of Grand Island (the "City") and the CRA determined that the redevelopment of the Conestoga Mall is for the betterment of the City and surrounding communities and serves various public needs. Filing nos. 1-10 – 1-13. The City duly adopted a Resolution, approving an Extremely Blighted Determination Study and declaring certain property, including the leased Premises "blighted and substandard and in need of redevelopment as contemplated in the [Act]." Filing No. 1-13. With the CRA's recommendation, the City approved a Redevelopment Plan, and authorized the execution of a redevelopment contract (the "Redevelopment Contract") with Woodsonia Hwy 281, LLC ("Woodsonia") for the implementation of the Redevelopment Plan. *Id*. The Redevelopment Plan would abate the blighted and substandard conditions of the Conestoga Mall, and the City and the CRA engaged Woodsonia as the developer to assist these government agencies in that regard. *Id*.

Woodsonia reached workout agreement with all of the tenants of the Mall to terminate existing leasehold interests so as to allow for the demolish of the Mall, except AMC. From September 2022 through March 2023. Woodsonia made numerous attempts to negotiate an amenable workout with AMC to terminate AMC's Lease, without success. On March 31, 2023, under threat of condemnation by the CRA, the CRA made an offer to AMC supported by a certified appraisal, which AMC never accepted. Filing No. 1-17.

Under Section 15.1 of the Lease, if a "substantial part" of the Demised Premises—i.e., AMC's leasehold interest—is "conveyed under threat of condemnation proceedings, then this Lease shall forthwith terminate." Filing No. 1-1 at 20-21. Under Section 15.5 of the Lease, the landlord, Woodsonia, "may, without any obligation or liability to [AMC], agree to sell and/or convey to the condemnor the Demised Premises, the Shopping Center or any portion thereof, sought by the condemnor, free from this Lease and the rights of Tenant hereunder." *Id*. at 21.

Section 15.5. continues, "In such event, this Lease shall be deemed terminated effective on the date of such transfer." *Id*. So, the CRA and Woodsonia signed that certain "TRANSFER AND TERMINATION OF AMC LEASE DATED EFFECTIVE MARCH 31, 2023" reflecting the operation of the Lease in this regard. Filing No. 1-18.

Thus, under the terms of the Lease, AMC granted to Woodsonia the contractual authority to transfer the leasehold interest to the condemning authority. Woodsonia exercised that contractual authority and made the transfer after the condemning authority had threatened condemnation proceedings, namely, notice of the CRA's intent "to exercise eminent domain power to take AMC's entire leasehold interest." Filing No. 1 at 20-21. Under the terms of the Lease, the Lease automatically terminated, yet AMC refused to vacate and continued to wrongfully possess the Premises. *Id*. Filing No. 21-2).

On April 4, 2023, Woodsonia served on AMC the "THREE (3) DAY NOTICE TO QUIT TO AMERICAN MULTI-CINEMA, INC. ("AMC") AND NOTICE OF TERMINATION OF AMC LEASE" pursuant to Neb. Rev. Stat. §§ 25-21,219, et seq. (the "Notice to Quit"). Filing No. 1-19. AMC wrongfully detained, occupied, and used the Premises in violation of Woodsonia's right to possess the Premises. Filing No. 21-2. After AMC ignored the Notice to Quit, on April 14, 2023, Woodsonia filed the forcible entry and detainer action, and on May 1, 2023, the County Court ruled from the bench, granting Woodsonia's request for forcible entry and detainer. *Id*. On May 8, 2023, the County Court entered an Order and Writ of Execution, denying AMC's Motion to Dismiss and granting the forcible entry and detainer action. *Id*. Thereafter, AMC appealed to the District Court of Hall County, and on n December 1, 2023, the District Court entered an Order affirming the decision of the County Court "in its entirety" finding that "the Lease was unambiguous, [and] allowed Woodsonia to transfer AMC's leasehold interest, and the transfer

terminated the Lease. Relatedly, Woodsonia proved that events occurred triggering the Lease condemnation termination clause." Filing No. 21-3 at 9-15, 21.

Both the Hall County Court and the Hall County District Court are the only courts to rule on the unambiguous language of §15 of the Lease, and both found that Woodsonia indeed had the private contractual right to transfer AMC's leasehold interest to the CRA and that by virtue of §15.5, the Lease then terminated effective on the date of the transfer. *Id*. Finding a jurisdictional question of first impression, the Nebraska Supreme Court held the application of §15 of the Lease presented a title issue, not a contract issue, so the Hall County Court had no jurisdiction. Filing No. 21-4 at 13, 21. Without jurisdiction, the Supreme Court reversed the eviction judgment, but not on the merits of Woodsonia's contract rights. *Id*. Before Woodsonia could institute a proceeding in the Hall County District Court, AMC filed this action to avoid litigating the issue again in Hall County where it lost and to ignore the mandatory arbitration provision in the Lease.

## III. <u>AMC'S CLAIMS SHOULD BE IN ARBITRATION</u>

All of AMC's claims contained in its Complaint against Woodsonia are subject to the Arbitration Provision agreed to by the parties. AMC should be compelled to bring its claims against Woodsonia in arbitration, and these proceedings should be stayed until the arbitration process is complete.

### A. LEGAL STANDARD.

The parties to the Arbitration Provision are citizens of Nebraska (Woodsonia) and Kansas and Missouri (AMC ), (Filing No. 1 at -3, ¶¶ 4-8), and the Arbitration Provision includes the location of arbitration to be in yet another state, Colorado (Filing No. 1-1 at 24). As this dispute involves parties from multiple states and in commerce, it involves interstate commerce and is governed by the Federal Arbitration Act ("FAA"). *See* 9 U.S.C. § 2 (2022); *Seldin v. Est. of Silverman*, 305 Neb. 185, 198, 939 N.W.2d 768, 782 (2020); *Cullinane v. Beverly Enters.-*

*Nebraska, Inc.*, 300 Neb. 210, 222, 912 N.W.2d 774, 788 (2018). "[C]ourts have given Congress an expansive power over economic and commercial activities [so] it is difficult to imagine an economic or commercial activity that would be outside the scope of the Commerce Clause and, by extension, the FAA." *Aramark Unif. & Career Apparel, Inc. v. Hunan, Inc.*, 276 Neb. 700, 706, 757 N.W.2d 205, 210 (2008).[1]

"To decide the question of arbitrability, we must determine whether a valid arbitration agreement exists between the parties and, if so, whether the subject matter of the dispute falls within the scope of the arbitration clause." *JES Farms P'ship v. Indigo Ag Inc.*, 116 F.4th 733, 736 (8th Cir. 2024)). A pre-answer motion to compel arbitration can be analyzed under the legal standards for Rule 12(b)(6). *City of Benkelman, Nebraska v. Baseline Eng'g Corp.*, 867 F.3d 875, 881–82 (8th Cir. 2017). A motion compelling arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *H&T Fair Hills, Ltd. v. Alliance Pipeline, L.P.*, 76 F.4th 1093, 1099 (8th Cir. 2023); *citing Indus. Wire Prods., Inc. v. Costco Wholesale Corp.*, 576 F.3d 516, 520 (8th Cir. 2009). "Quite simply, there is a general presumption of arbitrability under federal law." *Cybertek, Inc. v. Bentley Sys., Inc.,* 182 F. Supp. 2d 864, 868 (D. Neb. 2002).

### B.    ARGUMENT AND SUPPORTING AUTHORITIES.

As alleged in the Complaint, the parties entered into a valid contract in the form of the Lease, which contained the express Arbitration Provision. Filing No. 1 at 3-4, ¶¶ 12-18; Filing No. 1-1 at 24. § 16.8 of the Lease includes the following:

> Arbitration. In the event of any disagreement, dispute or claim concerning this Lease or the obligations of Landlord and Tenant under this Lease (except as otherwise provided below), and if such matter cannot be resolved within ten (10)

---

[1] Finding a contract involving the renting of goods between companies incorporated in different states to be commercial interstate commerce and, thus, the FAA applied.

days after written demand by Tenant or Landlord to the other party that the matter in dispute be resolved through arbitration, either Landlord or Tenant shall be entitled to submit such matter to binding arbitration under the rules of the American Arbitration Association (the "AAA") then in effect. Any claim by Landlord for the eviction of Tenant or for possession of the Demised Premises shall not be subject to arbitration including, without limitation, the disputes, claims and defenses underlying such claim for eviction or possession, unless Landlord consents to such arbitration in its sole discretion…

Filing No. 1-1 at 24, § 16.8.

