IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

| AMERICAN MULTI-CINEMA, INC., | ) | CASE NO. 8:25-CV-292 |
| --- | --- | --- |
| Plaintiff, | ) | |
| v. | ) | **BRIEF IN SUPPORT OF MOTION TO DIMISS OR TO STAY** |
| WOODSONIA HWY 281, LLC, GREGORY C. SCAGLIONE, CITY OF GRAND ISLAND, NEBRASKA, and COMMUNITY REDEVELOPMENT AUTHORITY OF THE CITY OF GRAND ISLAND, NEBRASKA, | ) | |
| Defendants. | ) | |

## INTRODUCTION

Defendants, the City of Grand Island (the "City") and the Community Redevelopment Authority of the City of Grand Island (the "CRA"), move the Court to dismiss the Plaintiff's Complaint as against said Defendants. As will be argued herein, dismissal is appropriate for the following reasons:

First, the Complaint fails to allege a viable constitutional "taking."

Second, if a taking is alleged, such claim is precluded by the automatic termination provisions of the Plaintiff's lease.

Third, in any event, the City should be dismissed because the Complaint fails to show any official policy or custom on the part of the City (as distinct from the CRA) could give rise to a "takings" claim.

Alternatively, should the Court decide dismissal is inappropriate at this juncture, the City and the CRA request that the action be stayed pending arbitration between the Plaintiff and Defendant Woodsonia.

## FACTUAL ALLEGATIONS

Plaintiff, American Multi-Cinema, Inc. ("AMC"), alleges that, through a series of mergers, it became a tenant under a lease for the operation of a movie theatre at the Conestoga Mall in Grand Island, Nebraska (the "Shopping Center"). (Complaint at ¶¶ 11, 15). The lease was to run through December 31, 2028. (Complaint at ¶ 18).

In March 2023, Defendant, Woodsonia Hwy 281, LLC ("Woodsonia"), acquired the landlord's rights and obligations under all leases for the Shopping Center, including AMC's lease. (Complaint at ¶ 20). This case arises from Woodsonia's efforts to terminate AMC's lease and re-take possession of the property.

AMC's allegations against the City are that, in November 2022 – prior to Woodsonia's acquisition of the AMC lease – (i) the City approved and adopted blight studies commissioned by Woodsonia relating to the Shopping Center, (ii) the City approved and adopted a redevelopment plan for the Shopping Center, and (iii) authorized the execution of a redevelopment contract between Woodsonia, the City, and the CRA. (Complaint at ¶¶ 21-25).

As against the CRA, Woodsonia alleges that, after Woodsonia acquired AMC's lease in March 2023, the CRA retained Woodsonia's attorney, Gregory Scaglione, to send a letter on behalf of the CRA advising of the CRA's intent to exercise eminent domain powers to take AMC's leasehold interest. (Complaint at ¶ 35). On the same day, Woodsonia and the CRA executed an agreement entitled "Transfer and Termination of AMC Lease Dated March 31, 2023" which purported

to transfer AMC's leasehold interest in the Shopping Center to the CRA and to mutually terminate the lease effective as of March 31, 2023. (Complaint at ¶ 37, Ex. 18).

Woodsonia subsequently commenced an action for forcible entry and detainer in the County Court of Hall County, Nebraska, based on its position that the lease had been terminated and AMC wrongfully remained in possession of the premises. (Complaint at ¶¶ 47-52). On May 1, 2023, the County Court ruled that it would enter an order evicting AMC. (Complaint at ¶ 52). On May 4, 2023, Woodsonia blocked AMC's access and excluded AMC from the premises. (Complaint at ¶ 53). Thereafter, Woodsonia began demolition of the Shopping Center. (Complaint at ¶ 54).

