**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEBRASKA**

| | |
|---|---|
| AMERICAN MULTI-CINEMA, INC., | Case No. 8:25-cv-292 |
| Plaintiff, | |
| v. | |
| WOODSONIA HWY 281, LLC, et al., | |
| Defendants. | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO**
**DEFENDANT GREGORY C. SCAGLIONE'S MOTION TO DISMISS**

Plaintiff American Multi-Cinema, Inc. ("AMC") respectfully offers the following brief in opposition to Defendant Gregory C. Scaglione ("Scaglione")'s Motion to Dismiss.

## I.     INTRODUCTION

The facts of this case are laid out in reasonable detail in AMC's Complaint. But at its core, this case is quite simple. AMC was a longtime tenant at the Conestoga Mall in Grand Island, Nebraska ("Shopping Center"), where it operated a movie theater in its leased premises ("Demised Premises") under a lease ("Lease") with the owner of the Shopping Center. Defendant Woodsonia Hwy 281, LLC ("Woodsonia") then purchased the Shopping Center from the previous owner and sought to redevelop it under a redevelopment plan and contract with the Community Redevelopment Authority of the City of Grand Island, Nebraska ("CRA") and the City of Grand Island, Nebraska ("City").

As part of this redevelopment, Woodsonia and the CRA sought to terminate the Lease and remove AMC from the Demised Premises. But they did not do this using condemnation proceedings. Instead, Woodsonia and the CRA used a plan concocted by their mutual attorney, Scaglione, which went as follows:

1

- The CRA, acting through Scaglione, sent a letter to AMC purporting to threaten condemnation of AMC's leasehold interest in the Demised Premises;

- That very same day—and without making any payment to AMC—Woodsonia purported to convey AMC's leasehold interest to the CRA;

- Again that same day—and without making any payment to AMC—Woodsonia and the CRA purported to immediately terminate the Lease;

- Woodsonia obtained an eviction order from the County Court of Hall County, Nebraska, which did not have jurisdiction over the proceedings; and

- The County Court ordered execution on the eviction, which was carried out by the Hall County Sheriff's Office.

As shown by these facts, Woodsonia and the CRA worked with their mutual attorney, Scaglione, to use state action to take AMC's leasehold interest and evict AMC from its Demised Premises, without paying compensation to AMC.

Scaglione's motion to dismiss is premised on his claim that Woodsonia and the CRA (together with and through Scaglione as their shared attorney) had the right to take AMC's leasehold interest without paying for it. But that is the nexus of virtually every lawsuit—did the defendants have the right to do what they did?

AMC has plausibly pleaded its causes of action, which is all that is required at this early stage of proceedings. The arguments advanced by Scaglione could be appropriately addressed in motion practice by all parties, after discovery. For the reasons below, this Court should deny Scaglione's motion to dismiss, without prejudice to him asserting the same arguments in an appropriate motion at a later time.

## II.    THE COURT SHOULD DENY SCAGLIONE'S MOTION TO DISMISS.

Scaglione first asserts that AMC has no standing to bring its only count against him, a claim for relief under 42 U.S.C. § 1983 (Count III), because under §§ 15.2–15.3 of the Lease, AMC assigned its right to any condemnation award to Woodsonia. But as AMC has plausibly alleged in

2

its Complaint, and as Scaglione's own brief likewise demonstrates, AMC has standing here. AMC suffered an unconstitutional taking, which is fairly traceable to the Defendants' challenged conduct, and likely to be redressed by a favorable judicial decision. Further, the Lease provisions that Scaglione cites have nothing to do with AMC's right to bring a § 1983 claim or to seek damages under § 1983 for the unlawful taking of its leasehold interest.

Scaglione also contends that AMC's § 1983 claim fails as a matter of law for various reasons, including that he is an attorney who was acting within the scope of his representation, that he cannot be considered a state actor under the facts alleged, that he is entitled to qualified immunity, and that he cannot be held liable due to the intracorporate conspiracy doctrine. All of these arguments likewise fail. There is ample authority that a private attorney can be held individually liable under § 1983, and the facts that AMC has alleged more than plausibly support a reasonable inference that Scaglione can be found liable. As to qualified immunity and intracorporate conspiracy, those doctrines are inapplicable here.

