**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEBRASKA**

| | |
|---|---|
| AMERICAN MULTI-CINEMA, INC., | Case No. 8:25-cv-292 |
| Plaintiff, | |
| v. | |
| WOODSONIA HWY 281, LLC, et al., | |
| Defendants. | |

**PLAINTIFF'S BRIEF IN OPPOSITION**
**TO DEFENDANT WOODSONIA HWY 281, LLC'S**
**MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS,**
**OR IN THE ALTERNATIVE, MOTION TO DISMISS**

Plaintiff American Multi-Cinema, Inc. ("AMC") respectfully offers the following brief in opposition to Defendant Woodsonia Hwy 281, LLC ("Woodsonia")'s Motion to Compel Arbitration and Stay Proceedings, or in the Alternative, Motion to Dismiss.

## I.    INTRODUCTION

The facts of this case are laid out in reasonable detail in AMC's Complaint. But at its core, this case is quite simple. AMC was a longtime tenant at the Conestoga Mall in Grand Island, Nebraska ("Shopping Center"), where it operated a movie theater in its leased premises ("Demised Premises") under a lease ("Lease") with the owner of the Shopping Center. Woodsonia then purchased the Shopping Center from the previous owner and sought to redevelop it under a redevelopment plan and contract with the Community Redevelopment Authority of the City of Grand Island, Nebraska ("CRA") and the City of Grand Island, Nebraska ("City").

As part of this redevelopment, Woodsonia and the CRA sought to terminate the Lease and remove AMC from the Demised Premises. But they did not do this using condemnation

1

proceedings. Instead, Woodsonia and the CRA used a plan concocted by their mutual attorney, Defendant Gregory C. Scaglione ("Scaglione"), which went as follows:

- The CRA, acting through Scaglione, sent a letter to AMC purporting to threaten condemnation of AMC's leasehold interest in the Demised Premises;

- That very same day—and without making any payment to AMC—Woodsonia purported to convey AMC's leasehold interest to the CRA;

- Again that same day—and without making any payment to AMC—Woodsonia and the CRA purported to immediately terminate the Lease;

- Woodsonia obtained an eviction order from the County Court of Hall County, Nebraska, which did not have jurisdiction over the proceedings; and

- The County Court ordered execution on the eviction, which was carried out by the Hall County Sheriff's Office.

As shown by these facts, Woodsonia and the CRA worked with their mutual attorney, Scaglione, to use state action to take AMC's leasehold interest and evict AMC from its Demised Premises, without paying compensation to AMC.

Woodsonia first moves this Court to compel AMC's claims—breach of contract (Count I), wrongful eviction (Count II), and claim for relief under 42 U.S.C. § 1983 (Count III)—into arbitration. But even if AMC's breach-of-contract and wrongful eviction claims are arbitrable, its § 1983 claim is not. So, this Court should deny Woodsonia's motion to compel arbitration.

Alternatively, Woodsonia moves to dismiss AMC's three claims. This motion is premised on Woodsonia's contention that Woodsonia and the CRA (together with and through Scaglione as their shared attorney) had the right to take AMC's leasehold interest without paying for it. But that is the nexus of virtually every lawsuit—did the defendants have the right to do what they did?

AMC has plausibly pleaded its causes of action, which is all that is required at this early stage of proceedings. The arguments advanced by Woodsonia could be appropriately addressed in

2

motion practice by all parties, after discovery. For the reasons below, this Court should deny Woodsonia's alternative motion to dismiss, without prejudice to Woodsonia asserting the same arguments in an appropriate motion at a later time.

## II.    THE COURT SHOULD DENY WOODSONIA'S MOTION TO COMPEL ARBITRATION.

Woodsonia first argues that all of the claims AMC has brought against it are subject to mandatory arbitration under § 16.8 of the Lease, and so this Court should compel the claims into arbitration and stay these proceedings pending arbitration. This is incorrect. Even if § 16.8 requires the parties to arbitrate AMC's breach-of-contract and wrongful eviction claims, the arbitration provision cannot reasonably be read to include AMC's § 1983 claim. In any event, to the extent § 16.8 can be read to compel arbitration of AMC's § 1983 claim, it is unenforceable as against federal statute and policy.

For these reasons, and as more fully explained below, this Court should deny Woodsonia's motion to compel arbitration.

