IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

| | |
|---|---|
| AMERICAN MULTI-CINEMA, INC., <br><br> Plaintiff, <br><br> v. <br><br> WOODSONIA HWY 281, LLC, et al., <br><br> Defendants. | Case No. 8:25-cv-292 |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS CITY OF GRAND ISLAND, NEBRASKA, AND COMMUNITY REDEVELOPMENT AUTHORITY OF THE CITY OF GRAND ISLAND, NEBRASKA'S MOTION TO DISMISS OR STAY**

Plaintiff American Multi-Cinema, Inc. ("AMC") respectfully offers the following brief in opposition to Defendants City of Grand Island, Nebraska ("City") and Community Redevelopment Authority of the City of Grand Island, Nebraska ("CRA")'s joint Motion to Dismiss or Stay.

**I.     INTRODUCTION**

The facts of this case are laid out in reasonable detail in AMC's Complaint. But at its core, this case is quite simple. AMC was a longtime tenant at the Conestoga Mall in Grand Island, Nebraska ("Shopping Center"), where it operated a movie theater in its leased premises ("Demised Premises") under a lease ("Lease") with the owner of the Shopping Center. Defendant Woodsonia Hwy 281, LLC ("Woodsonia") then purchased the Shopping Center from the previous owner and sought to redevelop it under a redevelopment plan and contract with the CRA and the City.

As part of this redevelopment, Woodsonia and the CRA sought to terminate the Lease and remove AMC from the Demised Premises. But they did not do this using condemnation proceedings. Instead, Woodsonia and the CRA used a plan concocted by their mutual attorney,

1

Defendant Gregory C. Scaglione ("Scaglione"), which went as follows:

- The CRA, acting through Scaglione, sent a letter to AMC purporting to threaten condemnation of AMC's leasehold interest in the Demised Premises;

- That very same day—and without making any payment to AMC—Woodsonia purported to convey AMC's leasehold interest to the CRA;

- Again that same day—and without making any payment to AMC—Woodsonia and the CRA purported to immediately terminate the Lease;

- Woodsonia obtained an eviction order from the County Court of Hall County, Nebraska, which did not have jurisdiction over the proceedings; and

- The County Court ordered execution on the eviction, which was carried out by the Hall County Sheriff's Office.

As shown by these facts, Woodsonia and the CRA worked with their mutual attorney, Scaglione, to use state action to take AMC's leasehold interest and evict AMC from its Demised Premises, without paying compensation to AMC. AMC has plausibly pleaded its claim for relief against the CRA and the City under 42 U.S.C. § 1983. The CRA and the City's joint motion to dismiss should be denied.

## II.   LEGAL STANDARDS

The CRA and the City seek dismissal of AMC's § 1983 claim under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

To adequately state a claim under the Federal Rules, the pleader must make "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation modified). Detailed factual allegations are not required, but the pleader must provide more than labels and conclusions or a formulaic recitation

of the elements of a cause of action. *Id.* A complaint must allege enough facts to state a claim that is plausible on its face. *Id.* This facial plausibility requirement is met when the pleader asserts "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This is not akin to a probability requirement, but asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.*

Rule 12(b) "is not a procedure for resolving contests about the facts or the merits of a case." *Gallentine v. Housing Authority of City of Port Arthur, Tex.*, 919 F. Supp. 2d 787, 794 (E.D. Tex. 2012) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2d* § 1356, at 294 (1990)). Instead, a court deciding a motion to dismiss must take all well-pleaded factual allegations in the complaint as true, "even if it strikes a savvy judge that actual proof of the facts alleged is improbable and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. Legal conclusions can provide the framework of the complaint, but they are not entitled to the same deference, and must be supported by factual allegations. *Iqbal*, 556 U.S. at 679. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Id.*

### III.  THE COURT SHOULD DENY THE CRA AND THE CITY'S JOINT MOTION TO DISMISS.

To state a facially plausible § 1983 claim against the CRA and the City, AMC is required to plead sufficient facts that, when taken as true, plausibly support that (1) the CRA and/or the City's challenged conduct deprived AMC of its constitutional rights and (2) the CRA and/or the

City's conduct was performed under color of state law. *See Alexander v. Peffer*, 993 F.2d 1348, 1349 (8th Cir. 1993).

### A.     AMC has Alleged Facts that Plausibly Show it Suffered an Unconstitutional Taking of its Leasehold Interest.

The CRA and the City first argue that AMC has failed to allege sufficient facts showing it suffered an unconstitutional taking of its leasehold interest, because the physical ouster of AMC from the Demised Premises was caused by the conduct of a private party (Woodsonia) and not by a state actor (the CRA and/or the City). This argument has no merit.