Consistent with the FAA, Woodsonia's motion seeks "to ensure that private agreements to arbitrate are enforced according to their terms." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (quotations omitted). In accordance with the "a strong federal policy in favor of enforcing arbitration agreements," the Arbitration Provision in this matter should be "rigorously enforce[d]." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217, 221 (1985).[2]

### i. The Issue Of Arbitrability Must Be Decided By The Arbitrator.

As a predicate matter, pursuant to the valid Arbitration Provision applicable to AMC and Woodsonia, even the question of whether AMC's claims are arbitrable should be determined by the arbitrator, not this Court, as the Arbitration Provision incorporates the "rules of the American Arbitration Association" (the "AAA"). Filing No. 1-1 at 24, § 16.8. AAA Commercial Rule 7(a) gives the power to the arbitrator to rule on their own jurisdiction, and the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.[3] The

---

[2] "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 626 (1985).

[3] American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures (2022), available at https://www.adr.org/sites/default/files/CommercialRules_Web_1.pdf. The AAA Rules from 2013, when the Lease was executed, include similar operative language under Rule 7 and can be accessed at
https://www.adr.org/sites/default/files/Commercial%20Arbitration%20Rules%20and%20Mediation%20Procedures%20Jul.%2001%2C%202003.pdf

Arbitration Provision at issue in this matter is similar to the arbitration provision in *Green v. SuperShuttle Int'l, Inc.* where the contract at issue also incorporated the AAA rules. Citing to the same Rule 7(a) as in the case at hand, the court determined that "[b]y incorporating the AAA Rules, the parties agreed to allow the arbitrator to determine threshold questions of arbitrability." *Green v. SuperShuttle Int'l, Inc.*, 653 F.3d 766, 769 (8th Cir. 2011); *see also Fallo v. High Tech-Inst.*, 559 F.3d 874, 878 (8th Cir. 2009) ("[W]e conclude that the arbitration provision's incorporation of the AAA Rules . . . constitutes a clear and unmistakable expression of the parties' intent to leave the question of arbitrability to an arbitrator.")(citation omitted).[4]

Therefore, even if AMC asserts that any or all of its claims should not be in arbitration, the parties have already agreed that even the issue of arbitrability of any of AMC's claims has been delegated to an arbitrator. In turn, an order staying the pending action before this Court and compelling arbitration is proper.

## ii. Arbitration of AMC's Claims pursuant to the Arbitration Provision.

Whether the issue of arbitrability is determined by the arbitrator or by this Court, arbitration of AMC's claims against Woodsonia is warranted pursuant to the Arbitration Provision because the parties (1) agreed to arbitrate and (2) the Arbitration Provision covers the issues that are the subjects of AMC's claims. *See BSI Grp. LLC v. EZBanc Corp*, 122 F.4th 712, 715 (8th Cir. 2024).

---

[4] *See also Archer & White Sales, Inc. v. Henry Schein, Inc.,* , the Fifth Circuit Court determined that "A contract need not contain an express delegation clause [of arbitrability to the court or the arbitrator]… an arbitration agreement that incorporates the AAA Rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." 935 F.3d 274, 279 (5th Cir. 2019). In *Brennan v. Opus Bank*, the Ninth Circuit concluded that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." 796 F.3d 1125, 1131 (9th Cir. 2015).

### a. AMC Agreed to Arbitrate.

From the face of the Complaint, which attaches and incorporates the Lease containing the Arbitration Provision, there can be no question that the parties agreed to arbitrate. Filing No. 1-1 at 24, § 16.8. Thus, the first prong of arbitrability is satisfied in favor of arbitration.

### b. AMC Agreed The Claims Raised in Its Complaint Are Arbitrable.

As for the second prong of arbitrability, it must be determined whether the Arbitration Provision covers the claims asserted by AMC against Woodsonia in the Complaint. Again, from the face of the Complaint, as well as the Exhibits attached thereto, it is clear the three claims raised by AMC are subject to the Arbitration Provision. AMC's claims for relief are of and concerning the "Lease or the obligations of Landlord and Tenant."

The Arbitration Provision applies to "any disagreement, dispute or claim" and is therefore considered a "broad arbitration clause." *JES Farms,* 116 F.4th at 736. The 8th Circuit further opined that a motion compelling arbitration,

> …should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute…
>
> [I]f doubts exist as to the arbitrability of an issue, the Federal Arbitration Act requires the disputes to be resolved in favor of arbitration. Our task is to look past the labels the parties attach to their claims to the underlying factual allegations and determine whether they fall within the scope of the arbitration clause.

*H&T Fair Hills,* 76 F.4th 1093, 1099, 1100 (8th Cir. 2023) (citations and quotations omitted). As set forth below, based on the liberal standard on arbitrability, AMC's claims are subject to the Arbitration Provision.

### 1. AMC's Count I is arbitrable.

AMC's first count expressly concerns the Lease as it is a breach of contract claim and is undeniably subject to the Arbitration Provision contained in Section 16.8 of the Lease. AMC

asserts Woodsonia breached the Lease by taking action that Woodsonia asserted was allowed by the express terms of the Lease. Therefore, there is no question that this breach of contract claim is a "disagreement, dispute or claim concerning this Lease" and is subject to the Arbitration Provision.

### 2. AMC's Count II is arbitrable.

While AMC's second count is labeled as a wrongful eviction claim, the Complaint's allegations amount to an allegation that Woodsonia's actions breached the Lease. And as found in *H&T Fair Hills*, AMC's label must be "look[ed] past" and the underlying factual allegations examined to determine "whether they fall within the scope of the arbitration clause." *H&T Fair Hills,* 76 F.4th at 1100. Paragraph 75 of the Complaint makes specific reference to Sections 15.1 through 15.5 of the Lease as the applicable provisions exercised by Woodsonia ("the purported termination of AMC's leasehold interest in the Demised Premises under 15.1 to 15.5 of Lease is nullity"). Filing No. 1 at 17, ¶ 75. AMC further specifically alleges that *the Lease* did not "permit Woodsonia to simply give AMC's contract rights under the lease to another party." *Id*. While Woodsonia obviously disagrees and asserts that Woodsonia's actions were in accordance with the rights the contractual provisions provided it, what matters for this purpose is the terms of the contract are specifically at issue under this claim for relief. Thus, this is an arbitrable claim under the Arbitration Provision.[5]

---

[5] Section 16.8 includes a carve out for eviction proceedings; however, that is inapplicable here. As noted, AMC's Count II is a breach of contract claim, not an eviction claim. Further, the carve out expressly applies to a "claim by Landlord for the eviction of Tenant," which this claim is clearly not. As AMC's Complaint alleges, the eviction has already occurred. Filing no. 1 at 13, ¶¶ 52-53. The action raised in the Complaint relates to the contractual provisions, not an eviction. Furthermore, even if this were an eviction action, the Arbitration Provision expressly gives the Woodsonia, as landlord, the power to "consent to arbitration in its sole discretion," which it does herein. Filing no. 1-1 at 24, § 16.8.

### 3. AMC's Count III is arbitrable.

AMC's third count alleges a violation of 42 U.S.C. § 1983; again, however, the issues that are to be actually adjudicated concern the Lease or the obligations under the Lease, and the Arbitration Provision therefore applies. The framing of this claim for relief as a Constitutional matter does not alter that the dispute falls squarely within subject matter of the Arbitration Provision. AMC's '§ 1983 label' should be ignored. *See H&T Fair Hills,* 76 F.4th at 1100.

Further, arbitration of a § 1983 claim is consistent with the expansive view the FAA and courts give to the application of arbitration provisions, and the consistent position that any doubt should be resolved in favor of arbitration.[6] Other federal courts have addressed this issue and found that compelling the litigation of a § 1983 claim through arbitration was appropriate. *See De Luna v. Spindletop Ctr.,* No. 1:23-CV-00167-MJT-ZJH, 2024 WL 2097165 (E.D. Tex. Apr. 17, 2024), report and recommendation adopted sub nom. *DeLuna v. Spindletop Ctr.,* No. 1:23-CV-00167-MJT-ZJH, 2024 WL 2094646 (E.D. Tex. May 9, 2024)(compelling arbitration of a claim arising under 42 U.S.C. § 1983). "Federal statutory claims are generally arbitrable because arbitration, like litigation, can serve a remedial and deterrent function, and federal law favors arbitration." *See Paladino v. Avnet Computer Techs., Inc*., 134 F.3d 1054, 1062 (11th Cir. 1998) (*citing Gilmer v. Interstate/Johnson Lane Corp*., 500 U.S. 20, 28, 111 S.Ct. 1647, 1653, 114 L.Ed.2d 26 (1991).