AMC subsequently appealed the County Court's eviction ruling, and the appeal was ultimately heard by the Nebraska Supreme Court. (Complaint at ¶¶ 55-58). On March 14, 2025, the Nebraska Supreme Court issued its opinion. (Complaint at ¶ 57). The Nebraska Supreme Court did not rule on the merits of the lease termination or eviction. Instead, the Supreme Court held that the County Court lacked subject matter jurisdiction in a forcible entry and detainer action to determine whether the lease had been validly terminated. (Complaint at ¶¶ 58-59).

On April 17, 2025, AMC filed this case in Federal Court against Woodsonia, Scaglione, the City, and the CRA. AMC alleges breach of contract and wrongful eviction against Woodsonia. (Complaint at Counts I and II). AMC also seeks relief under 42 U.S.C. § 1983 as against all Defendants. (Complaint at Count III). Woodsonia alleges that its constitutional rights under the Fifth and Fourteenth

3

Amendment were violated, which prohibit the government from taking private property for public use without just compensation. (Complaint at ¶ 79).

**ARGUMENT**

**1. THE COMPLAINT FAILS TO STATE A "TAKINGS" CLAIM BECAUSE NO CONSTITUTIONAL TAKING OF PROPERTY OCCURRED.**

A threshold issue is whether AMC's allegations set forth a cognizable "takings" claim. The Supreme Court has recognized two conceptually distinct categories of takings: physical takings and regulatory takings. <u>Tahoe-Sierra Preservation Council v. Tahoe Regional Planning Agency</u>, 535 U.S. 302, 321 (2002).[1] A physical taking occurs where the government requires a property owner to submit to the physical occupation of that property, whether by itself or through a third party. <u>Turntable Fishery & Moorage Corp. v. U.S.</u>, 52 Fed. Cl. 256, 262 (Ct. Cl. 2002). A regulatory taking occurs when the government prevents the landowner from making a particular use of the property that would otherwise be permissible. <u>Id</u>; <u>see also</u>, <u>United Water Conservation Dist. v. U.S.</u>, 133 F.4th 1050 (Fed. Cir. 2025). Physical takings are deemed "per se" takings that require compensation, whereas regulatory takings are evaluated under a factual inquiry under factors set forth in <u>Penn Central</u>. <u>Tahoe-Sierra</u>, at 321-22. It is critical to distinguish between the two types of takings because courts draw a bright line between the analysis applicable to alleged physical takings and that applicable to regulatory takings. <u>Katzin v. U.S.</u>, 908 F. 3d 1350 (Fed. Cir. 2018).

---

[1] Arguably, a third category of taking is the "exaction" taking. <u>See</u>, <u>Dolan v. City of Tigard</u>, 512 U.S. 374 (1994). Exaction takings are not at issue in this case and therefore are not further discussed herein.

4

In this case, AMC attempts to allege a physical taking, to wit, that it was wrongfully evicted from its leased premises resulting in the lost value of its leasehold interest, lost profits, and relocation and rebuilding expenses. However, the Complaint shows that there was no physical occupation of the premises by the City or the CRA. Rather, the landlord/developer, Woodsonia, instituted a forcible entry and detainer action and re-took possession of the premises. The allegations against the CRA are (1) that its counsel sent a letter threatening eminent domain, and (2) that it executed a legal document purporting to terminate AMC's lease. Such allegations do not allege a plausible takings claim. Mere threats of eminent domain or assertions of legal positions – without physical possession – do not constitute a taking.

Katzin, supra, is instructive. The case arose from a boundary dispute between the plaintiffs and the U.S. Fish and Wildlife Service involving parcels of land on the island of Culbera in Puerto Rico. The plaintiffs owned a parcel of property on the island, but the Fish and Wildlife Service also claimed a portion of the property based on a survey and monument markers.

In 2006, the plaintiffs signed a purchase agreement to sell their parcel for $4 million. However, the buyer subsequently became concerned about the claim of ownership by the Fish and Wildlife Service. Upon the buyer's inquiry, the Fish and Wildlife Service faxed several documents to the buyer outlining the government's claim of ownership over part of the land, including a survey map. The plaintiffs alleged that the government's claim of ownership caused the buyer to back out of the sale and rendered them unable to sell the property. The plaintiff's

claimed that the government's assertion of ownership over the property constituted a "taking."