For these reasons, and as more fully explained below, this Court should deny Scaglione's motion to dismiss.

### A.    Legal Standards

Scaglione seeks dismissal under both Fed. R. Civ. P. 12(b)(1) (lack of subject matter jurisdiction) and Fed. R. Civ. P. 12(b)(6) (failure to state a claim on which relief can be granted). Because Scaglione's jurisdictional attack is based solely on the allegations in the pleadings, it is a facial attack, and so the same dismissal standards apply whether his motion is considered under Rule 12(b)(1) or Rule 12(b)(6). *See Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016).

When standing is challenged under Rule 12(b), a plaintiff must plead sufficient facts which, taken as true, support a reasonable and plausible inference that the plaintiff satisfies the elements

of Article III standing. *Hawse v. Page*, 7 F.4th 685, 688–89 (8th Cir. 2021). The plaintiff must have (1) suffered an injury in fact, that (2) is fairly traceable to the challenged conduct of the defendant, and (3) is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

To adequately state a claim under the Federal Rules, the pleader must make "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation modified). Detailed factual allegations are not required, but the pleader must provide more than labels and conclusions or a formulaic recitation of the elements of a cause of action. *Id.* A complaint must allege enough facts to state a claim that is plausible on its face. *Id.* This facial plausibility requirement is met when the pleader asserts "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This is not akin to a probability requirement but asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.*

Rule 12(b) "is not a procedure for resolving contests about the facts or the merits of a case." *Gallentine v. Housing Authority of City of Port Arthur, Tex.*, 919 F. Supp. 2d 787, 794 (E.D. Tex. 2012) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2d* § 1356, at 294 (1990)). Instead, a court deciding a motion to dismiss must take all well-pleaded factual allegations in the complaint as true, "even if it strikes a savvy judge that actual proof of the facts alleged is improbable and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. Legal conclusions can provide the framework of the complaint, but they are not entitled to the same deference, and must be supported by factual allegations. *Iqbal*, 556 U.S. at 679. "When

4

there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Id.*

## B.     AMC has Standing to Bring its § 1983 Claim against Scaglione.

Scaglione first argues that AMC lacks standing to bring its § 1983 claim because under §§ 15.2–15.3 of the Lease, AMC waived or assigned its right to any condemnation award to Woodsonia. This argument is without merit.

### 1.     Scaglione gets standing backwards.

As AMC has plausibly alleged in its Complaint, and as Scaglione's own brief likewise demonstrates, AMC has standing here. Under the standing test set forth in *Spokeo*:

(1) AMC suffered an in injury in fact by losing its leasehold interest in the Demised Premises. AMC used to own a leasehold interest, and now it does not.

(2) AMC's injury is fairly traceable to the challenged conduct of the Defendants. Specifically, Woodsonia and the CRA, together with and through their shared attorney Scaglione, took AMC's leasehold interest without paying compensation.

(3) If AMC wins, its injury will be redressed in the form of compensation for the value of the leasehold interest that was taken from it, and other direct and consequential damages flowing from Defendants' misconduct in the unlawful taking.

AMC contends the taking of its leasehold interest was wrongful, and Scaglione contends it was not. The entire purpose of this lawsuit is to determine who is right. That is the very definition of a justiciable controversy between parties with standing.

Scaglione's standing argument is implicitly premised on his own interpretation of the Lease, and his assertion that AMC's leasehold interest was properly taken under the facts presented here. AMC adamantly disputes both Scaglione's interpretation of the Lease and his contention that the taking of AMC's leasehold interest was somehow proper here. But ultimately, the question of whether AMC is right, or Scaglione is, goes to the merits of AMC's claims. It has nothing to do

5

with whether AMC has standing to bring those claims in the first place. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute …."); *Red River Freethinkers v. City of Fargo*, 679 F.3d 1015, 1023 (8th Cir. 2012) ("The standing inquiry is not … an assessment of the merits of a plaintiff's claim.").