### A.    Legal Standards

When deciding a motion to compel arbitration under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"), courts consider (1) whether the parties entered a valid arbitration agreement and (2) if so, whether the parties' particular dispute falls within the scope of that agreement. *Parm v. Bluestem Brands, Inc.*, 898 F.3d 869, 873 (8th Cir. 2018). State contract law governs the first question, *i.e.*, whether the parties agreed to arbitrate. *See Donaldson Co. v. Burroughs Diesel, Inc.*, 581 F.3d 726, 731 (8th Cir. 2009) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995)). If an enforceable agreement exists, the federal substantive law of arbitrability governs whether a dispute falls within the scope of the arbitration agreement. *Donaldson*, 581 F.3d at 731.

Arbitration is a matter of contract; a party cannot be required to submit to arbitration any dispute it has not agreed to submit. *Id.* (citing *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643 (1986) and *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002)). "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Techs., Inc.*, 475 U.S. at 649. But where a valid arbitration exists, courts liberally construe it and resolve any doubts in favor of arbitration, unless it may be said with positive assurance that the arbitration agreement cannot be read to apply to the parties' dispute. *Parm*, 898 F.3d at 873–74.

### B.    This Court Should Decide Questions of Arbitrability.

As a threshold matter, Woodsonia contends that the question of the arbitrability of the parties' disputes must itself be decided by the arbitrator because the provision incorporates the rules of the American Arbitration Association ("AAA"), which in turn give the arbitrator the power to rule on his or her own jurisdiction, including objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim. *See Fallo v. High-Tech Inst.*, 559 F.3d 874, 877–78 (8th Cir. 2009).

The United States Supreme Court has emphasized that when courts are considering whether the parties' arbitration agreement includes a delegation provision—that is, an agreement for the arbitrator himself, and not a court, to decide questions of arbitrability—courts should not assume the parties agreed to arbitrate arbitrability unless there is a "clear and unmistakable" manifestation of their intent to do so. *First Options*, 514 U.S. at 944. The Supreme Court reasoned that there are important differences between the question of *who* should decide arbitrability (the court or the arbitrator) and *whether* a particular merits-related dispute is artbitrable because it is within the scope of a valid arbitration provision. *Id.* Whereas the parties likely gave at least some

4

thought to the scope of arbitration, the question of who should decide whether a particular dispute falls within that scope is "rather arcane." *Id.* at 945. So, given the principle that a party can only be forced to arbitrate issues it has specifically agreed to arbitrate, courts reverse the presumption of arbitrability on the issue of delegation (the "who decides" question), and instead presume that the parties intended a court to decide scope disputes unless the parties "clearly and unmistakably" agreed that the arbitrator would do so. *Id.* at 944–45.

In *Fallo*, the Eighth Circuit held that the parties' incorporation of the AAA Rules, which give the arbitrator the authority to determine his own jurisdiction, constituted a "clear and unmistakable" manifestation of the parties' intent to delegate scope questions to the arbitrator. 559 F.3d at 877–78. The arbitration provision at issue in *Fallo* stated:

> Any controversy or claim arising out of or relating to this Agreement, or breach thereof, no matter how pleaded or styled, shall be settled by arbitration in accordance with the Commercial Rules of the American Arbitration Association at Kansas City, Missouri, and judgment upon the award rendered by the Arbitrator may be entered in any court having jurisdiction.

559 F.3d at 876.

In contrast, the arbitration provision at issue here in § 16.8 of the Lease provides:

> 16.8    Arbitration. In the event of any disagreement, dispute or claim concerning this Lease or the obligations of Landlord and Tenant under this Lease (except as otherwise provided below), and if such matter cannot be resolved within ten (10) days after written demand by Tenant or Landlord to the other party that the matter in dispute be resolved through arbitration, either Landlord or Tenant shall be entitled to submit such matter to binding arbitration under the rules of the American Arbitration Association (the "AAA") then in effect. Any claim by Landlord for the eviction of Tenant or for possession of the Demised Premises shall not be subject to arbitration including, without limitation, the disputes, claims and defenses underlying such claim for eviction or possession, unless Landlord consents to such arbitration in its sole discretion. The matter shall be submitted to arbitration in Denver, Colorado and the parties shall immediately request that AAA provide a list of qualified arbitrators. If any discovery or document production is allowed and agreed upon by the parties, such discovery shall be limited to items and information directly and materially related to the matters at issue, and limited so as to (i)

5

minimize any burden on Landlord, and (ii) maintain the confidentiality of Landlord's books, records and documents. In the event the parties cannot agree on a single arbitrator within ten (10) days after the parties have received the list of arbitrators, each party shall designate one arbitrator from the list within ten (10) days thereafter and the selected arbitrators shall then select an additional arbitrator within ten (10) days after their selection to complete the panel of arbitrators. If the two arbitrators are unable to select an additional arbitrator, the AAA shall select the additional arbitrator. All arbitration proceedings shall then be conducted in an expedited manner and in accordance with the applicable rules of the AAA with all costs of the arbitration proceeding (including, without limitation, reasonable attorneys' fees, arbitrators' fees and witness fees) to be borne by the parties in accordance with this Lease, which shall be provided for in the arbitration award. …