The takings clause of the Fifth Amendment, as applied to the states through the Fourteenth Amendment, prohibits the government from taking private property for public use without just compensation. *See*, *e.g.*, *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 707 (2010). Although "the classic taking is a transfer of property to the State or to another private party by eminent domain, the Takings Clause applies to other state actions that achieve the same thing." *Id.* at 713. When determining whether a taking has occurred, it is the state action that matters; "the particular state *actor* is irrelevant." *Id.* at 715 (emphasis in original); *see also Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007) (recognizing that a private party may sometimes be characterized as a state actor).

State action occurs when the challenged conduct is "fairly attributable" to the state. *Lindke v. Freed*, 601 U.S. 187, 198 (2024). "An act is not attributable to the State unless it is traceable to the State's power or authority." *Id.*

> This rule runs through our cases. *Griffin* [*v. Maryland*] stresses that the security guard was "possessed of state authority" and "purport[ed] to act under that authority." … *West v. Akins* states that the "traditional definition" of state action "requires that the defendant … have exercised power 'possessed by virtue of state

> law and made possible only because the wrongdoer is clothed with the authority of state law.'" … *Lugar* [*v. Edmonson Oil Co.*] emphasizes that state action exists only when "the claimed deprivation has resulted from the exercise of a right or privilege having its source in state authority."

*Id.* (citation modified).

Here, as alleged in AMC's Complaint, Woodsonia purported to terminate its Lease with AMC under the eminent domain provisions of Article XV, which would apply "[i]f the Demised Premises, or a substantial part thereof, … be taken in eminent domain, or conveyed under threat of condemnation …." These provisions could only be triggered if a governmental authority with eminent domain power—*i.e.*, the CRA and/or the City—either actually carried out a condemnation proceeding, or at the very least "threatened" one. So, the CRA (through its attorney Scaglione, who was also representing Woodsonia) sent AMC a letter purporting to threaten condemnation of AMC's leasehold interest. That very same day, the CRA and Woodsonia entered a written agreement in which Woodsonia purported to transfer AMC's leasehold interest to the CRA, and the CRA and Woodsonia then purportedly agreed to terminate the Lease. Four days later, Woodsonia initiated a formal eviction action against AMC, and AMC was soon permanently excluded from the Demised Premises.

These allegations, taken as true, more than plausibly support the conclusion that there was state action resulting in an unlawful taking here. The right of eminent domain is an "attribute of sovereignty" that "appertains to every independent government." *Mississippi & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 406 (1878). So when the CRA purported to threaten AMC's leasehold interest, which supposedly triggered the eminent domain provisions in Article XV of the Lease, and then purported to accept the conveyance of AMC's leasehold interest from Woodsonia

and agree to terminate the Lease, it was doing so in the exercise of power that it "possessed by virtue of state law and [was] made possible only because [it was] clothed with the authority of state law." *Lindke*, 601 U.S. at 198 (quoting *West*, 487 U.S. 42 (1988)).

Further, this Court should reject the CRA and the City's suggestion that it was only Woodsonia's actions *after* the Lease was purportedly terminated—*i.e.*, the eviction action and physical ouster of AMC from the Demised Premises—that count. As the United States Supreme Court has made clear, once a state actor "declares that what was once an established right of private property no longer exists, it has taken that property, no less than if the State has physically appropriated it …. A State, by *ipse dixit*, may not transform private property into public property without compensation." *Stop the Beach Renourishment*, 560 U.S. at 715 (citation modified). AMC's allegations, taken as true, plausibly show that an unlawful taking occurred the moment the CRA accepted Woodsonia's purported conveyance of AMC's leasehold interest. *See also Knick v. Township of Scott, Pa.*, 588 U.S. 180, 189 ("If a local government takes private property without paying for it, that government has violated the Fifth Amendment—just as the Takings Clause says—without regard to subsequent state court proceedings.").

In any case, AMC's allegations plausibly support the conclusion that the eviction action and AMC's subsequent physical ouster from the Demised Premises were reasonably foreseeable consequences of the CRA's purported acceptance of AMC's leasehold interest and supposed termination of the Lease. *See Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986) (noting that § 1983 "should be read against background of tort liability that makes a man responsible for the natural consequences of his actions"). So, the CRA and the City's reliance on *Katzin v. United States*, in

which the challenged government conduct (sending a fax) did *not* result in any physical taking, is misplaced. *See* 908 F.3d 1350, 1361–63 (Fed. Cir. 2018).

For these reasons, AMC has alleged facts that plausibly show it suffered an unconstitutional taking of its leasehold interest. This Court should reject the CRA and the City's arguments otherwise.