In *DeLuna*, the court determined that a claim of improper termination under § 1983, allegedly related to substance abuse issues, still arose from the employment agreement that included an arbitration provision. *De Luna,* 2024 WL 2094646 *3. Just as in *DeLuna*, the claimed

---

[6] A "motion to compel arbitration should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Indus. Wire Prods., Inc. v. Costco Wholesale Corp*., 576 F.3d 516, 520 (8th Cir. 2009) (internal quotations and citations omitted).

§ 1983 action from AMC arises out of the Lease that contains the valid Arbitration Provision. As such, Claim III should be arbitrated accordingly.

### iii. It Is AMC's Burden To Prove A Claim's Non-Arbitrability, and AMC Cannot Do So.

If AMC disputes that any of its claims for relief should be subject to the Arbitration Provision of the Lease, AMC has the burden to prove that each of the claims for relief it has brought are not arbitrable. *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91- 92, 121 S. Ct. 513, 522 (2000) ("We have held that the party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue."). A plain reading of the terms of the Lease, the allegations contained in the Complaint, and the facts contained in the incorporated exhibits to the Complaint, establish that AMC cannot meet its burden that each of the claims for relief it has brought are not arbitrable.

### iv. Even If Not Subject To Arbitration, AMC's Counts II And/Or III Should Be Stayed Pending The Arbitration Of AMC's Counts I.

If it is determined that AMC's Count II or Count III are not subject to the Arbitration Provision, this pending matter should be stayed until arbitration on the arbitrable claim(s) has occurred. As set forth herein, the Complaint and Lease are clear that, at the very least, Count I of the Complaint should be compelled to arbitration under the Arbitration Provision. As such, the remaining claims should be stayed until the arbitration on the arbitrable claim is completed in accordance with the Arbitration Provision in the Lease. Such a stay would be consistent with precedent:

> Presumably, Section 3 [of the FAA] also is broad enough to permit the stay of an entire action even though only some of the issues in the lawsuit are referable to arbitration. Indeed, the Courts of Appeal for the Second and Seventh Circuit have declared that a "commonsense" reading of Section 3 leads to the conclusion that "if there is a federal action 'upon' an 'issue referable to arbitration' by the terms of an arbitration agreement, then the federal court must 'stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.'

*Cybertek*, 182 F. Supp. 2d at 871–72. (citations omitted). Furthermore, such a stay is within the sound discretion and authority of a district court. *See Collins Radio Co. v. Ex–Cell–O Corp.*, 467 F.2d 995, 1000 (8th Cir. 1972) (Court approved a district court's decision to stay entire action on a three-count complaint when only one count was subject to arbitration).

The practical impact of the arbitration proceeding on even the first Count, the breach of contract claim, makes staying these proceedings as to all other Counts logical, and necessary, to ensure appropriate adjudication. Because if the arbitration results in a recognition that Woodsonia's contractual rights to transfer the Leasehold interest of AMC, and the resulting termination of the Lease, then there was no taking of any right or interest of AMC. In that situation, there is no wrongful eviction and there can be no wrongful taking under § 1983. An arbitration result vindicating Woodsonia's action (a private party exercising private contract rights granted by AMC, not the exercise of governmental power or right) as pursuant to the Lease would preclude AMC's recovery on its other Counts.

Thus, a stay of the adjudication of all non-arbitrable claims of AMC in this Court whilst the arbitration of any arbitrable claims is 'commonsense' under the Arbitration Provision and it would be an appropriate use of this Court's discretion to issue an order as such.

## IV. IN THE ALTERNATIVE TO COMPELLING ARBITRATION, AMC'S CLAIMS SHOULD BE DISMISSED PER RULE 12(b)(1) AND/OR RULE 12(b)(6)

In the alternative, if AMC's claims are determined to not be subject to the Arbitration Provision, AMC's claims should be dismissed for lack of subject matter jurisdiction, pursuant to Fed. R. 12(b)(1), and/or failure to state a claim upon relief can be granted, pursuant to Fed. R. 12(b)(6).

### A. APPLICABLE PLEADINGS STANDARDS.

<u>Subject Matter Jurisdiction.</u> A motion to dismiss for lack of subject matter jurisdiction is

made pursuant to Federal Rule of Civil Procedure 12(b)(1). As plead, AMC's Complaint cannot survive a facial attack on subject matter jurisdiction in this court under Rule 12(b)(1). In such an attack, "the Court accepts the facts alleged in the complaint as true and draws all reasonable inferences in the plaintiff's favor." *W. Point Auto & Truck Ctr., Inc. v. Klitz*, 492 F. Supp. 3d 936, 940 (D. Neb. 2020) (*citing Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016)). Then the court looks to determine if the basis for subject matter jurisdiction has been sufficiently alleged. *See Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 914 (8th Cir. 2015). AMC cannot meet this pleading sufficiency requirement.

Subject matter jurisdiction "is a threshold requirement which must be assured in every federal case" as Federal Courts are courts of limited jurisdiction. *Turner v. Armontrout*, 922 F.2d 492, 493 (8th Cir. 1991). "Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'" *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 408 (2013). An essential element of justiciability under Article III is that a party must have standing to sue. *Id.* All courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). And "[t]he objection that a federal court lacks subject-matter jurisdiction, see Fed. Rule Civ. Proc. 12(b)(1), may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Id.* at 506. Standing is a threshold question that must be addressed before the merits of a case because, without it, judicial power ceases beyond recognition of its absence and dismissal of the case. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998); *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007) ("We have stated numerous times that "standing is a 'threshold inquiry' that 'eschews evaluation on the merits.'").

A plaintiff in federal court must meet Article III standing requirements irrespective of whether the underlying claims are based in federal or state law. *See In re Guidant Corp. Implantable Defibrillators Products Liability Litigation*, 484 F.Supp.2d 973, 982 (D. Minn. 2007). "To satisfy the requirements of standing, a plaintiff must (1) allege to have suffered an injury in fact, (2) establish a causal relationship between the defendant's conduct and the alleged injury, and (3) show that the injury would be redressed by a favorable decision." *Subramanian v. Tata Consultancy Servs. Ltd.*, 352 F.Supp.3d 908, 915 (D. Minn. 2018) (citing *Lujan v. Defendants of Wildlife*, 504 U.S. 555, 560-61 (1992)). This inquiry is determined based on the facts that existed at the time the complaint was filed. *Id.* Further, "[t]o establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). "Article III standing cannot be waived by the parties, nor can litigants consent to have the Court issue a non-binding advisory opinion." *Stewart v. City of Red Wing*, 554 F.Supp. 2d 924, 930 (D. Minn. 2008) (citing *Sierra Club v. Robertson*, 28 F.3d 753, 757 n. 4 (8th Cir. 1994)). As explained herein, AMC fails to plead and establish this requisite injury from an invasion of a legally protected interest in a concrete and particularized way.

"The real party in interest requirement, […], focuses on ensuring that the proper plaintiff is prosecuting the claim, i.e., that the plaintiff is the person who possesses the right to be enforced." *Hamilton v. Credit Bureau Servs.,* No. 8:20CV141, 2020 WL 5593885 (D. Neb. Sep. 18, 2020) (citing *Mitchell Food Prods., Inc. v. United States*, 43 F.App'x 369, 369-70 (Fed. Cir. 2002)). "The function of [FRCP 17(a)] 'is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata.' " *Id.* (quoting *Curtis Lumber Co. v. Louisiana Pac. Corp.,* 618 F.3d 762,

771 (8th Cir. 2010)(some internal quotation marks omitted). The rule "requires that the plaintiff 'actually possess, under the substantive law, the right sought to be enforced.'" *Id.* (quoting *United HealthCare Corp. v. Am. Trade Ins. Co.*, 88 F.3d 563, 569 (8th Cir. 1996)). Pursuant to the Lease that AMC, AMC is not the real party in interest as it lost and/or assigned any of the interests it now attempts to assert under the contractual terms of the Lease to which it agreed. AMC cannot meet this pleading requirement and therefore, under Rule 12(b)(1), AMC lacks standing and this Court does not have subject matter jurisdiction.