The Federal Circuit Court of Appeals rejected the takings claim. The Court did not need to resolve the parties' conflicting claims of ownership to decide in the case. Instead, the Court held that, even if the plaintiffs could establish they were the owners of the disputed area, the government's mere claim of ownership did not constitute a physical taking that would entitle the plaintiffs to compensation. The court explained that neither the government's internal documents claiming ownership nor the fax sent to the purchaser asserting the claim of ownership constituted a taking:

> … a mere government assertion of ownership does not constitute a taking. It logically follows that the government's internal documents here also do not constitute a taking, as they do not do anything other than confirm the government's assertion of ownership.
>
> …
>
> We hold that the government's mere sharing of information about its claim of ownership to real property with a third party does not constitute a physical taking (or a *per se* regulatory taking) of that property. …
>
> The Beasley fax does not constitute a physical taking or a *per se* regulatory taking under Supreme Court precedent. By sending the Beasley fax, the government did not: physically occupy some part of Plaintiffs' property, require Plaintiffs to suffer a permanent physical

invasion, directly appropriate Plaintiffs' property, effect the functional equivalent of an ouster of Plaintiffs' possession, or deprive Plaintiffs of all economically beneficial use of Plaintiffs' property. Indeed, the Beasley fax did nothing more than disseminate information about the government's property claims to Mr. Klaber and other potential buyers; it did not actually change any rights in any part of Parcel 4.

Katzin v. United States, 908 F.3d 1350, 1360, 1361–62 (Fed. Cir. 2018).

A threshold issue in this case is whether a constitutional "taking" has occurred. As shown by Katzin, mere assertions of ownership or legal positions – without a physical occupation or dispossession – are not sufficient. See also, Mangal v. City of Pascagoula, 2019 WL 3413850 (E.D. Miss. 2019)(allegation that city sent letter to the plaintiff's tenants claiming the city had acquired the plaintiff's four-plex property failed to state a takings claim).

In this case, Woodsonia – as AMC's landlord and owner of the fee estate - took the position that the lease had been terminated based on the "Transfer and Termination" Agreement. Woodsonia threatened eviction based on termination of the lease and ultimately sought to evict AMC based on the termination of the lease. The premise of AMC's lawsuit is that the termination was ineffective, and the eviction was therefore unlawful. (Complaint at ¶ 82.h). Notwithstanding such conflicting legal positions, there is no allegation that the CRA or the City dispossessed AMC of its physical occupancy of the premises. The Complaint makes clear that Woodsonia served the three-day notice to quit and prosecuted the action to evict AMC. (Complaint at ¶ 47). The case was litigated to the

Nebraska Supreme Court with Woodsonia as the named plaintiff. See, Woodsonia Hywy 281 v. American Multi-Cinema, Inc., 318 Neb. 592 (2025). Neither the CRA nor the City were parties to the action, and there is no allegation that they were responsible for the physical dispossession of the premises or that they subsequently occupied the premises.

AMC's Complaint fails to allege a physical taking by the CRA or the City. Neither the CRA nor the City were parties to the forcible entry and detainer action, and they never dispossessed AMC or took possession of the premises. At best, the CRA threatened eminent domain and executed a document establishing a legal position that the lease was terminated, but it was not ultimately responsible for AMC's loss of physical occupancy.

As in Katzin, even if AMC is ultimately correct that the termination of the lease was invalid, AMC does not have a takings claim because the government never dispossessed AMC of its property. The parties "legal sparring" and the CRA's assertion of a legal position do not constitute a physical taking.

**2. THE COMPLAINT FAILS TO STATE A CLAIM BECAUSE THE LEASE'S AUTOMATIC TERMINATION PROVISIONS ARE VALID.**

Assuming the allegations of the Complaint state a viable "takings" claim, such a claim would be precluded by the automatic termination provisions of the lease.