To the extent Scaglione suggests that AMC has no standing because he disputes the ultimate merits of AMC's claims, he is incorrect. AMC has plausibly alleged facts that show it has standing to bring this suit. This Court should reject Scaglione's arguments otherwise.

### 2.     AMC did not waive or assign its right to bring a § 1983 claim or to seek damages under § 1983.

The other major problem with Scaglione's standing argument is that he conflates AMC's § 1983 claim with a state-law claim for inverse condemnation or similar relief, and then erroneously concludes that AMC would have no right to compensation in such a proceeding, and so has no right to compensation under § 1983. This is incorrect.

Section 1983 is derived from the § 1 of the Civil Rights Act of 1871. *Carey v. Piphus*, 435 U.S. 247, 253 (1978). It creates "a species of tort liability" in favor of persons who are deprived of rights, privileges, or immunities secured to them by the United States Constitution. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305–06 (1986). Section 1983 "was intended not only to override discriminatory or otherwise unconstitutional state laws, and to provide a remedy for violations of civil rights where state law was inadequate, but also to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice." *Zinermon v. Burch*, 494 U.S. 113, 124 (1990) (citation modified); *see also Monroe v. Pape*, 365 U.S. 167, 180 (1961), *overruled on other grounds by Monnell v. Dep't Soc. Servs. of City of New York*, 436 U.S. 658 (1978) (noting that the legislative history of § 1983 "made abundantly clear that one reason

6

[it] was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced").

The remedy for a § 1983 violation is "supplementary to [any] state remedy, and the latter need not be first sought … before the federal one is invoked." *Monroe*, 365 U.S. at 183. So, in a § 1983 action based on an unlawful Fifth Amendment taking, the property owner may bring that action as soon as the government takes his or her property without paying for it, because that is the moment the constitutional violation occurs. *Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180, 185, 202 (2019). The existence of a state-law action for post-taking compensation is an additional remedy potentially available to the property owner, but it is not a necessary prerequisite for bringing a § 1983 action, nor does it undo the constitutional violation that has already happened. *Id.* at 201–02.

Because § 1983 actions sound in tort, the United States Supreme Court has looked to the common law of torts, as well as the purposes and policies underlying the statute, to determine what damages are available for a § 1983 violation. *Smith v. Wade*, 461 U.S. 30, 34 (1983). Ordinarily, the damages available in a common-law tort case (and thus a § 1983 action) are compensatory:

> [D]amages in tort cases are designed to provide compensation for the injury caused to plaintiff by defendant's breach of duty. To that end, compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation, personal humiliation, and mental anguish and suffering. Deterrence is also an important purpose of this system, but it operates through the mechanism of damages that are compensatory—damages grounded in determinations of plaintiffs' actual losses. Congress adopted this common-law system of recovery when it established liability for constitutional torts. Consequently, the basic purpose of § 1983 damages is to compensate persons for injuries that are caused by the deprivation of constitutional rights.

*Stachura*, 477 U.S. at 306–07 (citation modified). Moreover, as with common-law torts, punitive damages are available in § 1983 actions "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally

7

protected rights of others." *Smith*, 461 U.S. at 56.

It follows from the above that a § 1983 claim for damages based on an unlawful taking, which focuses on compensating an injured person for all losses caused by the violation of his or her constitutional rights, serves a different purpose than a condemnation or inverse condemnation proceeding, which focuses on compensating a property owner for the property interest taken. *See Home v. Dep't of Agriculture*, 576 U.S. 350, 368–69 (2015). It further follows that the damages available for a § 1983 violation based on an unconstitutional taking are distinct from, and in addition to, any compensation that might available in a condemnation or inverse condemnation proceeding. *See New England Estates, LLC v. Town of Branford*, 988 A.2d 229, 249–52 (Conn. 2010) (rejecting claim that damages available in a § 1983 action based on a wrongful taking were limited to those available as part of just compensation for the property interest taken); *see also Estate of Guled by and through Abdi v. City of Minneapolis*, 869 F.3d 680, 684 (8th Cir. 2017) (noting that "a limitation on the type of damages a party may receive in a state law action does not limit … the damages available under § 1983").