*Fallo* does not control here. Unlike the arbitration provision in *Fallo*, § 16.8 of the Lease does not simply adopt the AAA Rules wholesale. Instead, it gives extensive instructions for how an arbitration is to be conducted if there is an arbitration, including the location of the arbitration forum, limitations on discovery in arbitration, a specific procedure for the selection of arbitrators, and the apportionment of costs and attorneys' fees to be included in any arbitration award. This shows that the parties understood, at a minimum, that some of the AAA Rules would be disregarded or modified as part of their arbitration. So it cannot be said that the parties "clearly and unmistakably" agreed that any arbitration between them would follow all of the AAA Rules, in particular the "rather arcane" rule delegating scope disputes to the arbitrator.

For the above reasons and given the presumption against the arbitrability of scope disputes, this Court should not interpret § 16.8 of the Lease to include a delegation provision, but instead should itself decide questions of arbitrability.

**A. AMC's Claims are Outside the Scope of the Parties' Arbitration Provision.**

**1.    AMC's breach-of-contract and wrongful eviction claims are not arbitrable.**

As to the arbitrability of the merits of AMC's claims, the first question for this Court is whether AMC's breach-of-contract and eviction claims fall under the arbitration provision.

Section 16.8 of the Lease applies to "any disagreement, dispute or claim concerning this Lease or the obligations of Landlord and Tenant under this Lease," but then makes an important exception: "Any claim by Landlord for the eviction of Tenant or for possession of the Demised Premises *shall not* be subject to arbitration including, without limitation, the disputes, claims *and defenses* underlying such claim for eviction or possession, unless Landlord consents to such arbitration in its sole discretion" (emphasis added).

Here, AMC's breach-of-contract and wrongful eviction claims arise directly from Woodsonia's wrongful eviction of AMC from its Demised Premises. AMC's claims in this suit are the flip side of defenses it raised in the eviction proceeding—namely, that the Lease was not properly terminated (breach of contract) and so Woodsonia's effort to evict AMC before the expiration of the Lease term was improper (wrongful eviction). Because these claims arise from the eviction, they are exempt from arbitration. Although § 16.8 gives Woodsonia the "sole discretion" to choose to arbitrate eviction matters, it did not do so here. Instead, Woodsonia chose to use court proceedings to evict AMC. Having already elected to litigate eviction matters in court, Woodsonia cannot now change that election and demand arbitration now that it believes court to be a less favorable forum.

### 2.    AMC's § 1983 claim is not arbitrable.

Regardless of whether AMC's breach-of-contract and wrongful eviction claims are arbitrable, AMC's § 1983 claim is not. It is not merely a reframed version of its breach-of-contract or wrongful eviction claims, as Woodsonia suggests, but an entirely separate, constitutional tort brought to vindicate the violation of AMC's Fifth and Fourteenth Amendment rights. That fact

does not change just because the property interest that was wrongfully taken from AMC—its leasehold interest—arose under the Lease.

Section 1983 is derived from the § 1 of the Civil Rights Act of 1871. *Carey v. Piphus*, 435 U.S. 247, 253 (1978). It creates "a species of tort liability" in favor of persons who are deprived of rights, privileges, or immunities secured to them by the United States Constitution. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305–06 (1986). Section 1983 "was intended not only to override discriminatory or otherwise unconstitutional state laws, and to provide a remedy for violations of civil rights where state law was inadequate, but also to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice." *Zinermon v. Burch*, 494 U.S. 113, 124 (1990) (citation modified); *see also Monroe v. Pape*, 365 U.S. 167, 180 (1961), *overruled on other grounds by Monell v. Dep't Soc. Servs. of City of New York*, 436 U.S. 658 (1978) (noting that the legislative history of § 1983 "made abundantly clear that one reason [it] was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced").

The remedy for a § 1983 violation is "supplementary to [any] state remedy, and the latter need not be first sought … before the federal one is invoked." *Monroe*, 365 U.S. at 183. So, in a § 1983 action based on an unlawful Fifth Amendment taking, the property owner may bring that action as soon as the government takes his or her property without paying for it, because that is the moment the constitutional violation occurs. *Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180, 185, 202 (2019). The existence of a state-law action for post-taking compensation is an additional remedy potentially available to the property owner, but it is not a necessary prerequisite for bringing a § 1983 action, nor does it undo the constitutional violation that has already happened. *Id.* at 201–02.