> **B.     AMC is Entitled to Seek Damages Under § 1983 for the CRA's and/or the CRA's Wrongful Conduct in the Unconstitutional Taking of AMC's Leasehold Interest.**

Second, the CRA and the City contend that even if AMC has plausibly alleged an unconstitutional taking, AMC is not entitled to any compensation because the Lease was validly terminated and/or AMC waived or assigned its right to such compensation under the terms of the Lease. This argument likewise lacks merit.

As an initial matter, AMC notes that the CRA and the City are putting the cart before the horse. They contend that AMC has no right to compensation because the Lease was validly terminated under the eminent domain provisions of Article XV of the Lease, but it is the validity of this purported termination that is the very heart of this dispute. The CRA and the City are asking this Court to adjudicate the merits of AMC's § 1983 claim at the pleading stage, find that the Lease was validly terminated, and then take that conclusion and use it to prevent AMC from bringing its claim in the first place. This Court must reject such unsound logic.

But even taking the CRA and the City's argument at face value, it still holds no water. AMC's § 1983 claim is not merely repurposed condemnation or inverse condemnation claim, and AMC's potential damages are not limited to the amount of the award it might receive in such a proceeding. So, whether AMC would have been entitled to a condemnation award in an *in rem*

condemnation or inverse condemnation proceeding is neither here nor there—AMC seeks damages under § 1983 because its own constitutional rights were violated when its leasehold interest was wrongfully taken by the Defendants. *United States v. Petty Motor Co.*, 327 U.S. 372 (1946), which deals with a tenant's measure of just compensation in an actual condemnation proceeding, has no applicability here.

Section 1983 is derived from the § 1 of the Civil Rights Act of 1871. *Carey v. Piphus*, 435 U.S. 247, 253 (1978). It creates "a species of tort liability" in favor of persons who are deprived of rights, privileges, or immunities secured to them by the United States Constitution. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305–06 (1986). Section 1983 "was intended not only to override discriminatory or otherwise unconstitutional state laws, and to provide a remedy for violations of civil rights where state law was inadequate, but also to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice." *Zinermon v. Burch*, 494 U.S. 113, 124 (1990) (citation modified); *see also Monroe v. Pape*, 365 U.S. 167, 180 (1961), *overruled on other grounds by Monnell v. Dep't Soc. Servs. of City of New York*, 436 U.S. 658 (1978) (noting that the legislative history of § 1983 "made abundantly clear that one reason [it] was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced").

The remedy for a § 1983 violation is "supplementary to [any] state remedy, and the latter need not be first sought … before the federal one is invoked." *Monroe*, 365 U.S. at 183. So, in a § 1983 action based on an unlawful Fifth Amendment taking, the property owner may bring that action as soon as the government takes his or her property without paying for it, because the moment the constitutional violation occurs. *Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180,

185, 202 (2019). The existence of a state-law action for post-taking compensation is an additional remedy potentially available to the property owner, but it is not a necessary prerequisite for bringing a § 1983 action, nor does it undo the constitutional violation that has already happened. *Id.* at 201–02.

Because § 1983 actions sound in tort, the United States Supreme Court has looked to the common law of torts, as well as the purposes and policies underlying the statute, to determine what damages are available for a § 1983 violation. *Smith v. Wade*, 461 U.S. 30, 34 (1983). Ordinarily, the damages available in a common-law tort case (and thus a § 1983 action) are compensatory:

> [D]amages in tort cases are designed to provide compensation for the injury caused to plaintiff by defendant's breach of duty. To that end, compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation, personal humiliation, and mental anguish and suffering. Deterrence is also an important purpose of this system, but it operates through the mechanism of damages that are compensatory—damages grounded in determinations of plaintiffs' actual losses. Congress adopted this common-law system of recovery when it established liability for constitutional torts. Consequently, the basic purpose of § 1983 damages is to compensate persons for injuries that are caused by the deprivation of constitutional rights.

*Stachura*, 477 U.S. at 306–07 (citation modified). Moreover, as with common-law torts, punitive damages are available in § 1983 actions "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith*, 461 U.S. at 56.

It follows from the above that a § 1983 claim for damages based on an unlawful taking, which focuses on compensating an injured person for all losses caused by the violation of his or her constitutional rights, serves a different purpose than a condemnation or inverse condemnation proceeding, which focuses on compensating a property owner for the property interest taken. *See*

9

*Home v. Dep't of Agriculture*, 576 U.S. 350, 368–69 (2015). It further follows that the damages available for a § 1983 violation based on an unconstitutional taking are distinct from, and in addition to, any compensation that might be available in a condemnation or inverse condemnation proceeding. *See New England Estates, LLC v. Town of Branford*, 988 A.2d 229, 249–52 (Conn. 2010) (rejecting claim that damages available in a § 1983 action based on a wrongful taking were limited to those available as part of just compensation for the property interest taken); *see also Estate of Guled by and through Abdi v. City of Minneapolis*, 869 F.3d 680, 684 (8th Cir. 2017) (noting that "a limitation on the type of damages a party may receive in a state law action does not limit … the damages available under § 1983").