    Failure to State A Claim. Federal Rule of Civil Procedure 12(b)(6) provides for a pre-answer motion for dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 8(a)(2) requires a complaint to include a short and plain statement of the claim against a defendant showing that the plaintiff is entitled to the relief sought. Rule 10(c) reads, "[a] statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Federal Rule of Civil Procedure 10(c). Rule 9(g) requires the complaint to specifically state special damages. Federal Rule of Civil Procedure 9(g).

    The Court should consider the nonconclusory allegations as true for the purposes of ruling on this Motion. *See Bauer v. AGA Serv. Co.,* 25 F.4th 587, 589 (8th Cir. 2022) (quoting *Pietoso, Inc. v. Republic Servs., Inc.,* 4 F.4th 620, 622 (8th Cir. 2021)). "A claim survives a Rule 12(b)(6) motion to dismiss only if the complaint's nonconclusory allegations, accepted as true, make it not just 'conceivable' but 'plausible' that the defendant is liable." *Mitchell v. Kirchmeier*, 28 F.4th 888, 895 (8th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 680–83 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at

678. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

While the Court must accept factual allegations as true, it is not required to accept any "legal conclusion couched as a factual allegation." *Brown v. Green Tree Servicing LLC*, 820 F.3d 371, 373 (8th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678). Where the facts alleged in the complaint are 'merely consistent with' a defendant's liability, and fail to rise above a speculative level, the complaint "stops short of the line between possibility and plausibility of entitlement to relief." *See Twombly*, 550 U.S. at 557; *see also Dunbar v. Wells Fargo Bank, N.A.*, 853 F. Supp. 2d 839, 845–46 (D. Minn. 2012), as amended (Apr. 12, 2012), aff'd, 709 F.3d 1254 (8th Cir. 2013). Thus, if from the face of the complaint, the claim to relief is not plausible and conceivable, Rule 12(b)(6) also permits dismissal of such claim. *Twombly*, 550 U.S. at 570. *See, e.g., Couzens v. Donohue*, 854 F.3d 508, 517 (8th Cir. 2017) (concluding that dismissal was appropriate where Missouri did not recognize a claim for false light invasion of privacy); *Freeney v. Galvin*, No. 8:19CV557, 2020 WL 229996, at *2 (D. Neb. Jan. 15, 2020) (concluding that the plaintiff failed to state a § 1983 claim against the manager of his private place of employment because such a claim is not cognizable where a private person is not a state actor or engaged in joint action with the state or its agents).

On a Rule 12(b)(6) motion, this Court is not strictly limited to consideration of the nonconclusory allegations in AMC's Complaint, but "may [also] consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders,

items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Roberson v. Dakota Boys & Girls Ranch*, 42 F.4th 924, 928 (8th Cir. 2022) (internal quotation marks and citations omitted). As such, following Eighth Circuit precedent, the Court should also consider "materials 'necessarily embraced by the pleadings.'" *LeMay v. Mays,* 18 F.4th 283, 289 (8th Cir. 2021) (quoting *Buckley v. Hennepin Cnty.*, 9 F.4th 757, 760 (8th Cir. 2021), in turn quoting *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015)).

Thus, per the Rules and applicable case law, the 20 exhibits attached to AMC's Complaint containing 400 pages of additional factual information should be treated as a part of the complaint itself, including for purposes of this motion to dismiss. *See Ballinger v. Gustafson*, No. 8:22CV213, 2022 WL 16758558, at *3 (D. Neb. Oct. 19, 2022) (citing *Meehan v. United Consumers Club Franchising Corp.*, 312 F.3d 909, 913 (8th Cir. 2002) ("[T]he Eighth Circuit Court of Appeals, treat Rule 10(c) more broadly, and generally consider 'materials attached to the Complaint as exhibits' when construing the sufficiency of a complaint on a motion to dismiss."); *Bradford v. Huckabee*, 394 F.3d 1012, 1015 (8th Cir. 2005) ("The exhibits Bradford attached to his complaint are part of the complaint for this purpose" of reviewing a denial of a motion to dismiss."); *Klitz*, 492 F. Supp. 3d at 940 ("In evaluating a facial attack, the Court can consider 'materials that are necessarily embraced by the pleadings and exhibits attached to the complaint.'").

Where a document attached to the complaint contradicts an allegation of the complaint, the attached document controls. *Thompson v. Illinois Dept. of Prof. Reg.*, 300 F.3d 750, 754 (7th Cir. 2002) (noting the "well-settled rule that when a written instrument contradicts allegations in a complaint to which it is attached, the exhibit trumps the allegations") (internal quotation marks and omitted, emphasis in the original); *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 note 8 (3rd Cir.

1994) (same); *Feldmann Imports Inc. v. Mercedes-Benz USA, LLC*, 506 F. Supp. 3d 687, 694 (D. Minn. 2020) (same); *Elkharwily v. Mayo Holding Co.,* 955 F. Supp. 2d 988, 996 (D. Minn. 2013), *aff'd,* 823 F.3d 462 (8th Cir. 2016) (same).

As applied to AMC's nonconclusory allegation in its Complaint, AMC has not stated, and it cannot by amendment state, a plausible and conceivable claim for relief against Woodsonia. "[D]ismissal under Rule 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises and deigned to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001).

## B.    THE CHALLENGED CLAIMS AGAINST WOODSONIA AND AMC'S ALLEGATIONS.

AMC's Complaint raises three claims against Woodsonia. All three are supported by conclusory and insufficiently plead factual allegations. Additionally, the attached and incorporated exhibits to the Complaint contain a multitude of indisputable factual information that contradicts and subverts the allegations contained in the Complaint against Woodsonia.

### i.    AMC's Count I Allegations.

Under AMC's Count I for breach of contract, AMC offers de minimus allegations to support its claim. AMC asserts that Woodsonia breached an implied covenant of good faith and fair dealing by not refraining from doing anything that would injure AMC's right to benefit from the Lease. Filing No. 1 at ¶69. AMC further alleges that Woodsonia breached a covenant of quiet enjoyment. *Id*. at ¶71. AMC attempts to support these alleged breaches of contract allegations with conclusory language that Woodsonia's action in breach was to terminate the Lease and evict AMC from the Premises. *Id*. at ¶72.

The other allegations in the body of the Complaint are similarly without detail in support of the breach of contract claim. For example, AMC alleges multiple times about the City and the

CRA involvement in the approval and adoption of the redevelopment plan, which contradicts any breach of contract. *Id*. at ¶¶ 23-25. None of these allegations relate to Woodsonia. Further, AMC includes multiple allegations regarding Woodsonia's exercise of its contractual rights under the Lease in furtherance of the redevelopment plan. Filing No. 1 ¶¶27-29. Notably, AMC attached Woodsonia's March 8, 2023 letter to AMC wherein Woodsonia explains in detail what was happening and the rights under the Lease that were being exercised. Filing No. 1-15. As AMC admits, the letter includes and cites to language from the Lease that AMC was a party to. Filing No. 1 at ¶¶30-31. As explained in that letter, supported by the Lease itself, Woodsonia had acquired the lessor's rights and obligations under the Lease. Filing No. 1-15. Further, as alleged by AMC, and set forth in the incorporated letter to AMC, the CRA informed AMC that it was intending to exercise condemnation proceedings which, contractually, tripped Woodsonia's rights. Filing No. 1. at ¶35; Filing No. 1-17.

AMC further alleges that Woodsonia entered into a legal agreement with the CRA specifically addressing the CRA's threat of condemnation proceedings, and the resulting transfer of AMC's leasehold interest to the CRA and the termination of that interest, and attaches and incorporates the legal agreement itself to the Complaint. Filing No. 1 at ¶37-38; Filing No. 1-18. While AMC attempts to massage the facts through its conclusory allegations, the exhibits to the Complaint provide all context and meaning to understand the actions by Woodsonia, and Woodsonia's legal basis for those actions. AMC also alleges that Section 15.1 to 15.5 of the Lease use the term "Demised Premises, or a substantial part thereof" to mean the "land and building held in fee by Woodsonia" and assert that those Sections only operate to terminate AMC's leasehold interest in the Demises premises if, and only if, Woodsonia's own fee interest in the Demised Premises" is threatened in condemnation proceedings. Filing No. 1 at ¶¶39-40. This

characterization is demonstrably false and contradicted by the Lease that is attached and incorporated into the Complaint. Filing No. 1.1. Nowhere in the Lease does is "Demised Premises" defined in this manner; in fact, Demised Premises is defined in Section 1.1 and refers to the AMC location in the Shopping Center. Filing No. 1-1 at 3. It contains no language similar to what AMC alleges in its Complaint. *Id*. Further, Section 15.1 through 15.5 contain no such language as asserted by AMC that would modify this definition. Filing No. 1-1 at 20-21. AMC's allegations contained paragraphs 39-45, whereby it relies on this erroneous definition to assert there was no threatened condemnation are wholly unsupported under the express language of the Lease and should be accordingly disregarded.