Where a lease includes a provision for automatic termination upon the taking of property for public use by a governmental authority, the tenant has no right which persists beyond the taking and can be entitled to nothing. U.S. v. Petty

8

Motor Co., 327 U.S. 372, 376 (1946); see also, Bajwa v. Sunoco, Inc., 320 F.Supp.2d 454 (E.D. Va. 2004); Utah Dept. of Trans. v. Kmart Corp., 428 P.3d 1118 (Utah 2018); Fibreglas Fabricators, Inc. v. Kylberg, 799 P.2d 371 (Colo. 1990)(collecting cases and authorities). In such case, it is the tenant's contract with its landlord, not the condemnation, that terminates the lease. U.S. v. Right to Use and Occupy 3.8 Acres of Land, 484 F.2d 1140, 1144 (1973).

In U.S. v. Petty, supra, the Federal government had temporarily taken over a leased building. The government arranged with the property owner to pay compensation for the temporary use of the building, but some of the building's tenants disputed the compensation offered to them. Pertinent here, the Supreme Court noted that the lease of one of the tenants included an automatic termination provision. The Court stated,

> We are dealing here with a clause for automatic termination of the lease on a taking of property for public use by governmental authority. With this type of clause, at least in the absence of a contrary state rule, the tenant has no right which persists beyond the taking and can be entitled to nothing.

Petty, 327 U.S. at 376.

Thus, the tenant did not have any claim for compensation for loss of the leasehold interest.

In this case, AMC's lease included a provision for automatic termination of the lease if the premises were taken by eminent domain or under threat of eminent

9

domain. (Complaint at Ex. A, § 15.1). Moreover, any condemnation award belongs to the landlord. (Complaint at Ex. A, § 15.2).[2]

AMC alleges a "taking" has occurred. Accepting this allegation as true, the lease is terminated according to its own terms and there is nothing left for which AMC can be compensated. Put simply, if a taking has occurred, then the automatic termination provision applies and AMC is not entitled to compensation. On the other hand, if there is not a taking, then the City and the CRA cannot be liable.

To thread this needle, AMC alleges that the automatic termination provision only applies when the "fee interest" in the premises is taken. (Complaint at ¶ 75). But there is no support for such position in either the language of the agreement or the case law. The lease itself does not require a "fee" taking before the eminent domain provisions found in Article XV apply. The provisions refer to the "Demised Premises," which is the tenant's leased space. (Complaint at Ex. A, § 15.1). The lease further states that any condemnation award for the value of the leasehold estate shall be paid to the landlord, and that the landlord may transfer the demised premises "or any portion thereof" to the condemnor free from the lease and the rights of the tenant. (Complaint at Ex. A, §§ 15.2 and 15.5). There is nothing in this language indicating that the condemnor must take a fee interest in the real estate before the eminent domain provisions apply. To the contrary, they reflect an

---

[2] The lease reserves to AMC a claim against the condemnor for interruption or damage to AMC's business, and on account of any cost or loss AMC might incur in removing merchandise, furniture, or other personal property. (Complaint at Ex. A, § 15.2). However, as explained above, lost profit and relocation costs are not compensable damages in a Federal takings claim under the Fifth Amendment of the U.S. Constitution. U.S. v. Petty, 327 U.S. 372, 377-78 (1946)("…evidence of loss of profits, damages to good will, the expense of relocation and other such consequential losses are refused in federal condemnation proceedings."); see also, Land Use Planning and Development Regulation Law § 16:15, Noncompensable Damages (3d. Ed. 2024 Update).

intention that the landlord may convey the demised premises – including leasehold interest and/or any portion of the premises – to the condemnor under threat of eminent domain.

This is notably consistent with Petty. In Petty, the tenant's lease contained a nearly identical automatic termination provision that referred to the "demised premises." The provision was applicable when the government sought temporary use and occupancy of the building – not a fee taking.