In support of his argument that AMC waived or assigned its right to bring a § 1983 claim or to seek damages under § 1983, Scaglione relies primarily on § 15.2 of the Lease. Section 15.2 states in relevant part that "Landlord shall be entitled to the entire award in any condemnation proceeding or other proceeding for taking the Demised Premises," and that "Tenant hereby assigns to Landlord any award that may be made in such condemnation proceeding or other taking, together with any and all rights of Tenant now or hereafter arising in or to the same or any part thereof."

By its plain language, § 15.2 addresses only condemnation proceedings or other proceedings for the taking of the Demised Premises. Here, the Demised Premises has already been

taken, so § 15.2 does not even apply. But if it did, there is nothing in the plain language that addresses § 1983 at all, let alone waives or assigns AMC's right to bring a § 1983 claim or to seek damages under § 1983. Such a clause would not be valid in any case. *See 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 265 (2009) (recognizing that federal antidiscrimination rights cannot be prospectively waived). And as AMC explained, § 1983 actions serve a different purpose than condemnation proceedings, and the damages available in a § 1983 action are distinct from any condemnation award that might be available. So the waiver or assignment in § 15.2 cannot reasonably be interpreted to preclude AMC's § 1983 claim or the damages available under § 1983.

Further, § 15.2 specifically reserves to AMC the right to seek compensation from the condemnor for any damages that might be awardable to AMC in its "own right," such as damage to its business and relocation costs. Scaglione argues that AMC cannot recover lost profits or business reduction damages as a matter of law, referring to the limitation on damages available in a state-law inverse condemnation claim. But as noted above, AMC is not so limited in the compensatory or punitive damages it may seek against Scaglione under § 1983 for his involvement in the unlawful taking of AMC's leasehold interest.

Similarly, Scaglione contends that AMC is not entitled to relocation costs because it never informed anybody that it had incurred relocation costs for which it would be seeking reimbursement. Scaglione cites no authority for this proposition. AMC pleaded in its Complaint that it was seeking damages for relocation expenses, amongst other direct and consequential damages flowing from the unlawful taking of AMC's leasehold interest. This is a more than adequate request under federal pleading rules to entitle AMC to seek relief for damages naturally associated with its unlawful takings claim. *See Tipton v. Mill Creek Gravel, Inc.*, 373 F.3d 913, 922 n.10 (8th Cir. 2004) (citing *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219 (7th Cir.

1995)). AMC is entitled to seek its relocation damages here.

This leaves § 15.3. Scaglione conclusorily asserts that this section "provides that AMC has no claim whatsoever for the unexpired portion of the Lease," but he is again incorrect. First, this provision only limits AMC's ability to seek that compensation from the landlord, not any other parties. Second, when construing §§ 15.2 and 15.3 together, it is evident that § 15.3 simply takes the limitations of § 15.2, which apply when a condemnation or other proceeding for taking the Demised Premises actually occurs, and applies those same limitations when the landlord preemptively conveys the Demised Premises under threat of condemnation. As with § 15.2, § 15.3 relates to an assignment or waiver of compensation AMC might have sought as part of a condemnation proceeding, and has absolutely nothing to do with AMC's right to bring a § 1983 claim or to seek damages under § 1983.

For the above reasons, Scaglione's arguments that AMC has no standing to bring its § 1983 claim are without merit.

**C.     AMC has Stated a Facially Plausible § 1983 Claim against Scaglione.**

Scaglione next contends that AMC's § 1983 claim against him fails as a matter of law for various reasons, including that he is an attorney who was acting within the scope of his representation, that he cannot be considered a state actor under the facts alleged, that he is entitled to qualified immunity, and that he cannot be held liable due to the intracorporate conspiracy doctrine.