8

Because § 1983 actions sound in tort, the United States Supreme Court has looked to the common law of torts, as well as the purposes and policies underlying the statute, to determine what damages are available for a § 1983 violation. *Smith v. Wade*, 461 U.S. 30, 34 (1983). Ordinarily, the damages available in a common-law tort case (and thus a § 1983 action) are compensatory:

> [D]amages in tort cases are designed to provide compensation for the injury caused to plaintiff by defendant's breach of duty. To that end, compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation, personal humiliation, and mental anguish and suffering. Deterrence is also an important purpose of this system, but it operates through the mechanism of damages that are compensatory—damages grounded in determinations of plaintiffs' actual losses. Congress adopted this common-law system of recovery when it established liability for constitutional torts. Consequently, the basic purpose of § 1983 damages is to compensate persons for injuries that are caused by the deprivation of constitutional rights.

*Stachura*, 477 U.S. at 306–07 (citation modified). Moreover, as with common-law torts, punitive damages are available in § 1983 actions "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith*, 461 U.S. at 56.

It follows from the above that a § 1983 claim for damages based on an unlawful taking, which focuses on compensating an injured person for all losses caused by the violation of his or her constitutional rights, serves a different purpose than a condemnation or inverse condemnation proceeding, which focuses on compensating a property owner for the property interest taken. *See Home v. Dep't of Agriculture*, 576 U.S. 350, 368–69 (2015). It further follows that the damages available for a § 1983 violation based on an unconstitutional taking are distinct from, and in addition to, any compensation that might be available in a condemnation or inverse condemnation proceeding. *See New England Estates, LLC v. Town of Branford*, 988 A.2d 229, 249–52 (Conn. 2010) (rejecting claim that damages available in a § 1983 action based on a wrongful taking were

9

limited to those available as part of just compensation for the property interest taken); *see also Estate of Guled by and through Abdi v. City of Minneapolis*, 869 F.3d 680, 684 (8th Cir. 2017) (noting that "a limitation on the type of damages a party may receive in a state law action does not limit … the damages available under § 1983").

As discussed below, it is unclear whether an agreement to arbitrate a § 1983 claim would even be enforceable. But at the very least, it is apparent that any agreement to arbitrate a §1983 claim must be clear and unmistakable. *See 14 Penn Plaza LLC v. Pyett*, 566 U.S. 247, 274 (2009) (holding that an arbitration provision within a collective bargaining agreement that "clearly and unmistakably" requires union members to arbitrate claims brought under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, is enforceable as a matter of law).

Here, § 16.8 of Lease applies to only to disputes "concerning this Lease or the obligations of Landlord or Tenant under this Lease." It is entirely silent as to any statutory or tort claims, let alone a statutory claim brought under a federal statute created as a species of constitutional tort and specifically meant to provide a federal remedy for the violation of federal rights. So, § 16.8 cannot reasonably be read to encompass AMC's § 1983 claim against Woodsonia for its involvement in the unconstitutional taking of AMC's property right. *See Masso-Torrellas v. Municipality of Toa Alta*, 845 F.3d 461, 465–66 (1st Cir. 2017) (concluding § 1983 claim fell outside the scope of an arbitration clause covering "matter[s] related to this contract"); *see also Cummings v. City of Newton*, 164 F. Supp. 3d 227, 231–32 (D. Mass. 2016) (finding that plaintiff's § 1983 claims, which related to city's delay in compensating him after he was wrongfully terminated, concerned the status of his property right and not the dispute leading to his termination, and so fell outside the scope of the arbitration provision in his employment agreement).

The only case that Woodsonia cites in support of its argument that AMC's § 1983 claim is

arbitrable is *De Luna v. Spindletop Center*, No. 1:23-cv-00167, 2024 WL 2097165 (E.D. Tex. 2024). This case is inapposite. The arbitration provision there stated that it applied to

> all legally cognizable claims between Employee and Employer … arising from or in any way related to Employee's employment by Employer, including termination thereof …. It is the parties' intent that all disputes of any legally cognizable claim, *no matter whether alleged to arise by statute, contract, common law, or otherwise*, between them must be arbitrated … It is the intent of the parties that this agreement to arbitrate shall be construed as broadly as possible to include *any and all legally cognizable disputes which may arise between them.*

2024 WL 2097165, at *3 (emphasis added). Plainly, that arbitration provision is far broader than § 16.8 of the Lease, specifically encompasses statutory causes of action, and repeatedly states that the parties are agreeing to arbitrate any and all legally cognizable claims between them. *De Luna* is inapplicable here.

For these reasons, the Court should find that § 16.8 of the Lease does not apply to AMC's § 1983 claim against Woodsonia, and should deny Woodsonia's motion to compel arbitration at least as to that claim.