For these reasons, AMC is entitled to seek damages under § 1983 for the City's and/or the CRA's wrongful conduct in the unlawful taking of AMC's leasehold interest. This Court should reject their arguments otherwise.

        **C.**        **AMC has Stated a Facially Plausible § 1983 Claim Against the City.**

Finally, the City argues that it should be dismissed from this case because it cannot be held liable under § 1983 for the acts of its agent (the CRA), and AMC's allegations show that the City's direct role was limited to approving the redevelopment plan and redevelopment contract for Woodsonia's redevelopment of the Shopping Center

The City understates the facts that AMC has alleged. The allegations in AMC's Complaint, taken as true, show that the City did not merely approve the redevelopment contract that Woodsonia was acting under, but was actually a party to the contract (along with the CRA and Woodsonia).

Moreover, though the City may not be held liable under § 1983 solely based on the acts of

its agent (the CRA) under the doctrine of respondeat superior, that is not the basis on which AMC has alleged the City may be liable. *See Monell v. Dep't of Soc. Servs. of City of New York*, 426 U.S. 658, 691–92 (1978). Rather, AMC has alleged that the City may be liable for its participation in a conspiracy with the CRA, Woodsonia, and Scaglione to deprive AMC of its constitutional rights. Although the precise extent of the City's potential involvement in the conspiracy is not known at this time, it is at least plausible to conclude from AMC's allegations that the City was in communication with its agent (the CRA) and the other parties to the redevelopment contract (the CRA and Woodsonia), and knew about and/or participated in the scheme to unlawfully take AMC's leasehold interest without condemnation proceedings and without paying just compensation. AMC need not allege that the City, itself, took any of the overt acts that led to the unlawful taking. *See Helmig v. Fowler*, 828 F.3d 755, 763 (8th Cir. 2016) (only one alleged co-conspirator need perform an overt act in furtherance of a conspiracy).

Conspiracies seldom take place in such a way that the communications advancing the conspiracy are available to the public or to the intended victim of the conspiracy (in this case, AMC). AMC's Complaint plausibly alleges that the City is potentially liable as a co-conspirator based on its relationships with the CRA and with Woodsonia. It is possible that the City knew nothing about the conspiracy; that it knew about the conspiracy but did nothing to stop it; or that it actively supported or participated in the conspiracy with Woodsonia, Scaglione, and the CRA to unlawfully take AMC's leasehold interest. Depending on what discovery shows took place behind the scenes, AMC may dismiss the City, or it may continue to pursue recovery against the City. But because AMC has alleged a plausible factual basis for concluding that the City participated in this conspiracy, it would be improper for the Court to dismiss the City at this early stage of litigation.

For these reasons, AMC has stated a facially plausible § 1983 claim against the City. This Court should reject the City's arguments otherwise.

## IV. CONCLUSION

For the above reasons, AMC respectfully requests that this Court deny the CRA and the City's joint motion to dismiss or stay. Alternatively, if this Court finds AMC's Complaint against the City and/or the CRA are somehow deficient, AMC respectfully requests this Court grant it leave to amend under Fed. R. Civ. P. 15(a)(2) in the interest of justice to correct any deficiencies.

Respectfully submitted,

**LEWIS RICE LLC**

By: /s/ Thomas R. Larson
Thomas R. Larson, Mo. #26114
Ashlyn Buck Lewis, Mo. #65501
1010 Walnut, Suite 500
Kansas City, Missouri 64106
Tel:  (816) 421-2500
Fax:  (816) 472-2500
trlarson@lewisrickc.com
alewis@lewisrickc.com

*and*

**DVORAK LAW GROUP, LLC**

Ryan M. Kunhart, Neb. #24692
9500 W Dodge Road, Suite 100
Omaha, Nebraska 68114
Tel:  (402) 934-4770
Fax:  (402) 933-9630
rkunhart@ddlawgroup.com

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of NECivR 7.1(d) because it contains 3,684 words, which includes all text, including the caption, headings, footnotes, and quotations, as determined by Microsoft Word 2016, and because no generative artificial intelligence program was used in drafting this brief.

/s/ Ashlyn Lewis
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

/s/ Ashlyn Lewis
*Attorney for Plaintiff*