Furthermore, as plead by AMC, the Hall County Court, and the Hall County District Court, determined that Woodsonia had the right to evict AMC, which was only possible under the contractual rights under the Lease and the application of Section 15 of the Lease.[7]

AMC allegations are speculative and deficient, are improper legal conclusions, and are directly contradicted by the exhibits attached to and incorporated by the Complaint. Thus, AMC's allegations of a breach of contract cannot stand.

### ii. AMC's Count II Allegations

AMC's Count II is for "wrongful eviction" but essentially asserts the same operative allegations in support of this claim as it did in support of its breach of contract claim. AMC alleges that Woodsonia's termination under Section 15.1 was a nullity. Filing No. 1 at ¶75. This is an

---

[7] This Court can take judicial notice of the judicial opinion of the Hall County Court and District Court finding that the unambiguous language of section 15 the Lease and Nebraska law. *See Barfield-Peak v. Rudolph*, No. 8:24CV59, 2024 U.S. Dist. LEXIS 33996 (D. Neb. Feb. 28, 2024) (*citing Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005). The referenced opinions have been filed as evidence in support of Defendant Gregory S. Scaglione's Motion to Dismiss and incorporated herein by reference. Filing Nos. 21-1 – 21-4.

improper legal conclusion and contrary to the facts embraced by AMC contained in the Lease, as well as the judicial opinions of the Hall County Court and the Hall County District Court. Filing No. 1-1. AMC alleges that the "Lease does not permit Woodsonia to simply give AMC's contract rights under the lease to another party." Filing No. 1 at ¶75. As the Hall County courts found, Woodsonia was exercising its contractual rights granted to it by Section 15.1-15.5, which specifically allowed for AMC's actions as alleged in the Complaint. Filing Nos. 1-1, 1-15, 1-17, 1-19.

AMC's allegation at paragraph 76 regarding a wrongful eviction because the "Lease was in full force and effect," is also contrary to the facts set forth in the exhibits to the Complaint. The forcible detainer action was completed on May 1, 2025. Filing No. at ¶52. The termination of AMC's Lease occurred on March 31, 2023 and AMC was provided with the three-day notice to quit on April 4, 2023. Filing Nos. 1-18, 1-19. Thus, AMC's allegation that the Lease was in full force and effect and therefore the eviction was wrongful is contradicted by the undisputed facts contained in exhibits attached to its own Complaint. AMC's allegations fail on their face to support Count II.

### iii. AMC's Count III Allegations

AMC's Count III allegations attempt to support its cause of action for a wrongful taking under 42 U.S.C. § 1983, but again, the allegations contained in the Complaint are either factually deficient, are improper legal conclusions, or are directly contrary to the undisputed facts contained in the voluminous exhibits to the Complaint.

AMC begins with the naked and conclusory allegation that "Woodsonia…conspired to deprive AMC of its Fifth and Fourteenth Amendment rights, and therefore were acting under color of law and are subject to suit under 42 U.S.C. § 1983." Filing no. 1 at 16, ¶ 81. AMC's pleading then offers no specific allegation supporting Woodsonia acting under the color of law. Such an

allegation is contradicted by the exhibits to the Complaint establish that Woodsonia was only acting within its contractual rights, not the color of law. Filing No. 1-1, 1-15, and 1-19.

While using the modifier "specifically" in paragraph 82, ostensibly to provide appropriately detailed allegations, AMC's pleading again fails to offer allegations sufficient to arise above pure speculation. Paragraphs 82(a)-(b) offer nothing as it relates to Woodsonia's alleged actions in an unlawful taking as all it alleges are facts related to legal work in the pursuit of the parties' legal rights and obligations under the Lease. Filing No. 1 at ¶82(a)-82(b).

AMC's allegation at paragraphs 82(c)-2(d) also relate to a letter from CRA not a letter by Woodsonia, and therefore cannot support any alleged improper action by Woodsonia. Moreover, the letter simply set forth the facts of what had occurred related to the Redevelopment Plan, the Lease, and the leasehold rights under the Lease. Filing No. 1 at ¶¶82(c)-82(d). While AMC alleges the letter was intended to "induce" AMC and not represent "good faith negotiations," this is pure speculation and an improper legal conclusion. The letter is attached to the Complaint, including the appraisal report obtained for use in negotiations, and contradicts and trumps AMC's naked assertions that anything was being pursued other than good faith negotiations following the exercise of contractual rights. Filing No. 1-17.

AMC continues its conclusory, and irrelevant, allegations as to Woodsonia in paragraphs 82(e)-82(f) which address the Transfer and Termination Agreement. Filing No. 1 at ¶¶82(e)-82(f). The Transfer and Termination Agreement is attached the Complaint and sets forth the legal transfer of AMC's leasehold interest and termination of Lease, and basis for the same, per the terms of Section 15 of the Lease. Filing No. 1-18. AMC's attempts to cast doubt on the legality of the transfer is without basis, contradicts the written instrument, and should be disregarded as an improper legal conclusion.

Finally, AMC's allegations contained in paragraph 82(g)-82(h) are unfounded legal conclusions. Filing No. 1 at ¶¶82(g)-82(h). AMC's assertion the termination of the lease is a nullity, the lease termination ineffective, and the eviction wrongful are not allegations of fact, they are improper legal opinions and/or statements of law. Once Woodsonia transferred AMC's leasehold interest, § 15.5 of the Lease deemed the Lease terminated as of the date of such transfer, thus the mutual termination simply documented what occurred automatically by operation of the Lease. Filing Nos. 1-1 at 21, 1-18. Further, these allegations are directly contrary to the findings of the Hall County Court and the Hall County District Court, which both determined that Woodsonia was acting in accordance with its contractual rights.

Finally, in paragraphs 83 and 84, AMC alleges, in improper conclusory form, that it suffered damages and it entitled to recover attorney fees, costs and to be awarded punitive damages, and fails to specifically state special damages in violation of Federal Rule of Civil Procedure 9(g). No facts are alleged to identify such damages or to support a basis for an award of punitive damages other than quoting statutory grounds for such an award. Further, those allegations are directly contradicted by the express language of the Lease wherein AMC's agreed AMC is not entitled to, nor shall "seek any damages for lost profits, consequential or punitive damages" Filing No. 1-1 at 32, § 29.7.

### C. ARGUMENT AND SUPPORTING AUTHORITIES.

#### i. AMC's Claims Fail To Allege An Injury In Fact Should Be Dismissed For Lack of Subject Matter Jurisdiction Per Rule 12(b)(1).

In order for AMC to have standing to bring its claims against Woodsonia in this Court, it must plead and prove "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Young America Corp. v. Affiliated Computer Services (ACS), Inc.,* 424 F.3d 840, 843 (8th Cir.2005). As AMC's

Complaint offers no factual allegations that AMC itself suffered an injury in fact, the Complaint should be dismissed for lack of standing. *Id.* Further, the facts alleged in AMC's complaint are directly contradicted by the written instruments attached the Complaint and therefore fail to raise a reasonable expectation that AMC can meet the necessary elements of its claims.

AMC cannot plead and prove it has suffered an injury in fact because the incorporated exhibits to the Complaint establish AMC's lack of legally protected right and lack of any rights to damages. Specifically, Section 15.2 or the Lease includes the following:

> 15.2 Award. *Landlord shall be entitled* to the entire award in any condemnation proceeding *or other proceeding for taking* the Demised Premises, Building or Shopping Center for public or quasi-public use, including, without limitation, any award made for the value of the leasehold estate created by this Lease. *No award for any partial or total taking shall be apportioned*, and *Tenant hereby assigns to Landlord any award* that may be made in such condemnation or other taking, together with any and all rights of Tenant now or hereafter arising in or to the same or any part thereof…

Filing No. 1-1 at 21 (emphasis added). AMC's claims of injury are all related to its leasehold interest, which the operative language of the Lease evidences AMC no longer has and, thus, AMC does not have standing to assert the claims against Woodsonia. "When the terms of a contract are clear, . . . [they] are accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them, and in such a case, a court shall seek to ascertain the intention of the parties from the plain language of the contract." *Stackhouse v. Gaver*, 801 N.W.2d 260, 270 (Neb. 2011). The terms of the Lease are unmistakably clear on multiple fronts.