In sum, AMC's allegations fail to state a claim because the claim is precluded as a matter of law by the automatic termination provision of the lease.

3. **THE CITY OF GRAND ISLAND SHOULD BE DISMISSED FROM THE ACTION BECAUSE THE COMPLAINT FAILS TO ALLEGE ANY FACTS SHOWING A TAKING BY THE CITY.**

Assuming the Complaint alleges a plausible "taking" and the claim is not precluded by the lease provisions, the City should be dismissed because the Complaint fails to allege any official policy or custom adopted by the City that violated AMC's constitutional rights.

It is well settled that a municipality cannot be held liable under § 1983 based on a theory of respondeat superior – meaning it cannot be held liable based solely upon the acts of its employees or agents. Monell v. Dept. of Social Services, 436 U.S. 658, 692 (1978). Instead, the plaintiff must show that an official municipal policy of some nature caused a constitutional tort. Id. As stated in Monell,

> … a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when

> execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

Id at 694.

As shown in the Complaint and attachments, the City's role was limited to adopting resolutions to approve the redevelopment plan and redevelopment contract for the Shopping Center. (Complaint at ¶ 24). The Complaint does not allege any further action on the part of the City.

Passing "blight" or redevelopment ordinances does not rise to the level of a constitutional taking. See, Schoone v. Olsen, 427 F. Supp. 724 (E.D. Wis. 1977)(city's proposal to redevelop blighted downtown area "was not a taking in either the legal or constitutional sense."); see also, Danforth v. U.S., 308 U.S. 271, 286 (1939)("the mere enactment of legislation which authorizes condemnation of property cannot be a taking.").

Instead, the "takings" allegations are directed at acts allegedly committed by the CRA. The allegations are stated in paragraph 82. All of the allegations relate to the CRA, rather than the City. The CRA is a public body with its own power of eminent domain. Neb. Rev. Stat. § 18,2107 and 18-2122. There are no factual allegations to support a takings claim against the City. The City should be dismissed from the action.

**4. SHOULD THE COURT DETERMINE DISMISSAL IS INAPPROPRIATE AT THIS JUNCTURE, THE ACTION SHOULD BE STAYED PENDING ARBITRATION.**

Defendant Woodsonia has filed a Motion to Compel Arbitration based on the arbitration clause in the lease agreement between Woodsonia and AMC. (ECF Filing No. 22). The City and the CRA are not parties to the lease agreement and therefore not subject to the arbitration clause. However, if the Court grants Woodsonia's Motion to Compel Arbitration, the City and the CRA respectfully submit that this action should be stayed pending the outcome of the arbitration.

**CONCLUSION**

The City and the CRA move the Court for dismissal from the lawsuit. First, the Complaint fails to allege a viable "takings" claim. Second, any alleged "takings" claim would be precluded by the automatic termination provisions of the lease.

In the event the Court finds the Complaint sets forth a viable takings claim that is not precluded by the lease, the City seeks dismissal because the Complaint fails to allege any official policy or custom on the part of the City (as distinct from the CRA) that would constitute a taking.

Finally, if the Court declines to dismiss the City and the CRA, they request that the action be stayed pending arbitration between Woodsonia and AMC.

Dated this 11th day of June, 2025.

    Respectfully Submitted,

    CITY OF GRAND ISLAND,
    NEBRASKA

And

COMMUNITY REDEVELOPMENT
AUTHORITY OF THE CITY OF
GRAND ISLAND, NEBRASKA,
Defendant


By____/s/ Damien J. Wright_____
    DAMIEN J. WRIGHT, #23256
    WELCH LAW FIRM, P.C.
    1299 FARNAM ST., SUITE 1220
    OMAHA, NE  68102
    (402) 341-1200
    (402) 341-1515 (FAX)
    damien@welchlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2025, I electronically filed the foregoing Brief with the Clerk of the Court using the CM/ECF system which sent notification to the attorneys of record.


By____/s/ Damien J. Wright_____