Before addressing each of Scaglione's arguments, AMC emphasizes the unique factual posture that this case presents: Scaglione was the attorney representing *both* a private party (Woodsonia) *and* the government (the CRA) in the very state action that AMC challenges—the conspiracy to take AMC's leasehold interest by using the CRA's condemnation authority to

10

pretextually threaten condemnation against AMC's leasehold interest, and then (erroneously) arguing that this alleged threat gave Woodsonia the contractual right to convey AMC's leasehold interest to the CRA, so that Woodsonia and the CRA could then purport to mutually terminate the Lease.

Scaglione suggests that this situation somehow did not involve any state action because "AMC's leasehold interest was created, governed, and then upon the occurrence of an agreed subsequent event, was transferred and terminated by a private party via the operation of a private contract." This Court should reject this notion outright. Even under Scaglione's (incorrect) interpretation of the Lease, Woodsonia would not have the supposed authority to convey AMC's leasehold interest until "the occurrence of an agreed subsequent event"—*i.e.*, until a governmental authority threatened to condemn AMC's leasehold interest. In other words, the CRA's action in purportedly threatening condemnation was a necessary and integral part of the scheme to take AMC's leasehold interest. At a bare minimum, AMC's allegations more than plausibly support that inference.

Scaglione tries to have his cake and eat it too, arguing on the one hand that he cannot be liable under § 1983 because he was merely representing Woodsonia in a private contractual action and so not acting under color of state law, but on the other hand that as the attorney for the CRA, he is either entitled to qualified immunity or cannot be held liable under the intracorporate conspiracy doctrine. Hypocrisy aside, he is wrong on all counts. There is ample law that an attorney can be held individually liable under § 1983, whether because he was a willful participant in a joint action with the government or its agents, or because he was acting on behalf of the government itself. AMC has plausibly pleaded facts supporting Scaglione's liability on either basis. As to qualified immunity and intracorporate conspiracy, those doctrines are inapplicable here.

11

### 1. An attorney can be held individually liable under § 1983, and AMC has plausibly pleaded facts supporting Scaglione's liability here.

In support of his argument that he cannot be held liable under § 1983 because he was an attorney acting on behalf of disclosed principals and within the scope of his representation, Scaglione cites to general rules of agency law regarding attorney liability in contract or tort for actions taken in the course of a client representation. AMC has not brought a common-law contract or tort claim against Scaglione, and so those principles have little if any relevance here. In any case, as even Scaglione acknowledges, an attorney can be held liable for his own tortious conduct, or for knowingly assisting a client's tortious conduct. *See also Rochester Methodist Hosp. v. Travelers Ins. Co.*, 728 F.2d 1006, 1012 (8th Cir. 1984) (noting that agents may be subject to liability in either tort or contract for their own wrongful acts). As discussed below, the allegations plausibly show that Scaglione knowingly participated in the tortious conduct AMC challenges.

More importantly, there is ample authority that an attorney can be held individually liable in a § 1983 action, whether because he was a willful participant in a joint action with the government or its agents, or because he was acting on behalf of the government itself. *See, e.g.*, *DuBose v. Kelly*, 187 F.3d 999, 1003 (8th Cir. 1999) (citing *Dennis v. Sparks*, 449 U.S. 24 (1980)) (noting that private attorneys can be state actors for purposes of § 1983 liability under joint action theory); *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1266–67 (3rd Cir. 1994) (private attorney acting on behalf of private party who uses state's power to deprive another of property may be held liable under § 1983); *Doyle v. Schultz*, 97 F. Supp. 2d 763, 769–71 (W.D. La. 2000) (same); *Filarsky v. Delia*, 566 U.S. 377, 383–84, 393–94 (2012) (acknowledging that private attorney retained by city to assist in official investigation was state actor for purposes of § 1983); *Berridge v. Heiser*, 993 F. Supp. 1136, 1143–44 (S.D. Ohio 1997) (private attorney acting as "Special Counsel for the Attorney General" was state actor for purposes of § 1983); c.f. *West v.*

12

*Atkins*, 487 U.S. 42, 52 (1988) (physicians under contract to provide medical services to prison inmates were not "removed from the purview of § 1983 simply because they [were] professionals acting in accordance with professional discretion and judgment").