### 3.    To the extent the arbitration provision can be read to apply to AMC's § 1983 claim, it is unenforceable.

As a final matter, AMC notes that while the United States Supreme Court has never expressly decided whether a provision compelling arbitration of a § 1983 claim would be enforceable as a matter of law, *see Masso-Torrellas*, 845 F.3d at 466 n.2, its caselaw supports that such a provision would be unenforceable. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) (noting that statutory claims would not be arbitrable where Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue, which may be found in the statutory text, legislative history, or an inherent conflict between arbitration and the statute's purposes).

The Supreme Court has repeatedly looked to the legislative history surrounding the passage of § 1983 and emphasized that its purpose is to provide litigants access to federal *courts* to vindicate their federal rights. *See, e.g., Mitchum v. Foster*, 407 U.S. 225, 238–42 (1972) (noting that "the very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights"); *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 502–07 (1982) (explaining that in passing the Civil Rights Act of 1871 from which § 1983 is derived, "Congress assigned to the federal courts a paramount role in protecting constitutional rights."). An arbitration provision that deprives litigants of their right to seek redress in federal court for the violation of their federal constitutional rights is inimical to the very purposes of § 1983 and so is unenforceable as a matter of law.

If this Court finds that § 16.8 of the Lease can be read to include AMC's § 1983 claim against Woodsonia within its scope, it should deny Woodsonia's motion to arbitrate on the grounds that such agreement is unenforceable.

## III.     THE COURT SHOULD DENY WOODSONIA'S MOTION TO DISMISS.

Alternatively, Woodsonia argues that AMC has no standing because AMC has not suffered an invasion of a legally protected interest, and so its claims should be dismissed for lack of subject matter jurisdiction. This is incorrect. As AMC has plausibly alleged in its Complaint, and as Woodsonia's own brief likewise demonstrates, AMC has standing here. AMC suffered an unconstitutional taking, which is fairly traceable to the Defendants' challenged conduct, and likely to be redressed by a favorable judicial decision.

Woodsonia also contends that AMC has failed to plead claims against Woodsonia that entitle it to relief. Again, this is incorrect. Even under Woodsonia's erroneous interpretation of the Lease, AMC has still pleaded sufficient facts to plausibly show that Woodsonia participated in a

12

joint action with Scaglione, the City, and the CRA to wrongfully terminate the Lease, evict AMC, and take its leasehold interest without condemnation proceedings or payment of just compensation, entitling AMC to relief on all three of its claims. AMC has stated facially plausible claims against Woodsonia.

For these reasons, and as more fully explained below, this Court should deny Woodsonia's alternative motion to dismiss.

### A.    Legal Standards

Woodsonia seeks dismissal of AMC's claims under both Fed. R. Civ. P. 12(b)(1) (lack of subject matter jurisdiction) and Fed. R. Civ. P. 12(b)(6) (failure to state a claim on which relief can be granted). Because Woodsonia's jurisdictional attack is based solely on the allegations in the pleadings, it is a facial attack, and so the same dismissal standards apply whether his motion is considered under Rule 12(b)(1) or Rule 12(b)(6). *See Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016).

When standing is challenged under Rule 12(b), a plaintiff must plead sufficient facts which, taken as true, support a reasonable and plausible inference that the plaintiff satisfies the elements of Article III standing. *Hawse v. Page*, 7 F.4th 685, 688–89 (8th Cir. 2021). The plaintiff must have (1) suffered an injury in fact, that (2) is fairly traceable to the challenged conduct of the defendant, and (3) is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

To adequately state a claim under the Federal Rules, the pleader must make "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation modified). Detailed factual allegations are not

13

required, but the pleader must provide more than labels and conclusions or a formulaic recitation of the elements of a cause of action. *Id.* A complaint must allege enough facts to state a claim that is plausible on its face. *Id.* This facial plausibility requirement is met when the pleader asserts "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This is not akin to a probability requirement, but asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.*

Rule 12(b) "is not a procedure for resolving contests about the facts or the merits of a case." *Gallentine v. Housing Authority of City of Port Arthur, Tex.*, 919 F. Supp. 2d 787, 794 (E.D. Tex. 2012) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2d* § 1356, at 294 (1990)). Instead, a court deciding a motion to dismiss must take all well-pleaded factual allegations in the complaint as true, "even if it strikes a savvy judge that actual proof of the facts alleged is improbable and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. Legal conclusions can provide the framework of the complaint, but they are not entitled to the same deference, and must be supported by factual allegations. *Iqbal*, 556 U.S. at 679. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Id.*

## B.    AMC has Standing to Bring its Claims Against Woodsonia.

Woodsonia contends that AMC lacks standing in this matter because the taking of AMC's leasehold interest was not wrongful, and so AMC has failed to plead facts showing it has suffered an injury in fact. Woodsonia also suggests that AMC lacks standing because it waived or assigned its right to seek damages, and so there is no redress available to AMC. These arguments are without merit.