Firstly, pursuant to the Lease, Woodsonia is the "Landlord" and therefore the party who has any entitlement to any award from a condemnation proceeding, which did not occur, or any other "taking" proceeding, which is exactly what AMC has alleged in this action. Secondarily, the Lease specifically states that any award for any taking action cannot be apportioned, so AMC lacks any right to even a portion of an award for a takings action. Finally, Section 15.2 explicitly states

that AMC, as the "Tenant," has assigned any award in any takings action specifically to Woodsonia. Thus, under the express terms of the Lease, attached to and incorporated into the Complaint, AMC cannot allege a right to any damages for any alleged taking as it does not such right.

While Section 15.2 includes two possible exceptions to the assignment, neither are applicable to this case. One exception is the "right to claim and recover from the condemnor, but not from Landlord" damages for business interruption due to the condemnation. However, no such claim or right exists and AMC's claim fails on the face of its Complaint.[8] AMC may only recover "just compensation" as defined by NJI2d Civ. 13.26 (namely that amount of money equal to the decrease in the fair market value of AMC's leasehold interest figured according to the following formula, *first*, before the alleged taking, the fair market value of the remainder of the term of the Lease, minus the amount of rent AMC was obligated to pay over the remainder of the term of the Lease; *second,* after the alleged taking, what was the fair market value of the remainder of the term

---

[8] When a tenant asserts an inverse condemnation, the law prohibits (i) the consideration of anticipated lost profits from the continued carrying on of a business in an established location in estimating the damages, and (ii) the showing of lost profits of a business for the purpose of proving the value of the taken property. *Lantis v. City of Omaha,* 237 Neb. 670, 674, 467 N.W.2d 649, 652 (Neb. 1991). As stated in the Annotation, 7 A.L.R. 163, and in 27 Am.Jur.2d, Eminent Domain, § 285, p. 83, and § 431, p. 338, American jurisdictions have held that evidence of profits derived from a business conducted on property is too speculative, uncertain, and remote to be considered as a basis for ascertaining the market value of property taken in eminent domain proceedings. In the case of business income, much depends on such factors as management, available capital, advertising, business connections, the times, etc. Nichols on Eminent Domain (3d Ed.), § 19.-3(1) offers a similar analysis and conclusion. Further, A capitalization of income or profit approach has met with disfavor. *Y Motel, Inc. v. State Dept. of Roads,* 193 Neb. 526, 533, 227 N.W.2d 869, 874 (Neb. 1975) ("There is no such thing as typical income or expenses for the operation of a restaurant, motel, or lounge. To permit a person, even a qualified one, to appraise a tract of land on the basis of capitalization of income by an estimate of the operation of a typical business would be guesswork at every stage."); *see Verzani v. State,* 188 Neb. 162, 195 N.W.2d 762 (1972).

of the Lease, minus the amount of rent AMC was obligated to pay over the remainder of the term of the Lease; *third*, subtract the second number from the first number to determine the amount of compensation to which the AMC is entitled). Importantly, however, AMC assigned that claim and related damages to Woodsonia without apportionment. Filing No. 1-1 at 21. Moreover, 15.4 of the Lease provides that AMC has no claim whatsoever for the unexpired portion of the Lease. *Id*.

The second exception allows AMC the right to relocation costs that AMC might incur in moving from the Demised Premises. *Id.* However, other than a conclusory allegation that AMC suffered damages that include "relocation and rebuilding expenses," AMC has not plead any such damages. In fact, as set forth in Exhibit 15 to the Complaint, Woodsonia noted the availability of relocation costs reimbursements. Filing No. 1-15 at 5. However, AMC's Complaint makes no allegation that it ever requested any such reimbursement. AMC's Complaint does not set forth sufficient allegations to make any claim related to even this limited right to the relocation costs.

Further, AMC also lacks standing under Section 15.3 of the Lease wherein AMC expressly disclaimed any right to a cause of action against Woodsonia for the alleged lost value of the leasehold:

> 15.3 <u>No Claim Against Landlord</u>. It is understood that in the event of the termination of this Lease as provided under this Article, Tenant shall have no claim against Landlord for the value of any unexpired term of this Lease and has no right or claim to any part of the award made on account thereof, except as specifically provided in this Article.

Filing No. 1-1 at 21, § 15.3. AMC acknowledges in its Complaint that the Lease was terminated in accordance with Section 15 of the Lease. Filing No. 1 at ¶38; Filing No. 1-18. Under Section 15.3, that termination of the Lease resulted in AMC having "no claim against [Woodsonia]." AMC's attempt to legally conclude the exercise of Woodsonia's contractual rights were "not authorized" is a legal conclusion that should be ignored. The exhibits to the Complaint establish

that Woodsonia had certain contractual rights, (Filing No. 1-1), that it exercised those contractual rights, (Filing No. 1-18, and AMC's Lease, and any rights derived from the Lease, was terminated as a result (Filing No. 1-19). As such, AMC's Complaint for an award related to any rights existing after termination of the Lease is also without factual support because AMC had no such rights. As such, the Court lacks subject matter jurisdiction for AMC's claims.

AMC's Counts I and II seek an award of lost profits and consequential damages. As referenced herein, AMC has no claim for lost profits and AMC lacks standing in this Court to assert that claim. Furthermore, AMC expressly waived any right to seek any damages for lost profits, consequential, or punitive damages:

> 29.7 <u>Limitation of Landlord Liability</u>....In no event shall Tenant be entitled to seek damages for Landlord's breach of this Lease in an amount greater than the out-of-pocket cash expenditures of Tenant resulting from such breach, and Tenant shall not be entitled to nor shall Tenant seek any damages for lost profits, consequential or punitive damages.

It is accepted law in Nebraska that "a contractual waiver or exclusion of consequential damages will be upheld unless the provision is unconscionable." *Swan Realty Grp., LLC v. State Farm Fire & Cas. Co.*, No. 8:24CV364, 2024 WL 4870502, at *9 (D. Neb. Nov. 22, 2024) (citing and quoting *U.S. Pipeline, Inc. v. N. Nat. Gas Co.*, 930 N.W.2d 460, 476 (Neb. 2019). Under the law, and the contractual terms under the Lease agreed to by AMC, AMC has no legal right to lost profits, consequential damages, or punitive damages. Without such a legally recognized right for those damages, AMC does not have standing in this Court to seek the requested redress.

Based on the Exhibits attached to and incorporated into the Complaint, and the relevant case law, AMC's Complaint does not contain a cognizable claim for any of the damages AMC

asserts as the rights ceased upon termination and assignment to Woodsonia. Therefore, under Rule 12(b)(1), the dismissal of AMC's claims for lack of standing is appropriate.

### ii. AMC's Count I For Breach of Contract Should Be Dismissed For Failure To State A Claim.

Under Nebraska law, in order for AMC to state a claim for breach of contract, AMC "must plead the existence of a promise, its breach, damages, and compliance with any conditions precedent that activate the defendant's duty." *See Fundacion Teleton USA v. Alorica, Inc.*, No. 8:24CV117, 2024 U.S. Dist. LEXIS 146255 (D. Neb. Aug. 15, 2024) (citing and quoting *Kotrous v. Zerbe*, 287 Neb. 1033, 846 N.W.2d 122, 126 (Neb. 2014)). On the face of AMC's Complaint, AMC does not state a claim for breach of contract upon which relief could be granted as it fails to allege an essential element of that claim.

### a. AMC fails to sufficiently allege a breach of the Lease.

While there is no dispute the Lease was a valid contract, AMC's pleading fails to allege a breach of the Lease. The breach allegations asserted by AMC are all related to Woodsonia's exercise of its rights contained in the express contractual terms of the Lease that resulted in the termination of AMC's leasehold interest and eviction. However, these rights were specifically granted to Woodsonia under the Lease, and AMC has not sufficiently plead anything showing that exercising those contractual rights was a breach of the Lease. AMC's allegations that Woodsonia breached its covenant of quiet enjoyment by evicting AMC and breached the covenant of good faith and fair dealing by terminating the Lease are nothing more than legal conclusions couched as factual allegations. Such legal conclusions are the exact type that should be rejected as not rising to the required pleading level. Furthermore, AMC's naked attempts to characterize Woodsonia's involvement with the City and/or the CRA during the process as conspiratorial and nefarious do not offer any facts that Woodsonia's actions breached the Lease. (*See* Filing No. 1 at 16, ¶ 72).