The allegations in AMC's Complaint are more than sufficient to support a reasonable inference of Scaglione's liability under either theory. *See Cordova v. Vaughn Mun. Sch. Dist. Bd. of Educ.*, 3 F. Supp. 2d 1216, 1220–22 (D.N.M. 1998) (citing *Bray by Bray v. Hobart City Sch. Corp.*, 818 F. Supp. 1226, 1237 (N.D. Ind. 1993)) (allegations against private attorney, who advised school board on a contractual basis, were sufficient to support inference of attorney's § 1983 liability either as a government agent or under joint action theory, where attorney was active participant in events that led to plaintiff's unlawful discharge).

There is no dispute here that Scaglione represented the CRA in its purported threat of condemnation against AMC's leasehold interest. This fact alone supports a reasonable inference that Scaglione can be held liable under § 1983. But even beyond that, the allegations reasonably support that Scaglione was the architect of the entire scheme to unlawfully take AMC's leasehold interest. Scaglione represented Woodsonia in its attempt to buy out the Lease. When that was unsuccessful (at least under Woodsonia's preferred terms), Woodsonia and Scaglione persuaded the CRA to retain Scaglione as well. Now armed with government authority to threaten AMC's leasehold interest, Scaglione did just that and sent his March 31 letter to AMC on behalf of the CRA. Then that same day, without even waiting for AMC to respond to the CRA's supposed "good faith" offer in Scaglione's letter, Woodsonia and the CRA (both represented by Scaglione) entered their purported transfer and termination agreement under the guise that this purported threat triggered the Lease's eminent domain provisions and allowed them to take AMC's leasehold interest.

13

For these reasons, AMC has adequately pleaded facts that support a plausible inference of Scaglione's liability under § 1983. This Court should reject Scaglione's arguments otherwise.

> **2.     Qualified immunity and the intracorporate conspiracy doctrine are inapplicable here and cannot save Scaglione from § 1983 liability.**

Scaglione also argues that even if he could be considered a state actor for purposes of § 1983, he cannot be held liable as a matter of law because he is entitled to qualified immunity and/or because under the intracorporate conspiracy doctrine, a state actor cannot conspire with its agents acting within the scope of their employment. Both of these arguments fail.

As to qualified immunity, it is far from clear that Scaglione is even entitled to invoke this doctrine. The Eighth Circuit has acknowledged that private individuals, as state actors, are not necessarily entitled to assert a qualified immunity defense. *Davis v. Buchanan County, Mo.*, 11 F.4th 604, 617 (8th Cir. 2021) (citing *Domina v. Van Pelt*, 235 F.3d 1091 (8th Cir. 2000)). Instead, to determine whether a private individual may assert qualified immunity, courts look to: (1) the general principles of tort immunities and defenses applicable at common law; and (2) the policy reasons for affording protection from suit under § 1983. *Davis*, 11 F.4th at 617 (citing *Richardson v. McKnight*, 521 U.S. 399 (1997) and *Filarsky v. Delia*, 566 U.S. 377 (2012)).

Scaglione relies on *Filarsky* for the proposition that a "private attorney temporarily retained by the city to conduct the city's work [is] entitled to seek qualified immunity from suit under § 1983." Scaglione overstates *Filarsky*'s holding. There, the United States Supreme Court addressed the narrow question of whether an individual hired by the government to do its work is prohibited from seeking qualified immunity *solely* on the basis that he works for the government on something other than a permanent or full-time basis. 577 U.S. at 380. After reviewing the historical bases for affording qualified immunity to individuals engaged in government work, the Court determined there was no historical reason for distinguishing between full-time government

14

employees and individuals working for the government on some other basis. *Id.* at 384–89.