14

### 1.    Woodsonia gets standing backwards.

As AMC has plausibly alleged in its Complaint, and as Woodsonia's own brief likewise demonstrates, AMC has standing here. Under the standing test set forth in *Spokeo*:

(1)    AMC suffered an in injury in fact by losing its leasehold interest in the Demised Premises. AMC used to own a leasehold interest, and now it does not.

(2)    AMC's injury is fairly traceable to the challenged conduct of the Defendants. Specifically, Woodsonia and the CRA, together with and through their shared attorney Scaglione, took AMC's leasehold interest without paying compensation.

(3)    If AMC wins, its injury will be redressed in the form of compensation for the value of the leasehold interest that was taken from it, and other direct and consequential damages flowing from Defendants' misconduct in the unlawful taking.

AMC contends the taking of its leasehold interest was wrongful, and Woodsonia contends it was not. The entire purpose of this lawsuit is to determine who is right. That is the very definition of a justiciable controversy between parties with standing.

Woodsonia's argument that AMC has no standing is largely based on Woodsonia's interpretation of the Lease, and its assertion that AMC's leasehold interest was properly taken under the facts presented here. Simply put, Woodsonia says that AMC cannot bring its claims that the Lease was improperly terminated, that it was wrongfully evicted, and that its leasehold interest was unconstitutionally taken *because* (in Woodsonia's view) the Lease was properly terminated, the eviction was lawful, and AMC was not deprived of any constitutionally protected property interest.

This is completely backwards. Woodsonia is asking this Court to adjudicate the merits of this dispute at the pleading stage and find that AMC has no standing *due to the very conduct that AMC claims is in this suit was unlawful*. While AMC adamantly disputes both Woodsonia's

interpretation of the Lease and its contention that the taking of AMC's leasehold interest was somehow proper here, the question of who is right—AMC or Woodsonia—ultimately goes to the merits of AMC's claims. It has nothing to do with whether AMC has standing to bring those claims in the first place. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute ….."); *Red River Freethinkers v. City of Fargo*, 679 F.3d 1015, 1023 (8th Cir. 2012) ("The standing inquiry is not … an assessment of the merits of a plaintiff's claim.").

Woodsonia's argument that AMC has no standing because Woodsonia disputes the ultimate merits of AMC's claims is baseless. AMC has plausibly alleged facts that show it has standing to bring this suit. This Court should reject Woodsonia's arguments otherwise.

**2.    AMC did not assign or waive its right to seek damages.**

Next, Woodsonia claims that AMC contractually assigned or waived its right to seek damages, and so AMC has no standing because it cannot recover anything in this suit. This argument is likewise without merit.

In support of its argument that AMC waived or assigned its right to seek any damages, Woodsonia relies primarily on § 15.2 of the Lease. Section 15.2 states in relevant part that "Landlord shall be entitled to the entire award in any condemnation proceeding or other proceeding for taking the Demised Premises," and that "Tenant hereby assigns to Landlord any award that may be made in such condemnation proceeding or other taking, together with any and all rights of Tenant now or hereafter arising in or to the same or any part thereof."

By its plain language, § 15.2 addresses only condemnation proceedings or other proceedings for the taking of the Demised Premises. Here, the Demised Premises has already been taken, so § 15.2 does not even apply. But if it did, there is nothing in the plain language that

16

addresses § 1983 at all, let alone waives or assigns AMC's right to bring a § 1983 claim or to seek damages under § 1983. Such a clause would not be valid in any case. *See 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 265 (2009) (recognizing that federal antidiscrimination rights cannot be prospectively waived). And as AMC explained, § 1983 actions serve a different purpose than condemnation proceedings, and the damages available in a § 1983 action are distinct from any condemnation award that might be available. So the waiver or assignment in § 15.2 cannot reasonably be interpreted to preclude AMC's § 1983 claim or the damages available under § 1983.

Further, § 15.2 specifically reserves to AMC the right to seek compensation from the condemnor for any damages that might be awardable to AMC in its "own right," such as damage to its business and relocation costs. Woodsonia argues that AMC cannot recover lost profits or business reduction damages as a matter of law, referring to the limitation on damages available in a state-law inverse condemnation claim. But as noted above, AMC is not so limited in the compensatory or punitive damages it may seek against Woodsonia under § 1983 for its involvement in the unlawful taking of AMC's leasehold interest.