Statements such as those are empty, conclusory statements with no pleading value.

As evidenced by the many Exhibits attached and incorporated into the Complaint, all of Woodsonia's actions were duly authorized under the Lease, Filing No. 1-1, authorized pursuant to other parties of authority such as the City and the CRA, and in accordance with, for example, the Redevelopment Plan, CRA Resolution No. 416, City City Resolution 2022-341, City Resolution 2022-347, City Resolution 2022-352, the Redevelopment Contract, CRA Resolution 430, Transfer and Termination of Lease, and the minutes of the CRA. Filing nos. 1-9 – 1-14, 1-16, 1-18, and 1-20. AMC's allegations do not amount to a breach of any contractual terms; instead, AMC's allegations simply demonstrate it is displeased with the results of Woodsonia's exercise of its rights under those contractual terms.

Based on its face, the Complaint fails to allege anything more than legal conclusions and facts that are 'merely consistent' with Woodsonia's alleged liability. AMC's allegations in support of its Count I therefore fail to rise above the speculative level. As such, AMC's Count I for breach of contract should be dismissed.

### b. AMC's allegations are contradicted by the written instruments attached to the Complaint.

Dismissal is especially appropriate in a situation such as this where there is a written instrument attached to the Complaint that contradicts allegations made; in that situation, "the exhibit trumps the allegations." *Elkharwily v. Mayo Holding Co.*, 955 F. Supp. 2d 988, 996 (D. Minn. 2013) (internal quotation marks omitted), *aff'd, Elkharwily v. Mayo Holding Co.*, 823 F.3d 462 (8th Cir. 2016). AMC's Complaint attached, incorporated, and embraced the Lease itself, which included unambiguous terms that allowed for Woodsonia's actions in this matter. "When the terms of a contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as an ordinary or reasonable person would

understand them." *Starks v. Tula Life, Inc*., 684 F. Supp. 3d 941 (D. Neb. 2023) (citing and quoting *Bierman v. Benjamin*, 305 Neb. 860, 943 N.W.2d 269, 273 (Neb. 2020)). AMC's own attachment and incorporation of the written instruments, like the Lease, to its Complaint demonstrate AMC's lack of claim.[9]

The Complaint cites to Sections 15.1 to 15.5 of the Lease, attaches the complete Lease to the Complaint, and attaches the Transfer and Termination Agreement wherein AMC's leasehold interest is transferred to CRA "in light of the CRA's threat of condemnation proceedings" and terminates the AMC Lease, all in accordance with Section 15 of the Lease. Filing No. 1 at 10, ¶ 40; Filing No. 1-1 at 20-21; Filing No. 1-18. Yet, AMC alleges that Woodsonia breached the Lease by taking this action. AMC's summary conclusions cannot withstand the contradictions of its own Exhibits it has offered in support of its claims.

Under the plain terms of Sections 15.1 through 15.5 of the Lease, once the CRA threatened to condemn the Premises, Woodsonia, as the landlord, had the express right to convey AMC's entire leasehold interest in the Premises to the CRA "free from [the] Lease and the rights of" AMC without any other action or proceeding needed. Further, the express terms of the Lease state that "[i]n such event, this Lease shall be deemed terminated effective on the date of such transfer." Filing No. 1-1 at 20-21, §§ 15.1-15.5. AMC knowingly entered into the Lease that included these provisions. When the CRA threatened condemnation on March 31, 2023, Woodsonia's rights under Sections 15.1 through 15.5 were triggered. Woodsonia was then fully within its rights, rights to which AMC knowingly agreed to when entering into the Lease, to take the actions of which AMC now complains. Exercising contractually provided rights cannot, at the same time, be a

---

[9] "A plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment." *Matter of Wade*, 969 F.2d 241, 249 (7th Cir. 1992)

breach of contractual rights. A complaint that pleads that a party exercised its contractual right, which is what AMC alleges Woodsonia did through all of its Exhibits to the Complaint, cannot present a facially plausible claim that Woodsonia is then liable for a breach of that same contract. *See Starks v. Tula Life, Inc*., 684 F. Supp. 3d 941 (D. Neb. 2023) (The Court granted the defendant's motion to dismiss for failure to state a breach of contract claim where the plain terms of an agreement gave defendant the right to terminate the contract.).

The plain terms of the Lease gave Woodsonia the right to convey the leasehold interest and to terminate the Lease. Those plain terms contradict AMC's allegations of breach. As there is no breach of the Lease, AMC's Complaint fails to state a breach of contract claim.

### iii. AMC's Count II For Wrongful Eviction Should Be Dismissed For Failure To State A Claim.

As previously noted herein, while asserted as a different claim, AMC's Count II for "Wrongful Eviction" is just a mistitled breach of contract claim. AMC's allegations regarding this alleged wrongful eviction are all related to Woodsonia's exercise of its rights under Sections 15.1 through 15.5 of the Lease. AMC makes the contractual basis of this claim clear when it asserts that "Woodsonia's and the CRA's actions purporting to convey AMC's leasehold interest and terminate the Lease were not authorized under the Lease" Filing No. 1 at 12, ¶ 49 and asserts the Lease did not "permit Woodsonia to simply give AMC's contract rights under the lease to another party." Filing No. 1 at 17, ¶ 75.

In turn, AMC's Count II should be subsumed by its Count I for breach of contract. And for the same reasons set forth herein for the dismissal of AMC's Count I, Count II should also be dismissed for failure to state a claim.

### iv. AMC's Count III For Violation of 42 U.S.C. § 1983 Should Be Dismissed For Failure To State A Claim.

AMC's Count III asserts that the termination of the Lease and eviction from the Premises

was a violation of 42 U.S.C. § 1983 as a wrongful taking without just compensation, in violation of the Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth Amendment, of the United States Constitution ("Takings Clause"). On the face of the Complaint, Count III does not present a claim upon which relief can be granted. To state a claim under 42 U.S.C, § 1983, AMC is required to plead and establish both the violation of a constitutional right, and that the violation was committed by a state actor. *West v. Atkins*, 487 U.S. 42, 48 (1988). AMC's Count III does not meet these requirements and does not present a claim for relief upon which relief can be granted.

a.  **AMC Cannot Establish A Taking in Violation Of Its Constitutional Rights.**

AMC's Count III fails to plead and prove the existence of a legally cognizable property interest under the Takings Clause. In order to state a claim, AMC must allege that it has a property interest protected by the Takings Clause, but by operation of Sections 15.1, 15.2, and 15.5, of the Lease, AMC does not have a property interest protected by the Takings Clause.

To state a claim for violation of the Takings Clause, AMC "must show [it has] property interests protected by the Takings Clause." *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 439 (8th Cir. 2007) (internal citations omitted). A legally cognizable property interest only exists pursuant to the express contract originally granting the interest. *See Hawkeye Commodity Promotions, Inc. v. Vilsack,* 486 F.3d 430, 440 (8th Cir. 2007) (finding there was no legally cognizable property interest where the contract provided for termination due to a change in law); *The Lamar Co., LLC v. City of Fremont,* 278 Neb. 485, 493, 771 N.W.2d 894, 903 (2009) (finding any rights to a nonconforming use of land were extinguished when the leases at issue were terminated).

As alleged in the Complaint, Woodsonia exercised is contractual rights pursuant to Section 15 et seq. to transfer and terminate AMC's leasehold interest. By operation of the exercise of Woodsonia's contractual rights, AMC's cognizable property interest ceased to exist at at the time of termination of the Lease. Pursuant to Section 15.1 of the Lease, the term of the Lease expires at the time of a taking, ceasing any interest of AMC. Filing No. 1-1 at 20 ("If the Demised Premises, or substantial part thereof, shall be taken in eminent domain, or conveyed under threat of condemnation proceedings, then this Lease shall forthwith terminate and end upon the taking thereof…"). Moreover, under Section 15.5, Woodsonia had the contractual right to convey any portion of the Demised Premises to the CRA free from the Lease and that upon such conveyance, the Lease is terminated. Filing No. 1-1 at 21. As such, under the express terms of the Lease, AMC no longer had any legal property interest once the Lease terminated upon the conveyance of the leasehold to the CRA.