The Court then identified three policy reasons for recognizing qualified immunity under § 1983: to help avoid unwarranted timidity in the performance of public duties, to ensure that talented candidates are not deterred from public service, and to prevent harmful distractions from carrying out governmental work. *Id.* at 389–90 (citing *Richardson*, 521 U.S. at 409–11). The Court determined that under the circumstances presented in that case, there were no policy reasons to depart from the common-law rule. *Id.* at 389–94. As Justice Sotomayor noted in her concurring opinion, the Court's decision did not mean that *every* private individual who works for the government in some capacity is entitled to assert qualified immunity. 566 U.S. at 397 (Sotomayor, J., concurring). Those individuals would still be required to satisfy the Court's two-part test for conferring qualified immunity. *Id.*

Here, the policy reasons for making a qualified immunity defense available in § 1983 actions to private individuals employed by the government on a limited basis do not extend to Scaglione. Simply put, Scaglione was representing *both* a private party *and* the government in the very state action being challenged. To allow him to assert a qualified immunity defense here would fly in the face of the very purpose of § 1983. Under Scaglione's theory, an attorney could immunize himself from § 1983 liability merely by representing both private and public parties in challenged state action. This position should be rejected.

Moreover, the policy concerns identified in *Filarsky* and *Richardson* do not favor allowing Scaglione to assert a qualified immunity defense here. Scaglione was retained by the CRA for the limited role of representing it in negotiations with leaseholders and potentially in condemnation proceedings against those leaseholders. Given the limited scope of Scaglione's government role, any concern that ongoing government functions would be affected by § 1983 liability is minimal.

15

Further, as a private attorney facing marketplace pressures, the concern that Scaglione would act with "unwarranted timidity" is less present. *See Davis*, 11 F.4th at 620. Similarly, those same marketplace realities suggest that immunity would not be necessary to attract a "talented candidate" to fill the limited role that Scaglione undertook on behalf of the CRA. *See id.* at 621–22. And finally, the risk of "harmful distractions" caused by the threat of litigation is inapposite here. Private attorneys such as Scaglione already operate in an arena where the threat of litigation is ever present. *Cf. id.* at 622 (threat of facing § 1983 claim is no more distracting to medical professionals than regular threat of malpractice claims).

Further, dismissal of AMC's § 1983 claim against Scaglione is unwarranted at this early stage of proceedings:

> Qualified immunity shields public officials from liability for civil damages if their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. … To overcome qualified immunity at the motion to dismiss state, a plaintiff must plead facts showing (1) that the official violated a statutory or constitutional right, and (2) the right was clearly established at the time of the challenged conduct.

*Watkins v. City of St. Louis, Mo.*, 103 F.4th 947, 951 (8th Cir. 2024) (citation modified). The focus of this inquiry is on the objective legal reasonableness of a government official's acts. *Jones v. Coonce*, 7 F.3d 1359, 1362 (8th Cir. 1993) (citing *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). The qualified immunity defense fails if the official violates a clearly established right because a reasonably competent public official should know the law governing his conduct. *Coonce*, 7 F.3d at 1362. The official's good faith or bad faith is irrelevant. *Slone*, 983 F.3d 107, 110 (8th Cir. 1993).

As previously discussed, the allegations in AMC's Complaint more than support a plausible inference that Scaglione violated AMC's clearly-established Fifth and Fourteenth Amendment rights to not have its leasehold interest in the Demised Premises taken without just

compensation. Even under Scaglione's own erroneous interpretation of the Lease, the allegations in AMC's complaint plausibly support the inference that his actions were objectively unreasonable. Specifically, the "threat of condemnation" in Scaglione's March 31 letter on behalf of the CRA was made in an improper effort to trigger the termination provisions in the Lease, and not because the CRA actually intended to (or could) move forward with a condemnation proceeding. So, AMC has met any burden it has to overcome Scaglione's qualified immunity defense at the motion to dismiss stage.