Similarly, Woodsonia contends that AMC is not entitled to relocation costs because it never informed anybody that it had incurred relocation costs for which it would be seeking reimbursement. Woodsonia cites no authority for this proposition. AMC pleaded in its Complaint that it was seeking damages for relocation expenses, amongst other direct and consequential damages flowing from the unlawful taking of AMC's leasehold interest. This is a more than adequate request under federal pleading rules to entitle AMC to seek relief for damages naturally associated with its unlawful takings claim. *See Tipton v. Mill Creek Gravel, Inc.*, 373 F.3d 913, 922 n.10 (8th Cir. 2004) (citing *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219 (7th Cir. 1995)). AMC is entitled to seek its relocation damages here.

17

Next, Woodsonia conclusorily asserts that § 15.3 of the Lease "provides that AMC has no claim whatsoever for the unexpired portion of the Lease," but it is again incorrect. First, this provision only limits AMC's ability to seek that compensation from the landlord, not any other parties. Second, when construing §§ 15.2 and 15.3 together, it is evident that § 15.3 simply takes the limitations of § 15.2, which apply when a condemnation or other proceeding for taking the Demised Premises actually occurs, and applies those same limitations when the landlord preemptively conveys the Demised Premises under threat of condemnation. As with § 15.2, § 15.3 relates to an assignment or waiver of compensation AMC might have sought as part of a condemnation proceeding and has absolutely nothing to do with AMC's right to bring a § 1983 claim or to seek damages under § 1983.

Finally, Woodsonia cites to § 29.7 of the Lease, which states in part:

29.7    Limitation of Landlord Liability. . . . In no event shall Tenant be entitled to seek damages for Landlord's breach of this Lease in an amount greater than the out-of-pocket cash expenditures resulting from such breach, and Tenant shall not be entitled to nor shall Tenant seek any damages for lost profits, consequential or punitive damages.

AMC does not dispute that § 29.7 of the Lease may limit its ability to seek lost profits, consequential damages, and punitive damages from Woodsonia for its breach-of-contract claim. But this limitation expressly applies only to damages for "breach of this Lease." By its plain language, it does not apply to AMC's wrongful eviction claim. And it certainly does not apply to the damages AMC may seek from Woodsonia under § 1983 for Woodsonia's involvement in the unlawful taking of AMC's leasehold interest.

For the above reasons, Scaglione's arguments that AMC has no standing to bring its § 1983 claim are without merit.

18

**C.     AMC has Stated Facially Plausible Claims Against Woodsonia.**

Woodsonia next contends that AMC has failed to state facially plausible breach-of-contract, wrongful eviction, and § 1983 claims against Woodsonia. These arguments are without merit and can be readily rejected.

Woodsonia's basic premise is that it had the right under the Lease to convey AMC's leasehold interest to the CRA and then terminate the Lease, and so AMC's factual allegations are insufficient to support its claims. As with Woodsonia's standing argument, it gets things completely backwards. Just because Woodsonia disagrees with the merits of AMC's claims does not mean AMC has failed to sufficiently plead those claims. The entire point of AMC's Complaint is that Woodsonia's actions were *not* authorized under the Lease but instead were *invalid* and *ineffective* to terminate the Lease. So, this invalid and ineffective termination of the Lease constituted a breach of the Lease, and Woodsonia's subsequent eviction of AMC from the Demised Premises was therefore wrongful. The factual allegations in AMC's Complaint more than plausibly support a conclusion that Woodsonia can be held liable for breach-of-contract and wrongful eviction.

As for AMC's § 1983 claim against Woodsonia, AMC is required to plead sufficient facts that, when taken as true, plausibly support that (1) Woodsonia's challenged conduct deprived AMC of its constitutional rights and (2) Woodsonia's conduct was performed under color of state law. *See Alexander v. Peffer*, 993 F.2d 1348, 1349 (8th Cir. 1993). A private party acts under color of state law when it is a willful participant in joint activity with the state or its agents. *Gibson v. Regions Fin. Corp.*, 557 F.3d 842, 846 (8th Cir. 2009). Woodsonia argues that AMC has failed to sufficiently allege an unconstitutional taking because Woodsonia was acting within its contractual rights when it conveyed AMC's leasehold interest to the CRA and agreed with the CRA to

19

terminate the Lease. But that is the conclusion Woodsonia wants this Court to reach, not the fact that AMC must overcome to plausibly allege a constitutional violation. Once again, the facts that AMC has alleged in its Complaint more than plausibly support that AMC has suffered an unlawful taking of its leasehold interest in violation of its Fifth and Fourteenth Amendment rights.