Due to the operation of contractual provisions of the Lease, which AMC has alleged and incorporated into its Complaint, AMC no longer has a legally cognizable property right on which to base a Takings Clause violation.[10] AMC cannot allege the required property interest taking because AMC had no property interest to take. As such, AMC's cannot allege the first element of a claim for a wrongful taking under § 1983.

_____

[10] Even if there was a Takings Clause violation, any award for that violation would belong to Woodsonia as the Landlord, not AMC. Section 15.2 of the Lease states, "Landlord shall be entitled to the entire award in any condemnation proceeding or other proceeding for taking the Demised Premises… including without limitation, any award made for the value of the leasehold estate created by this Lease." Filing no. 1-1 at 21, § 15.2. Thus, not only is AMC prevented from plausibly alleging a legally cognizable property interest, but it cannot even plausibly allege a right to any award for damages under such a claim.

### b. Woodsonia Is Not A State Actor As Required For A § 1983 Claim.

Additionally, AMC cannot meet the required element of Woodsonia being a state actor for liability under § 1983 to be found. "Only state actors can be held liable under Section 1983…A private party who willfully participates in joint activity with the State or its agents is considered a state actor." *Youngblood v. Hy-Vee Food Stores, Inc*., 266 F.3d 851, 855 (8th Cir. 2001).

In the present matter, AMC's claim fails as Woodsonia was not a state actor, nor did it participate in any joint activity with the State. While AMC may have alleged "joint" actions in its Complaint, the facts established by the Exhibits to that Complaint establish that Woodsonia was a private actor exercising its private contractual rights granted by AMC, issued the Three Day Notice to Quit, and filed and prosecuted the eviction action That was not joint action with a state agency or the exercise of governmental functions, power, or right. The allegations contained in AMC's Complaint make this clear. Filing No. 1, ¶ 47. Further, the incorporated Exhibit 19, the Three Day Notice to Quit, includes Woodsonia's invocation of its contractual rights set forth in Section 15 of the Lease. Filing No. 1-19. Woodsonia's actions were not that of a state actor but of a party to a contract.

As the Exhibits to the Complaint establish that Woodsonia was not a state actor, AMC has not plead and cannot establish a required element of its § 1983 claim. As such, Count III of AMC's Complaint should be dismissed for failure to state a claim.

### v. AMC Fails To State a Claim For Damages.

Regarding AMC's damages claims, AMC failed to "specifically state [its alleged] special damages, in violation of Rule 9(g). AMC is not entitled to nor shall AMC "seek any damages for lost profits, consequential or punitive damages" (Filing Nos. 1-1 at 32,§29.7). AMC failed to allege reduction of the FMV of the leasehold interest  damages as provided in NJI2d Civ. 13.26. AMC failed to allege out of pocket relocation costs and a denied request for reimbursement of the same.

AMC made no nonconclusory fact allegations supporting a basis for punitive damages in its Complaint. Filing No. 1 at 21, ¶84. AMC has failed to plead facts showing the necessary intent, namely "willful or malicious conduct." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 n. 9 (1986); see *Smith v. Wade*, 103 S. Ct. 1625, 1640 (1983)( evil motive or intent). AMC alleged no evil or malicious motive or intent , and certainly none was recognized by the Hall County Court or the Hall Conty District Court in the position and arguments Woodsonia made. To the contrary, the Exhibits to the Complaint show that Woodsonia was being transparent and cooperative with each step it took in exercising its contractual and litigation rights. (See Filing nos. 1-15, 1-17). AMC's mere conclusion that it is entitled to punitive damages is insufficient to support such a claim. *See Cameron v. Whirlwindhorse*, 494 F.2d 110, 114 (8th Cir. 1974). As for all of its vague damages assertions and prayer, AMC made conclusory allegations of damages that are directly violate the Lease, with no amounts identified or allegations as to how Woodsonia caused, or should be liable to pay for, such alleged damages. As the element of "damages" is essential to each claim for relief, and yet was not pled factual, AMC claims for relief should be dismissed for failure to state a claim.

## V.     AMC SHOULD NOT BE GIVEN LEAVE TO AMEND

With regards to AMC's pleading deficiencies that require dismissal of the Complaint pursuant to Fed. R. 12(b)(1) and 12(b)(6), AMC cannot amend its pleading in any way to cure those deficiencies. As such, no amendment should be allowed.

"A district court, in its discretion, may dismiss a pleading for failure to state a claim with or without prejudice." *Paisley Park Enters., Inc. v. Boxill*, 361 F. Supp. 3d 869, 880 n.7 (D. Minn. 2019) (citing *Orr v. Clements*, 688 F.3d 463, 465 (8th Cir. 2012)). "Dismissal with prejudice is appropriate if amending the complaint would be futile." *Spagna v. Tift*, No. 8:19-CV-481, 2020 WL 7075523, at *3 (D. Neb. Dec. 3, 2020) (citing *Pet Quarters, Inc. v. Depository Tr. & Clearing*

*Corp*., 559 F.3d 772, 782 (8th Cir. 2009)). "[F]utility constitutes a valid reason for denial of a motion to amend." *Knapp v. Hanson*, 183 F.3d 786, 790 (8th Cir. 1999). The futility of any amendment by AMC is present under an analysis of the Complaint's failings as to Rule 12(b)(1) and Rule 12(b)(6).

As noted in the Pleadings Standards cited above, this Court should consider the nonconclusory allegations as true for the purposes of ruling on this Motion, and should ignore any "legal conclusion couched as a factual allegation." Moreover, when considering documents incorporated by reference, as well as the Orders and Opinion subject to judicial notice, the incorporated or noticed documents control, and will not change any amendment.

The governing and unambiguous Lease provisions (AMC's assignment of claims and damages to Woodsonia, AMC's wavier of taking-type claims and damages, AMC's grant of authority for Woodsonia to transfer the Lease to the CRA and then terminate the Lease, AMC's promise and commitment that AMC is not entitled to nor shall AMC "seek any damages for lost profits, consequential or punitive damages", etc.) are not going to change by any conceivable amendment by AMC.

No factual nonconclusory amendment can change the undisputed reality that Woodsonia (i) did not breach the Lease or wrongfully evict AMC; (ii) was not a state actor; and (iii) did not act under color of law.

Given all that is contained and incorporated in AMC's Complaint, there are no amendments AMC could, in good faith, make that would state a plausible claim for relief or damages against Woodsonia. Thus, AMC should not be given leave to amend its Complaint as it relates to Woodsonia.

## VI.    <u>CONCLUSION</u>

All of AMC's claims for relief are subject to a valid arbitration agreement. As a result, this action should be stayed pending the completion of arbitration of the appropriate claims for relief. In the alternative, dismissal of AMC's Complaint is warranted for lack of subject-matter jurisdiction or for failure to state a claim upon which relief can be granted as it relates to Woodsonia.

For the reasons contained herein, and pursuant to the authorities cited herein, Defendant Woodsonia Hwy 281, LLC respectfully requests that the Court enter an order staying these proceedings and compelling arbitration of AMC's claims, or, in the alternative and order dismissing AMC's Complaint, with prejudice and without leave to amend, for lack of subject matter jurisdiction and/or for failure to state a claim.

Dated this 4th day of June 2025.

WOODSONIA HWY 281, LLC,
DEFENDANT


By:*/s/  Patrick J. Kimmel*
    Patrick J. Kimmel, #26263
    KOLEY JESSEN P.C., L.L.O.
    One Pacific Place, Suite 800
    1125 South 103rd Street
    Omaha, NE  68124-1079
    (402) 390 9500
    (402) 390 9005 (facsimile)
    Patrick.Kimmel@koleyjessen.com

    *Attorney for said Defendant.*

**CERTIFICATION**

I hereby certify that this brief complies with the word limit requirement and generative artificial intelligence requirements of 7.1(d)(1). This brief includes 12,896 words, including all captions, headings, footnotes, quotations, and certificates, which were counted by Microsoft Word 365. This brief complies with the generative artificial intelligence usage reporting requirement because to the extent that a generative artificial intelligence program was used in drafting this brief and all generated text, including all citations and legal authority, have been verified for accuracy and approved by a human signatory of this brief.

*/s/ Patrick J. Kimmel*
Patrick J. Kimmel


**CERTIFICATE OF SERVICE**

This is to certify that on the 4th day of June 2025, a true and correct copy of the above and foregoing document was filed with the CM/ECF system which will send notice to all CM/ECF participants.

*/s/ Patrick J. Kimmel*
Patrick J. Kimmel