Turning to Scaglione's invocation of the intracorporate conspiracy doctrine, it is again unclear whether that doctrine might even apply in this case. As Scaglione admits, the Eighth Circuit has never applied that doctrine in context of a § 1983 claim. *See Baude v. City of St. Louis*, 476 F. Supp. 3d 900, 915–16 (E.D. Mo. 2020), *aff'd sub nom. Baude v. Leyshock*, 23 F.4th 1065 (8th Cir. 2022) (noting the "uncertainty regarding the applicability of the intracorporate conspiracy doctrine in § 1983 cases"). Futher, the docrtrine should not be applied under the facts of this case. The conspiracy AMC has alleged was not merely a conspiracy between a local government entity (the CRA) and its agent (Scaglione acting as its attorney), but a conspiracy involving Woodsonia as well. As with the qualified immunity doctrine, Scaglione should not be permitted to avoid liability merely because he acted as the attorney for both the private party and the government in the conspiracy to unlawfully take AMC's leasehold interest.

For these reasons, qualified immunity and the intracorporate conspiracy doctrine are inapplicable here, and cannot save Scaglione from § 1983 liability, especially at this early stage of proceedings. This Court should reject Scaglione's arguments otherwise.

**D.     AMC has Adequately Pleaded its Claim for Damages.**

Finally, Scaglione briefly contends that AMC did not adequately plead its claim for compensatory or punitive damages. He is again incorrect.

First, none of the damages that AMC has alleged are special damages that need to be specifically stated under Fed. R. Civ. P. 9(g). "'Special damages' are those types of damages that, although resulting from the wrongful act, are not usually associated with the claim in question and must be plead in order to avoid unfair surprise to the defendant." *Tipton*, 373 F.3d at 922 n.10. The compensatory damages AMC seeks are "the lost value of its leasehold interest; lost profits; relocation and rebuilding expenses, and other direct and consequential damages flowing from Defendants' misconduct." These are damages that naturally and foreseeably flow from AMC's claim that Scaglione participated in an unlawful taking of AMC's leasehold interest. *See McGhee v. State Farm Fire and Cas. Co.*, 771 F. Supp. 3d 1084, 1091 (E.D. Mo. 2025). AMC is not required to plead such damages with any more specificity.

As to punitive damages, those are not special damages that must be specifically stated, either. *See Figgins v. Advance Am. Cash Advance Centers of Mich., Inc.*, 482 F. Supp. 2d 861, 868–70 (E.D. Mich. 2007). Punitive damages are available in § 1983 actions "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith*, 461 U.S. at 56. As discussed above, the allegations in AMC's Complaint are more than sufficient to support an inference that Scaglione acted, at a minimum, with reckless or callous indifference to AMC's federally-protected rights. So, AMC has plead a sufficient basis to request punitive damages against Scaglione.

## III.      CONCLUSION

For the above reasons, AMC respectfully requests that this Court deny Scaglione's motion to dismiss. Alternatively, if this Court finds AMC's Complaint against Scaglione somehow deficient, AMC respectfully requests this Court grant it leave to amend under Fed. R. Civ. P. 15(a)(2) in the interest of justice to correct any deficiencies.

Respectfully submitted,

**LEWIS RICE LLC**

By: /s/ Thomas R. Larson
Thomas R. Larson, Mo. #26114
Ashlyn Buck Lewis, Mo. #65501
1010 Walnut, Suite 500
Kansas City, Missouri 64106
Tel:   (816) 421-2500
Fax:  (816) 472-2500
trlarson@lewisricekc.com
alewis@lewisricekc.com

*and*

**DVORAK LAW GROUP, LLC**

Ryan M. Kunhart, Neb. #24692
9500 W Dodge Road, Suite 100
Omaha, Nebraska 68114
Tel:   (402) 934-4770
Fax:  (402) 933-9630
rkunhart@ddlawgroup.com

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of NECivR 7.1(d) because it contains 6,122 words, which includes all text, including the caption, headings, footnotes, and quotations, as determined by Microsoft Word 2016, and because no generative artificial intelligence program was used in drafting this brief.

/s/ Ashlyn Lewis
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

/s/ Ashlyn Lewis
*Attorney for Plaintiff*