This leaves the question of whether AMC has alleged facts that plausibly support the conclusion that Woodsonia participated in a joint action with the government that deprived AMC of its constitutional rights. It has. The facts in AMC's Complaint, taken as true, show that after Woodsonia was unsuccessful in attempt to buy out the Lease, Woodsonia and Scaglione persuaded the CRA to retain Scaglione as well. Now armed with government authority to threaten AMC's leasehold interest, Scaglione did just that and sent his March 31 letter to AMC on behalf of the CRA. Then that same day, without even waiting for AMC to respond to the CRA's supposed "good faith" offer in Scaglione's letter, Woodsonia and the CRA (both represented by Scaglione) entered their purported transfer and termination agreement under the guise that this purported threat had triggered the Lease's eminent domain provisions and allowed them to take AMC's leasehold interest. Woodsonia then proceeded to evict AMC. These facts more than plausibly support the conclusion that Woodsonia jointly acted with Scaglione and the CRA to unlawfully take AMC's leasehold interest.

For these reasons, AMC has adequately pleaded facts that support a plausible inference of Woodsonia's liability on AMC's breach-of-contract, wrongful eviction, and § 1983 claims. This Court should reject Woodsonia's arguments otherwise.

**D.     AMC has Adequately Pleaded its Claim for Damages.**

Finally, Woodsonia briefly contends that AMC did not adequately plead its claim for compensatory or punitive damages. It is again incorrect.

20

First, none of the damages that AMC has alleged are special damages that need to be specifically stated under Fed. R. Civ. P. 9(g). "'Special damages' are those types of damages that, although resulting from the wrongful act, are not usually associated with the claim in question and must be plead in order to avoid unfair surprise to the defendant." *Tipton*, 373 F.3d at 922 n.10. The compensatory damages AMC seeks are "the lost value of its leasehold interest; lost profits; relocation and rebuilding expenses, and other direct and consequential damages flowing from Defendants' misconduct." *See* Complaint, ¶¶ 2, 83. These are damage that naturally and foreseeably flow from AMC's claim that Woodsonia breached the Lease, wrongfully evicted AMC, and participated in an unlawful taking of AMC's leasehold interest. *See McGhee v. State Farm Fire and Cas. Co.*, 771 F. Supp. 3d 1084, 1091 (E.D. Mo. 2025). AMC is not required to plead such damages with any more specificity. Moreover, as noted above, whatever damages AMC may have waived under § 29.7 of the Lease related to Woodsonia's breach of the Lease, that waiver does not apply to AMC's wrongful eviction claim, and certainly not to AMC's § 1983 claim.

As to punitive damages, those are not special damages that must be specifically stated, either. *See Figgins v. Advance Am. Cash Advance Centers of Mich., Inc.*, 482 F. Supp. 2d 861, 868–70 (E.D. Mich. 2007). Punitive damages are available in § 1983 actions "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith*, 461 U.S. at 56. As discussed above, the allegations in AMC's Complaint are more than sufficient to support an inference that Woodsonia acted, at a minimum, with reckless or callous indifference to AMC's federally protected rights. So, AMC has pleaded a sufficient basis to request punitive damages against Woodsonia.

## IV.     CONCLUSION

For the above reasons, AMC respectfully requests that this Court deny Woodsonia's motion to compel arbitration and its alternative motion to dismiss. Alternatively, if this Court finds AMC's Complaint against Woodsonia somehow deficient, AMC respectfully requests this Court grant it leave to amend under Fed. R. Civ. P. 15(a)(2) in the interest of justice to correct any deficiencies.

Respectfully submitted,

**LEWIS RICE LLC**

By: /s/ Thomas R. Larson
Thomas R. Larson, Mo. #26114
Ashlyn Buck Lewis, Mo. #65501
1010 Walnut, Suite 500
Kansas City, Missouri 64106
Tel:   (816) 421-2500
Fax:  (816) 472-2500
trlarson@lewisricekc.com
alewis@lewisricekc.com

*and*

**DVORAK LAW GROUP, LLC**

Ryan M. Kunhart, Neb. #24692
9500 W Dodge Road, Suite 100
Omaha, Nebraska 68114
Tel:   (402) 934-4770
Fax:  (402) 933-9630
rkunhart@ddlawgroup.com

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of NECivR 7.1(d) because it contains 7,100 words, which includes all text, including the caption, headings, footnotes, and quotations, as determined by Microsoft Word 2016, and because no generative artificial intelligence program was used in drafting this brief.

/s/ Ashlyn Lewis
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

/s/ Ashlyn Lewis
*Attorney for Plaintiff*